```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF IOWA
 2

 3   UNITED STATES OF AMERICA,   )
                                 )
 4              Plaintiff,       )
                                 )
 5      VS.                      )   20-CR-1012
                                 )
 6   DOUGLAS BUTTIKOFER, JR.,    )
                                 )
 7              Defendant.       )

 8

 9                   APPEARANCES:

10   ATTORNEY ELIZABETH DUPUICH, U.S. Attorney's Office,
     111 Seventh Avenue S.E., Box 1, Cedar Rapids, Iowa 52401,
11   appeared on behalf of the United States.

12   ATTORNEY MARK EISENBERG, Eisenberg Law Offices,
     308 E. Washington Avenue, PO Box 1069, Madison,
13   Wisconsin 53701-1069, appeared on behalf of the
     Defendant.

14

15                   SENTENCING HEARING,

16            HELD BEFORE THE HON. C.J. WILLIAMS,

17   on the 20th day of August, 2021, at 111 Seventh Avenue

18   S.E., Cedar Rapids, Iowa, commencing at 8:58 a.m., and

19   reported by Patrice A. Murray, Certified Shorthand

20   Reporter, using machine shorthand.

21   Transcript Ordered:  9/24/21
     Transcript Completed:  10/27/21
22

23              Patrice A. Murray, CSR, RMR, FCRR
                        Court Reporter
24                       PO Box 10541
                    Cedar Rapids, Iowa 52410
25               PAMurrayReporting@gmail.com
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*

**INDEX**

**WITNESS**                                                        **PAGE**

CHARLES GREGORY
        DIRECT EXAMINATION - BY MS. DUPUICH            16
        CROSS-EXAMINATION - BY MR. EISENBERG           26
JOSHUA HEER
        DIRECT EXAMINATION - BY MS. DUPUICH            36
        CROSS-EXAMINATION - BY MR. EISENBERG           50


                              * * * * *

Exhibit 1 through 13                                   10
Exhibits A through U                                   10


                              * * * * *

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 2 of 108

1     (The following proceedings were held in open court.)

2          THE COURT:  The matter now before the Court is

3     United States of America versus Douglas John Buttikofer,

4     Jr., Criminal Case Number 20-CR-1012.  This matter comes

5     on for a sentencing hearing.  The United States is

6     represented by Assistant United States Attorney Elizabeth

7     Dupuich.  The defendant is personally present and

8     represented by Attorney Mark Eisenberg.  Participating by

9     telephone is United States Probation Officer Pat Korth.

10    He is the author of the presentence investigation report

11    filed at document number 128 in the court's file.

12         On February 2, 2021, the defendant pled guilty to

13    one count of a three-count superseding indictment.  He

14    pled guilty to Count 3 which charged him with accessing

15    child pornography.  This was in violation of Title 18

16    United States Code Sections 2252A(a)(5)(B) and

17    2252A(b)(2).

18         By statute, that crime is punishable by up to

19    20 years in prison without the possibility of parole.

20    After the defendant has served his prison sentence, the

21    Court will place him on a term of supervised release of

22    at least 5 years and it can be up to life on supervised

23    release.  Probation is an option under the statute; and

24    were the Court to impose probation, it would be for a

25    term of 1 to 5 years.  The Court can impose a fine of up

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 3 of 108

1  to $250,000.  The Court must impose a mandatory special

2  assessment of $100.  Under the JVTA, I also have to

3  impose a mandatory $5,000 special assessment unless I

4  find the defendant to be indigent.  And under the AVAA,

5  the -- I think it's the Amy, Vicky, and Andy Child

6  Pornography Assistance Act, I can also impose another

7  special assessment of up to $17,000.

8      Ms. Dupuich, on behalf of the United States, have

9  you had a full and fair opportunity to review this

10  presentence report?

11          MS. DUPUICH:  Yes, Your Honor.

12          THE COURT:  I noted that the government had

13  some objections.  I saw objections at paragraphs 59 and

14  60 having to do with defendant's mental health.  And then

15  at paragraph 73 having to do with ability to pay a fine.

16  Are those the only objections the government has to the

17  presentence report, including the calculation of the

18  guidelines?

19          MS. DUPUICH:  Yes, Your Honor.

20          THE COURT:  Tell me about the ability to pay a

21  fine at this point.  Are you contesting the defendant's

22  ability to pay a fine at this stage?  Do you intend to

23  contest that at this point?

24          MS. DUPUICH:  No, Your Honor.

25          THE COURT:  All right.  This is a victim case.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 4 of 108

1 Do you have any victims who wish to address this Court as

2 part of this hearing?

3          MS. DUPUICH:  No, Your Honor.

4          THE COURT:  Do you intend to present any

5 witnesses during this hearing?

6          MS. DUPUICH:  Yes, I do.

7          THE COURT:  All right.  On what issues, just so

8 I'm familiar?

9          MS. DUPUICH:  Thank you, Your Honor.  With

10 respect to the paragraph reflecting the defendant's

11 mental health, we do have a witness from the correctional

12 center, an inmate named Charles Gregory, with respect to

13 some statements made by the defendant related to his

14 mental health.  And then we have a witness from the

15 Illinois State Police here to testify briefly.

16          THE COURT:  About the Illinois --

17          MS. DUPUICH:  Correct.

18          THE COURT:  Understood.  All right.  Thank you.

19     Mr. Eisenberg, first of all, have you and your

20 client had a full and fair opportunity to review this

21 report?

22          MR. EISENBERG:  Yes, sir.

23          THE COURT:  I understand -- when I went through

24 it, I saw the defendant had some objections as well.  I

25 saw objections at paragraphs 6, 9, 13, 14, 15, 21, and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 5 of 108

```
 1  24, having to do with some details of the offense
 2  conduct.  There was an objection at paragraph 47 having
 3  to do with pending charges; at paragraph 48 having to do
 4  with other arrests; and then at paragraph 93 regarding
 5  the defendant's ability to pay the JVTA special
 6  assessment.  Are those the only objections the defendant
 7  has to the presentence report?
 8          MR. EISENBERG:  They are, Your Honor.  And I
 9  would point out these might not necessarily be objections
10  but they might also be some explanation in the
11  presentence.
12          THE COURT:  And clarification.
13          MR. EISENBERG:  Yes, sir.
14          THE COURT:  And I understood them to be such.
15      Do you believe, other than the JVTA, that I need to
16  rule on any of your objections at this point?
17          MR. EISENBERG:  No, Your Honor, I don't.
18          THE COURT:  Very good.  Could you make a brief
19  record, Mr. Eisenberg, of how you went through this
20  report with your client?
21          MR. EISENBERG:  Sure.  The first one I did send
22  to him and we discussed it over the telephone.  Then on
23  the addendum, I sent him the addendum on June 2nd, and we
24  both read it.  We talked briefly about it last night, but
25  he will tell you he read it, and I read it, and we
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 6 of 108

```
 1   discussed it.

 2           THE COURT:  Very good.

 3      Mr. Buttikofer, first of all, do you feel like

 4   you've had sufficient time to go over this report with

 5   Mr. Eisenberg?

 6           THE DEFENDANT:  Yes, Your Honor.

 7           THE COURT:  And whenever you spoke with

 8   Mr. Eisenberg about this report, has he been able to

 9   answer any questions you've had about it?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Do you have any questions today

12   about this report?

13           THE DEFENDANT:  No, Your Honor.

14           THE COURT:  All right.  Let's begin this

15   hearing then by turning to the calculation of the

16   advisory guidelines as determined by the probation

17   office.  That calculation begins at page 10.  At

18   paragraph 27 the probation office has assessed the

19   defendant with a base offense level for this offense of

20   18.  This is under guideline section 2G2.2(a)(1).

21      At paragraph 28 the probation office has assessed

22   the defendant with a 2-level enhancement because the

23   offense involved material involving a prepubescent minor

24   or a minor who had not attained the age of 12 years.

25   This is under guideline section 2G2.2(b)(2).
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 7 of 108

1       At paragraph 29 the probation office has assessed
2  the defendant with a 2-level enhancement under guideline
3  section 2G2.2(b)(3)(F) because the defendant knowingly
4  engaged in distribution.
5       At paragraph 30, the probation office has assessed
6  the defendant with a 4-level enhancement under guideline
7  section 2G2.2(b)(4), because the material involved or
8  portrayed sadistic or masochistic conduct or sexual abuse
9  or exploitation of an infant or toddler.
10      At paragraph 31, the probation office has assessed
11 the defendant with a 2-level enhancement under guideline
12 section 2G2.2(b)(6), because the offense involved the use
13 of a computer or computer service for the possession,
14 transmission, or receipt of the material.
15      At paragraph 32, the probation office has assessed
16 the defendant with a 4-level enhancement under guideline
17 section 2G2.2(b)(7)(C) for the number of images.  In this
18 case, the number of images the probation office
19 determined to be 344.  This is -- falls in the range of
20 300 -- more than 300 but less than 600 images.  That
21 gives us an adjusted offense level of 32.
22      The defendant has pled guilty to this offense, and
23 so the probation office has awarded him with a 2-level
24 reduction for acceptance of responsibility.  This is
25 under guideline section 3E1.1(a).

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 8 of 108

1    Ms. Dupuich, as I recall, the defendant's plea in
2    this matter was late.  What is the government's position
3    about whether the defendant should receive an additional
4    1-level reduction for acceptance under guideline section
5    3E1.1(b)?
6            MS. DUPUICH:  We are not making that motion.
7    Thank you, Your Honor.
8            THE COURT:  Very good.  The Court cannot grant
9    that additional level without the government's motion,
10   and the government has not made that motion.  So that
11   leaves us with a total offense level of 30.
12       The defendant has some criminal history, which the
13   probation office has summarized and scored beginning at
14   paragraph 40, carrying over to paragraph 45.  The
15   defendant's prior convictions have not resulted in any
16   criminal history points however, so he remains in
17   criminal history category I.  So with a total offense
18   level of 30, criminal history category I, the advisory
19   guideline range of imprisonment here is 97 to 120 months.
20       In preparation for today's hearing, I have reviewed
21   in detail, of course, this presentence investigation
22   report.  I've also received additional materials from the
23   parties.  The defendant filed a sentencing memorandum at
24   document 130, and attached to that were Exhibits A
25   through U.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 9 of 108

1     Mr. Eisenberg, are you moving those exhibits into

2     evidence at this time?

3          MR. EISENBERG:  I would, Your Honor.  Thank

4     you.

5          THE COURT:  Any objection?

6          MS. DUPUICH:  No, Your Honor.

7          THE COURT:  A through U will be received.

8     (Whereupon, Exhibit A through U were received.)

9          THE COURT:  Then at document 140, the

10    government filed a sentencing memorandum and attached

11    Exhibits 1 through 13.  1 actually is a video interview

12    of the defendant, which I have reviewed and it was

13    provided to the Court in advance.

14     Ms. Dupuich, are you moving those into evidence?

15          MS. DUPUICH:  Yes, Your Honor, under seal

16    please.  Thank you.

17          THE COURT:  Any objection?

18          MR. EISENBERG:  No, Your Honor.

19          THE COURT:  Government Exhibits 1 through 13

20    will be received and under seal.

21     (Whereupon, Exhibits 1 through 13 were received.)

22          THE COURT:  Mr. Eisenberg, I neglected to ask

23    you when we were going through the preliminary matters,

24    are you intending to call any witnesses today?

25          MR. EISENBERG:  Depending on what the jailhouse

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 10 of 108

1  informant says, I may call his -- Mr. Buttikofer's mother

2  in rebuttal, but doubtful.

3          THE COURT:  Okay.  We'll see how that goes

4  then.  I appreciate that.

5      All right.  There are no contested guideline issues

6  here, but there are some contested issues with regard to

7  fine, the special assessments -- well, apparently not the

8  fine any longer, but the special assessments.  There are

9  also restitution issues here.  This is a mandatory

10  restitution.  The Court previously ruled on a motion to

11  schedule a hearing on restitution at a later date.

12  That's scheduled for November 16, 2021, and so my intent

13  today is to rule on everything except for restitution,

14  and we will handle the restitution at that November

15  hearing.

16      Ms. Dupuich, I'd like to talk about the special

17  assessments first and then my intent would be to move on

18  to the evidence we have, and then go from there.  What is

19  the government's position regarding the defendant's

20  indigent status and whether the Court should impose

21  either the JVTA special assessment or the AVAA special

22  assessment?

23          MS. DUPUICH:  Thank you, Your Honor.

24  Obviously, the restitution is going to be first and

25  foremost of importance to the government.  Secondly, with

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 11 of 108

1  respect to the JVTA, I think we would just simply rest on
2  the information provided in the brief and are aware that
3  it is a mandatory $5,000 unless the defendant is
4  indigent, and we understand that.
5       With respect to the AVAA, again, I think we're just
6  resting on the information in the brief.  We understand
7  that the fine is up to $17,000 based on the 3553(a)
8  factors, and would also leave that to the Court's
9  discretion.  Thank you, Your Honor.
10          THE COURT:  Thank you.
11       Mr. Eisenberg, do you want to be heard on these
12  matters?
13          MR. EISENBERG:  The only thing I would add,
14  Judge, is that the presentence writer has already
15  determined that he is indigent, and so I appreciate the
16  fact that you have the opportunity to impose these
17  sanctions, but since he's indigent, I don't think they're
18  warranted.
19          THE COURT:  Thank you.
20       The case law with regard to the JVTA is somewhat in
21  a state of flux, as I understand it.  There is at least
22  one case out of the Eighth Circuit, to my recollection,
23  that says the court, in assessing whether the defendant
24  should have to pay that JVTA special assessment, can take
25  into account not only his current assets but his future

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 12 of 108

1   earning capacity.  Certainly with regard to a fine, the

2   Court assesses a defendant's ability to pay a fine based

3   not just on his current financial status but his ability

4   to earn money in the future and pay a fine.  And the

5   Court also takes those -- that earning capacity into

6   account, as I understand it, with the AVAA special

7   assessment as well.

8        At paragraph -- starting at paragraph 70 in the

9   presentence report and carrying over to paragraph 73, the

10  probation office has summarized the defendant's financial

11  condition.  The defendant previous to his arrest in this

12  matter was earning a good income, around $80,000 on

13  average a year, at least in the last 5 years of his

14  employment.  He has been in custody for quite some time

15  now, has not been employed.  He initially had some

16  assets.  Those assets have been dissipated, largely for

17  his criminal defense in this case.  And the probation

18  office has determined right now that he has maybe $1,000

19  in assets, but liabilities exceeding $45,000, so the

20  defendant is indigent at this point.

21       The defendant has some ability to earn a living in

22  the future.  The nature of his employment previously was

23  as a driver for UPS.  This conviction is not such that it

24  would keep him from working at his profession, unlike,

25  you know, for example, if this was a controlled substance

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 13 of 108

```
1   offense and he was working as a medical provider, that he
2   may never be able to go back to that work.  Here, the
3   defendant could go back to driving and could earn some
4   income in the future.
5       Nevertheless, I find the defendant is indigent.  And
6   so, first of all, as far as the JVTA, I find that he does
7   not have the ability to pay that.  I find that although
8   he has some earning capacity in the future, that earning
9   capacity is going to be delayed for some period of time
10  while he is incarcerated, and it is going to be somewhat
11  up in the air on what his earning capacity is going to be
12  in the future.  So given those facts, I find the
13  defendant is unable to pay either a fine or the AVAA, and
14  I will not impose either one in this case.  The defendant
15  will be responsible for restitution.  I am taking that
16  into account as well in my assessment of the defendant's
17  ability to pay in the future.  Paying restitution will
18  take priority, as the government has noted.  And so to
19  the extent the defendant has any future earning capacity,
20  I want that earning capacity to be devoted toward paying
21  restitution to victims in this case as opposed to a fine
22  or the other special assessments.  So that will be my
23  ruling regarding the financial issues in this case.
24      Ms. Dupuich, before we move on to hear the
25  government's evidence, is there anything else you think
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 14 of 108

1    from a housekeeping standpoint we should take up at this

2    stage?

3                MS. DUPUICH:  No, thank you, Your Honor.

4                THE COURT:  Mr. Eisenberg?

5                MR. EISENBERG:  No, Your Honor.

6                THE COURT:  All right.  I should have noted as

7    well that there is a motion for a downward variance that

8    the defendant has made as part of his sentencing

9    memorandum, and we'll take that up at the appropriate

10   time as well.

11       All right.  Ms. Dupuich, I'm happy to hear from your

12   witnesses, so you may call your first witness.

13               MS. DUPUICH:  Thank you, Your Honor.  The

14   government calls Charles Gregory.

15               THE COURT:  Is he in custody?

16               MS. DUPUICH:  Yes.

17               THE COURT:  Very good.

18               MS. DUPUICH:  And I would note that the other

19   witness from Illinois is also present in the courtroom,

20   just to let defense know in case there's any objection to

21   that witness remaining.

22               THE COURT:  Mr. Eisenberg?

23               MR. EISENBERG:  No problem.

24               THE COURT:  All right.  Very good.  He may

25   remain.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 15 of 108

1       Good morning, sir.  If you walk over here by this

2   chair, I'm going to have you raise your right hand as

3   best you can.  I'll place you under oath.

4                       CHARLES GREGORY,

5   called as a witness, being first duly sworn or affirmed,

6   was examined and testified as follows:

7               THE COURT:  All right.  The marshal will help

8   you move that chair out and take a seat.  And I'd like

9   you to scoot up so you are right in front of that

10  microphone.  And when you are comfortable, I'd like you

11  to state your name and spell your name for the court

12  reporter, please.

13              THE WITNESS:  Okay.  Charles Robert Gregory

14  III.  C-H-A-R-L-E-S; Robert, R-O-B-E-R-T; Gregory,

15  G-R-E-G-O-R-Y, III.

16              THE COURT:  Thank you.

17      Ms. Dupuich, you may proceed.

18                    DIRECT EXAMINATION

19      BY MS. DUPUICH:

20  Q.   In what correctional facility are you currently

21  living?

22  A.   Iowa County Jail.

23  Q.   Was there a period of time where you were housed in

24  the Linn County Correctional Center?

25  A.   Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 16 of 108

1  Q.   Was that from approximately November of 2020 through

2  January of 2021?

3  A.   Yes.

4  Q.   And at that point when you were housed in the Linn

5  County Correctional Center, did you have some contact

6  with another inmate named Doug Buttikofer, who is

7  currently seated in this courtroom?

8  A.   Yes.

9  Q.   What type of contact did you have with him over that

10 period?  Was it a situation where you were speaking to

11 him every day or occasionally?  Can you describe it?

12 A.   Yes.  Well, we lived in -- we were housed in like a

13 dorm type of facility.  And initially, upon my coming to

14 that dorm, I was in the bunk right above him, so we

15 talked every day.

16 Q.   So are you saying you were actually in the same sort

17 of cell area, where you were sleeping?

18 A.   Yes, it's like a dormitory, and I was in -- it's

19 like bunkbeds.  He was in the bottom bunk.  I was in the

20 top bunk.  But it's a dormitory so it's open, so you see

21 each other all day every day.

22 Q.   And was that throughout the entire period that you

23 were there with the defendant from November of 2020

24 through January of 2021?

25 A.   Yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 17 of 108

```
1   Q.   When you were housed with the defendant, did you
2   have an opportunity to speak to him regarding the
3   criminal charges he was facing?
4   A.   Yes.
5   Q.   What information was he able to share with you with
6   respect to the criminal charges he was facing?
7   A.   He told me -- we referred to them as charge A,
8   charge B, and charge C.  Charge A and charge B were
9   receiving -- one was receiving child pornography, one was
10  distributing it, and charge C was, we referred to it, was
11  possessing of child pornography.  Charge A and charge B
12  he said had a 5-year mandatory minimum, and charge C had
13  no 5-year mandatory minimum.  And he didn't want to
14  take -- he was trying to -- he was hoping to only go to
15  trial or receive child -- charge C, which had no 5-year
16  mandatory minimum so that he maybe could, I don't know,
17  get a slap on the wrist.
18  Q.   So you are indicating that he -- your understanding
19  was that he was facing a charge of possessing child
20  pornography which did not have a 5-year mandatory
21  minimum?
22  A.   Yes.
23  Q.   And that is the charge that he wanted to plead to?
24  A.   That's the one that he wanted.
25  Q.   At some point did he share some information with you
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 18 of 108

1  with respect to an expert witness he had hired in his

2  case?

3  A.    Yes.  He said that during the motion hearing, that

4  his attorney had got -- it was a female that was an

5  expert witness, and that she was testifying as far as him

6  having some type of autism, because he was going with

7  some type of autism defense, and that when the prosecutor

8  had cross-examined her, that he referred -- said she,

9  quote, unquote, cracked under pressure, and that she was

10 suffering some type of disability, whether it be autism

11 or some type of anxiety herself, and that she didn't want

12 to proceed.  Also, that the prosecutor had pointed out

13 the fact that she wasn't licensed to practice in Iowa.

14 So since she didn't want to proceed as far as, like,

15 being a material witness in this case, she wanted to give

16 him a refund or a partial refund, and he said that he was

17 going to take that and apply it towards a new

18 psychologist to go with his autism defense or something

19 like that.

20 Q.    Are you saying that the defendant indicated to you

21 that he wanted to get a refund from this expert?

22 A.    Yes, because -- yes, he didn't want her to proceed.

23 He was going to go with a different psychologist.

24 Q.    At some point throughout your conversations with the

25 defendant, did you have an opportunity to discuss his

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 19 of 108

1  charge relating to the distribution of any video within a

2  chat group?

3  A.   Yes.  He said -- okay, he said that he had

4  encountered the lady who had sent him the videos through

5  some -- he referred to it as "taboo," so I don't know if

6  that was a site or just the name he said for it, but it

7  was also some type of chat group that he had joined.  And

8  this chat group, the leader of the chat group, he had

9  mentioned to him that he had received some new pics and

10  this porn tape, or this tape of the minor, and that the

11  person had wanted to see it.  So he said that -- well, he

12  mentioned he was going to send it.  Then he thought twice

13  about it.  And then he said -- then the person had

14  mentioned to him like, "Hey, whatever happened to that

15  video," so he ended up sending it.

16  Q.   When you say "the person," are you talking about the

17  perceived leader of the chat group?

18  A.   Yeah, the leader of the chat group, because he said

19  he didn't want the leader of the chat group -- like, he

20  didn't want to fall out of favor and possibly get kicked

21  out of the group, is what he told me.

22  Q.   Did he give you any information about why it was

23  that he wanted to stay in the chat group?

24  A.   He had said something that he had mentioned to the

25  person of the chat group, that in prior chat groups of

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 20 of 108

1   that nature, that -- it was something about like he had

2   encountered a lot of them that had homosexuals and didn't

3   have real women and like catfish-type scenarios.  And

4   when he had mentioned this to the leader of the chat

5   group, that the leader of the chat group had told him,

6   yeah, there's some of that, but there's also real women,

7   so he was content with that.

8           MR. EISENBERG:  I'm sorry, Judge, I couldn't

9   hear.  Something "women"?  "There's also" what?

10          THE WITNESS:  That there was also real women in

11  the chat group.

12          MR. EISENBERG:  Thank you.

13      BY MS. DUPUICH:

14  Q.   So the defendant indicated to you that he had

15  previously been in groups reflecting individuals who

16  maybe were not real females; is that accurate?

17  A.   Yes, exactly.

18  Q.   And did the defendant express to you his interest in

19  remaining in the chat group?

20  A.   Yes.

21  Q.   What information did he share with you, if any,

22  about the video that he received from the woman?

23  A.   He said that he had -- he said he also had received

24  some pictures of like -- I think it was like breasts, and

25  then, that when he had received the video, that he said

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 21 of 108

1  that it was -- okay, like when you're texting back and

2  forth, I think on his text it said something like "What

3  is this?" So he sent that to the administrator.  His

4  whole thing was to be able to say like, "Oh, I was saying

5  'What is this' like 'What is this?'"  But that he really

6  meant like -- like if -- like if a person receives some

7  news and then you're expecting something else and then

8  when it comes, you're like, "Oh!  What is this?"  But

9  then he was going to try to spin it for the Court to be

10  like he didn't know what it was and that -- and he said

11  that -- his exact words was -- his thing was with the

12  courts, to try to make it seem like he only forwarded

13  that because of his autism situation and that -- oh, he

14  also had studied like a lot of -- read a lot of material

15  on autism and stuff like that.

16  Q.   Okay.  I'll ask you about that in just a second.

17  Did he indicate any information to you about whether the

18  video he received from the woman was from another

19  country?

20  A.   Yes, yes, he said something like it was from London

21  or something like that and that it was the woman and her

22  daughter.  And then, when I had asked him like "A woman

23  and a daughter," so then he said something like the plan

24  was to have a three-some with these two.  So I was like

25  "Wouldn't it be incest?"  And he said that, "No, it's the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 22 of 108

1  same" -- he just shrugged it off like "Same thing as

2  having sex with two twins," so . . .

3  Q.   So defendant expressed to you that the purpose of

4  sending the video was to remain in the chat group?

5  A.   Yes, yes, to maintain favor with the leader, so he

6  wouldn't be kicked out of the chat group for any reason.

7  For some reason, he wanted to stay on the leader's good

8  side.

9  Q.   Now, you indicated that the defendant expressed to

10  you that he had some knowledge about autism.  What

11  comments or what information did he share with you about

12  his autism or potential autism defense?

13  A.   He told me that he had a co-counsel.  There was

14  another lawyer from New York that wrote a book on autism.

15  And that after reading his book, he had received a lot of

16  information on how he could try to apply that to this

17  situation.  That is what caused -- like he's highly

18  impressionable or something like that.  And it was

19  something about this whole autism defense that he felt

20  that if he could play the role and seem to have autism,

21  that it would help him receive just the possession, which

22  had the no 5-year mandatory minimum.  He also said --

23  yeah, yeah, that's it.

24  Q.   Do you recall whether or not he shared with you any

25  information about marijuana being found or anything with

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 23 of 108

```
1   respect to that?
2   A.   Yes, he said also that at the time he was arrested,
3   they had also found some marijuana, but that he wasn't
4   being charged with that to his knowledge.
5   Q.   I think the last question I have for you is do you
6   recall whether the defendant expressed to you anything
7   with respect to a possible trip to the Philippines?
8   A.   Oh, yes, he had also said that if he knew back then
9   what he knew now, like all this money that he's paying
10  for legal fees and all that, that he would have been
11  better off just going to the Philippines.  It would have
12  been way more cheaper and he wouldn't have got in all
13  this trouble, and he could just do whatever he wanted to
14  as far as this whole child sexual thing.
15  Q.   And how -- how did that comment strike you?
16            MR. EISENBERG:  Relevance, relevance.
17            THE COURT:  The Rules of Evidence don't apply
18  at a sentencing hearing.  So you may answer the question
19  and the Court will accept it for whatever value the Court
20  finds.
21  A.   It struck me as unremorseful.  I had -- 31 years ago
22  I was charged with a sexual offense myself, which I pled
23  guilty to.  And I felt that part -- which was like the
24  biggest shame in my life, the thing I'm most regretful
25  for and ashamed of my whole life, so I felt that --
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 24 of 108

1   there's no excuse, but, like, the circumstances leading

2   to it, I felt that he wasn't, like, remorseful, that he

3   was just trying to think of how to get out of the

4   situation, that he wasn't trying to think of how to

5   better himself or how to correct the problem that he has,

6   but how to do -- to commit this crime and get away with

7   it. Like, it wasn't like "Oh, I shouldn't have. I wish

8   I wouldn't have." It was more so "I wish I would have

9   did it this way so I could have got away with it." And I

10   just felt that for a guy that -- like, he told me -- if

11   you're telling me -- you're telling me that you did this

12   and you're telling me about your defense and all this you

13   do, and I'm sitting there saying to myself, "Wow, you

14   sound pretty convincing," so I can imagine to a jury, you

15   just might convince them. So I just felt like, I don't

16   know, that I needed to say something, because he

17   expressed to me his lawyer is trying to talk him -- to

18   take a copout and he wouldn't do it, his mother, several

19   people. And then I just knew that by me being a witness

20   in this case, I knew that as soon as he heard my name,

21   he'd plead because of all the stuff he told me.

22   Q. Was part of the reason that you came forward the

23   comment about the Philippines?

24   A. Yeah, yeah.

25        MS. DUPUICH: I don't have any other questions

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 25 of 108

```
 1  for this witness.  Thank you.
 2              THE COURT:  Thank you.  Cross-examination.
 3              MR. EISENBERG:  Judge, I'm having a very
 4  difficult time seeing him.  Is there any way we can put
 5  him over here.
 6              THE COURT:  No, because of the security in the
 7  courtroom, he's going to have to remain there.  You can
 8  move.  If you wish, you can move over to the lectern.
 9              MR. EISENBERG:  How about -- is this okay?
10              THE COURT:  Yes, certainly.
11                     CROSS-EXAMINATION
12      BY MR. EISENBERG:
13  Q.   Mr. Gregory, how many convictions do you have?
14  A.   A total of three that I can think of.
15  Q.   All right.  And so one was 31 years ago, and that
16  was a sex offense?
17  A.   Yes.
18  Q.   And what -- what about after that?
19  A.   After that, it was armed robbery -- I mean, no, the
20  armed robbery was with the sex offense.  That was one.
21  There was a pistol, a gun, which is a UUW.  And the third
22  was a burglary.
23  Q.   What are you in jail for now?
24  A.   Failure to register as a sex offender.
25  Q.   I'm sorry?
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 26 of 108

```
1   A.   Failure to register as a sex offender.
2   Q.   Is that a state charge or federal charge?
3   A.   It's federal.
4   Q.   Okay.  Was your sex crime federal as well?
5   A.   No.
6   Q.   And what's your sentence right now?
7   A.   I have no sentence.
8   Q.   Why are you being held?
9   A.   I'm -- I'm confused as to what you mean.
10  Q.   Well, you're in jail right now, right?
11  A.   Yes.
12  Q.   What is putting you in jail right now?
13  A.   For a failure to register as a sex offender.
14  Q.   I understand that.  What is your sentence on that
15  charge?
16  A.   I haven't been sentenced.
17  Q.   Okay.  So you are on a -- you're not on probation or
18  anything, are you?
19  A.   No.
20  Q.   Okay.  So you are being detained because you
21  couldn't post bail?
22  A.   True, yes, there is no bail.
23  Q.   Is that a federal charge or a state charge?
24  A.   It's a federal --
25  Q.   Is that a federal charge or a state charge, failure
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 27 of 108

1    to register as a sex offender?

2    A.    It's a federal charge.

3            THE COURT:  Mr. Eisenberg, it may help you to

4    know in this district we have a hearing on determining

5    whether somebody is going to be released.  Unlike other

6    districts, we seldom have people post bail.  They're

7    either released on personal recognizance or they're

8    detained pending trial.  In this particular case, the

9    magistrate judge ordered this defendant detained pending

10   trial in this matter without posting bond and without

11   that possibility.

12           MR. EISENBERG:  Thank you.

13        BY MR. EISENBERG:

14   Q.    How long have you been in jail on this charge?

15   A.    Since mid November.

16   Q.    Okay.  And how many meetings have you had with

17   government agents about your discussions with

18   Mr. Buttikofer?

19   A.    I met with the marshal once, and then with the

20   marshal and prosecutor and my lawyer.  Two, a total of

21   two.

22   Q.    Two total.  And when were you in the cellblock with

23   Mr. Buttikofer?

24   A.    From November of last year, up until January of this

25   year.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 28 of 108

1 Q.   So two months, right?

2 A.   Yes.

3 Q.   And you're not an expert on autism spectrum

4 disorder, are you?

5 A.   No, I'm not.

6 Q.   And you're hoping, by the way, that you get some

7 benefit for your testimony today, right?

8 A.   Am I hoping?  Well, I'm hopeful, but I wasn't

9 promised or guaranteed anything.

10 Q.   I respect that.  But you're not just testifying

11 because you are a good samaritan, are you?

12 A.   Well, I'm testifying because I felt like it was the

13 right thing to do.  And I felt that what -- from what

14 your client told me, that you had even tried to talk him

15 into taking a copout.  I mean, you asked me.  I'm telling

16 you.  You would -- he would --

17 Q.   Could you answer my question, sir?

18 A.   Your question was again, sir?

19 Q.   Yeah.  You're not testifying here because you are

20 just a good samaritan.  You are testifying because you

21 are hoping the government will give you some concession

22 for this, right?

23 A.   I'm hoping for a concession, and I'm also -- but

24 nothing is guaranteed, and I'm also doing so because I

25 feel that it's the right thing to do.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 29 of 108

1  Q.   Sure.  And did you feel that was the right thing to

2  do when you had all your other criminal charges?

3  A.   To -- I'm confused with what you mean.

4  Q.   You told me that you felt -- you told the government

5  you felt like he wasn't accepting responsibility for his

6  behavior, right?

7  A.   Well, if you check my -- my criminal charge, you'll

8  see that I took a copout on each one of them.

9  Q.   Okay.

10 A.   I -- I owned up to my responsibilities to the law as

11 far as my mistakes.

12 Q.   I respect that.  But the question was --

13          MR. EISENBERG:  Could you read the question

14 back, Madam Court Reporter, please?

15      (Whereupon, the requested portion of the record was

16 read by the court reporter.)

17 Q.   And that's why you came forth, right?

18 A.   Yes.

19 Q.   And were you accepting responsibility for your sex

20 offender convictions when you failed to report as a sex

21 offender?

22 A.   Was I accepting responsibility?  I was actually --

23 if you want to talk my case, what happened was, I

24 didn't --

25 Q.   Just answer my question, please.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 30 of 108

1  A.    Was I accepting responsibility?

2  Q.    Yeah, by not registering as a sex offender for your

3  prior sex offender conviction.

4  A.    By -- I committed a crime.  I accepted

5  responsibility when I pled guilty.

6  Q.    Okay.  Why didn't you register as a sex offender?

7  A.    I didn't do so in a timely manner.

8  Q.    How many other people were in that dorm with you and

9  Mr. Buttikofer?

10  A.    I believe a total of 13 of us.

11  Q.    Okay.  And so when you had these discussions with

12  Mr. Buttikofer, did you have a private area that you

13  could go talk and nobody else would hear you?

14  A.    Sometimes we would sit there; it was like a chair or

15  table right below our bunk.  Sometimes we would sit at

16  the table and talk.  Sometimes we would come over by my

17  bed and sit there and talk.  Sometimes we would sit at

18  this other table that was off to the side and talk.

19  Whenever we talked about things of that nature -- I mean,

20  sometimes though we would just talk just at random.

21  Q.    So nobody else could hear you though, right?

22  A.    I wouldn't say no one could hear us.

23  Q.    By the way, in that cellblock with you and

24  Mr. Buttikofer was some fellow that had actually been --

25  had gone to the Philippines and got convicted for having

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 31 of 108

1  sex with a child, correct?

2  A.   I don't know.

3  Q.   You said that you didn't feel that he was accepting

4  responsibility.  Did you know that he was interviewed by

5  the FBI on the day of his arrest?

6  A.   I'm not sure.

7  Q.   Did you know that he told the FBI that he thought he

8  had probably sent the video to the administrator of the

9  chat room?

10  A.   I don't know.

11  Q.   Did he tell you that?

12  A.   He told me that he sent it to the leader of what he

13  believed to be a chat group, who turned out to be an FBI

14  agent.

15  Q.   What did he say he did with his account after he

16  sent that video to the administrator?

17  A.   I don't recall what he did with his account.

18  Q.   Okay.  Did he tell you that he deleted it, the app,

19  after he sent that to the administrator?

20  A.   I don't recall.

21  Q.   That would kind of rebut your argument that he sent

22  the video to the administrator so he could stay in the --

23  in the chat room, right, if he did that?

24  A.   I'm not sure.  All I know is what he told me.  I'm

25  not sure what that would do as far as some -- doing so or

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 32 of 108

1 not doing so.  I don't know.

2 Q.    You said that he was attempting to fake the autism

3 spectrum disorder so he could play it to the jury; is

4 that right?

5 A.    Exactly.

6 Q.    He didn't go to a jury though, right?

7 A.    No, because by me coming forward, I believed that's

8 what caused him to take a plea.

9 Q.    But at the time he pled, you weren't in the

10 cellblock at that time, were you?

11 A.    No, at that time I had left.  He had pled I believe

12 shortly after.  At the time that I was in the cellblock

13 with him, he was talking to you, and he was on the phone

14 with you for hours he told me, and that, from the amount

15 that you charge per hour, that the bill was going up to a

16 thousand or better, and that --

17 Q.    Let me just interrupt you so we can get back to the

18 question.

19 A.    Okay, uh-huh.

20 Q.    You were gone from the time that -- you were gone

21 from the time that -- out of that cell when he pled,

22 right?

23 A.    I was gone from the time that he pled?

24 Q.    Yeah.

25 A.    Yes, yes.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 33 of 108

1  Q.    Okay.  So how did you find out he pled?

2  A.    Because once I gave this information to the

3  authorities, it was said that I would probably -- he was

4  set for trial, so I would have probably have had to come

5  testify at his trial, but then by him turning around --

6  after I came forward, he pled guilty, so then it was

7  brought to my attention that there would be no trial

8  because, as a result, he pled guilty, so that's how I

9  knew.

10 Q.    The government told you that, right?

11 A.    I can't -- I don't know.  No, I believe it was my

12 attorney.

13 Q.    Your attorney, okay.

14 A.    I believe it was my attorney.

15 Q.    All right.  So let's go back --

16 A.    As a matter of fact, it was my attorney.

17 Q.    -- and then I'm done.  This autism spectrum

18 disorder, you're not an expert in this, right?

19 A.    Far from it.

20 Q.    Do you know what -- how a therapist who specializes

21 in that diagnoses somebody with that?

22 A.    I have no idea.

23 Q.    Okay.  And so, in fact, you don't know that one of

24 the portions of that diagnosis is getting a history from

25 a parent or a wife or something to help make that

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 34 of 108

1 diagnosis, right?  You don't know that?

2 A.    I have no idea.

3 Q.    Okay.  And Mr. Buttikofer never told you that he was

4 going to call his mother and tell her to lie to these two

5 therapists so that he could do this charade with the

6 autism spectrum disorder, right?

7 A.    I never said anything about him calling -- anything

8 about his mother lying or him telling me anything about

9 his mother lying.

10 Q.    Thank you.

11        MR. EISENBERG:  That's all I have, Judge.

12 Thank you.

13        THE COURT:  Any redirect examination?

14        MS. DUPUICH:  No, thank you.

15        THE COURT:  All right.  Thank you.  You are

16 excused as a witness.

17     The government may call its next witness.

18        MS. DUPUICH:  Thank you, Your Honor.  The

19 government calls Joshua Heer.

20        THE COURT:  Good morning, sir.  Please step up

21 here by the court reporter and raise your right hand and

22 I'll place you under oath.

23                        JOSHUA HEER,

24 called as a witness, being first duly sworn or affirmed,

25 was examined and testified as follows:

Contact Patrice Murray at PAMurrayReporting@gmail.com
for a complete copy of the transcript.
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 35 of 108

```
 1            THE COURT:  Thank you.  Please have a seat in
 2   the witness chair.  And when you are comfortable, I'd
 3   like you to pull that chair up.  And when you are
 4   comfortable, please state your name and spell your name
 5   for the court reporter.
 6            THE WITNESS:  Joshua Heer.  J-O-S-H-U-A, middle
 7   initial R., Heer, H-E-E-R.
 8            THE COURT:  Thank you.
 9        Ms. Dupuich, you may proceed.
10            MS. DUPUICH:  Thank you, Your Honor.
11                      DIRECT EXAMINATION
12        BY MS. DUPUICH:
13   Q.   What is your occupation and current assignment?
14   A.   Currently, I'm a sergeant of investigations with the
15   Illinois State Police, Rockford, Zone 2, Major Crimes.
16   Q.   Could you please briefly state your background,
17   training, and experience in law enforcement?
18   A.   2002 I began a career with the City of Berlin, which
19   is a small city in Wisconsin, worked as --
20            MR. EISENBERG:  I'll stipulate to his
21   qualifications if that would speed this up.
22            THE COURT:  I would just as soon I think hear
23   them myself so I have some idea of what his background
24   is.  So thank you.
25   A.   In 2002 after graduating with a four-year degree in
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 36 of 108

1  criminal justice, started at the City of Berlin.  It's a

2  small city in Wisconsin.  Worked there for 22 months.

3  After that I went to work for the City of Monroe, which

4  is a City of about 10,000 in Wisconsin.  I did patrol, I

5  did undercover narcotics for about 3 years there, but in

6  total with Monroe I was there for about 9.  So after

7  11 years in law enforcement, I went to work with the

8  Illinois State Police in 2013.  2013 to roughly 2018 I

9  worked patrol.  In 2018 I began as an investigator with

10  Zone 2, Rockford, where I am now.  Since then, I've been

11  with the Illinois Attorney General's Office, ICAC Task

12  Force, Internet Crimes Against Children's Task Force,

13  since I believe May of 2019, maybe before that.

14  Q.    Are you the investigator assigned to an Illinois

15  case involving the defendant from the fall of 2019?

16  A.    Yes, ma'am.

17  Q.    How did this case first come to your attention?

18  A.    I believe it was September 23rd of 2019, sometime in

19  the afternoon, narcotics Special Agent Merritt brought it

20  to my attention that he had recently spoken with a

21  confidential source.  The confidential source had

22  indicated they had met an individual in Dubuque, Iowa,

23  and during that conversation, that first meeting in

24  person, that individual had indicated they were into

25  no-limit sex.  While that informant talked to that

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 37 of 108

1 individual, the informant asked what that meant. The

2 individual in question then told the informant that

3 no-limit sex meant that -- referred to a time in his life

4 with a prior girlfriend or female acquaintance/friend.

5 The individual -- the female had drugged an approximate

6 5-year-old child so he could have oral sex with the

7 child, and the adult female could then have oral sex on

8 him and then he could then ejaculate on the child.

9 Q.   Is the individual whom you are referring to

10 ultimately determined to be the defendant seated in

11 court?

12 A.   It is.

13 Q.   Is the confidential source you are referring to a

14 female?

15 A.   It is.

16 Q.   And you obviously had an opportunity to meet and

17 speak with this female in person, correct?

18 A.   I did.

19 Q.   Did you determine at some point whether or not she

20 had children?

21 A.   I did.

22 Q.   Approximately how many, if any, and their ages if

23 you know?

24 A.   She had four.  At that time, she had a 5-year-old

25 male; 8-year-old, 10-year-old, and 16-year-old female

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 38 of 108

1  daughters.

2  Q.    As a result of the information provided to you by

3  this confidential source, how did you decide to proceed

4  next in your investigation?

5  A.    As all investigations, first try to verify and

6  validate anything that was said.  Look at Facebook, see

7  if I can find a picture of who she referred to as D.J.

8  Buttikofer.  Found that individual.  Went to -- we have a

9  state-ran intelligence agency, STIC.  Run the information

10 through STIC, other law enforcement record databases, to

11 try to identify the person.  It wasn't long until I was

12 able to actually identify who she thought was D.J.

13 Buttikofer as Douglas J. Buttikofer.  Get the address, do

14 surveillance, confirm.  We weren't able to actually

15 locate him personally at that time.  And with -- with her

16 indicating that they spoke freely, hours and hours and

17 hours a day by text, by phone conversation, by Snapchat,

18 I reached out to the local state's attorney in Jo Daviess

19 County to see if they could authorize what in Illinois we

20 need -- because we're a single-party state for electronic

21 recording, we need what's called an eavesdrop order.

22 It's actually granted by a judge in Illinois.

23 Q.    And did you ultimately obtain an eavesdrop order?

24 A.    I did, the very next day.

25 Q.    On or about September 24 of 2019 then, did you have

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 39 of 108

1  an opportunity to meet with this confidential source in

2  person and examine some messages on her cellular

3  telephone?

4  A.    I did.  So in order to have an eavesdrop order

5  signed, that individual -- the informant needs to, one,

6  agree to having her -- his or herself recorded and they

7  also need to sign the order itself.  So myself and a

8  female special agent, Special Agent Montes, went to a

9  predetermined location, picked her up, transported her to

10 the City of Galena for that.

11 Q.    And then you -- you were ultimately with her on

12 September 24th, correct?

13 A.    Yes.

14 Q.    Before you came to court today, did you have an

15 opportunity to review what's been previously marked as

16 Government's Exhibits 6?

17 A.    I did.

18 Q.    Showing you what's been marked as Government's

19 Exhibit 6, then, do you recognize the first page of this

20 exhibit, which appears to be a Facebook picture?

21 A.    I do.

22 Q.    Where is that from?

23 A.    So my informant told me who this person was to her.

24 I found that on Facebook, just simply searching D.J.

25 Buttikofer on my own covert Facebook account.  I then

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 40 of 108

```
 1  screen captured with my -- my work phone that photo to
 2  then show that to the informant as a means of identifying
 3  and making sure we were speaking about the right person.
 4  Q.   So page 1 of 12 on Government's Exhibit 6,
 5  document 140-6, is a -- a Facebook screenshot that you
 6  personally took of the defendant, correct?
 7  A.   Correct.
 8  Q.   The subsequent pages in Government's Exhibit 6,
 9  which are pages 2 of 12 through 12 of 12, those appear to
10  reflect screenshots from Snapchat; is that accurate?
11  A.   Correct.
12  Q.   Where are those from?
13  A.   So as myself and the other agent picked up the
14  informant and transported her to the Jo Daviess County
15  Courthouse, she began receiving messages from D.J., from
16  Mr. Buttikofer.  Snapchat is peculiar in a way that if
17  you -- if you take a screenshot of your -- using your own
18  phone of a message or a photo within Snapchat, you alert
19  the other person that you've screen captured.  So as a
20  result, rather than have that person, the informant,
21  screen capture those images herself and alerting him to
22  that, I took those photos with my own department-issued
23  cell phone.
24  Q.   So what's been marked here as Government's
25  Exhibit 6, pages 2 of 12 through 12 of 12, were taken by
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 41 of 108

1  you personally from the CS's cellular phone on or about

2  September 24, 2019?

3  A.   Correct, and they were taken in the actual

4  courthouse for Jo Daviess County.

5  Q.   And those are true and accurate copies reflecting

6  the screenshots that you took, correct?

7  A.   Yes.

8  Q.   Now, the following day, on or about September 25th

9  of 2019, did you ultimately participate in some

10  recordings between the female CS and the defendant?

11  A.   Yes.

12  Q.   And before you came to court today, did you have an

13  opportunity to review what's been marked as Government's

14  Exhibit 7, which is a transcript of recordings?

15  A.   Yes.

16  Q.   Was that a true and accurate copy reflecting an

17  accurate transcript of those recordings you participated

18  in on or about September 25th of 2019?

19  A.   Yes, ma'am.

20  Q.   At some point throughout the course of your

21  investigation, in your contact with this female, did she

22  advise you whether or not in speaking to the defendant he

23  had asked her to delete any messages?

24  A.   Yes.

25  Q.   And what was said?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 42 of 108

1  A.   So we've got to back up a day.  So the 24th of

2  September, actually, so after we signed the eavesdrop

3  order, she was escorted back to a predetermined location,

4  dropped off.  Throughout the evening, she kept in contact

5  with me, and I want to say early evening, late evening,

6  she reached out to me to let me know that she was at a

7  friend's house, and unbeknownst to her and unplanned,

8  Mr. Buttikofer had stopped by, located her, taken her

9  cell phone, went onto Snapchat and their text messages

10 and deleted their conversations and said something to the

11 effect of, you know, if he hadn't been able to delete or

12 make sure they were deleted, that he was going to throw

13 her phone in the river.

14 Q.   Were you able to in any way verify any of this

15 information?

16 A.   The next day on the 24th, her phone was wiped.  It

17 didn't have anything on there from the day before.  I

18 can't confirm that he was the one that deleted it.  I can

19 just say that that next morning when she told me that,

20 you know, things were gone because he -- he deleted those

21 things; those things were no longer there.  I did --

22 there's one caveat to it, during the conversation on the

23 24th, he had expressed a desire to have her go home that

24 day and take pictures of her children's underwear and

25 send them.  Later, after his arrest, per a search

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 43 of 108

1    warrant, his cell phone was downloaded.  Within the
2    confines of what's called a Cellebrite download of his
3    phone, you see images of underwear that were sent to him
4    that day from the CS.  You also -- that night, the CS had
5    indicated she had friend requested that account, the
6    D.J. -- D.JButtikofer Facebook account.  You can see on
7    the Cellebrite download that very night that he had gone
8    onto her Facebook profile and viewed all of her
9    children's photos, and I believe in reviewing the
10   Cellebrite download, it actually saved those photos of
11   her children onto his phone.
12   Q.    All right.  So let me ask you, then, the defendant's
13   cellular telephone was obviously recovered as part of
14   your investigation, correct?
15   A.    Yes, ma'am.
16   Q.    And a Cellebrite extraction was performed by a
17   qualified individual within your agency on or about
18   October of 2019; is that accurate?
19   A.    It was performed by the City of Dubuque, because he
20   was arrested in Dubuque, not in Illinois.  The warrant --
21   because it's across state lines, it gets a little bit
22   different with how it gets handled, but Iowa did the
23   seizing.  Iowa did the Cellebrite extraction.
24   Q.    And you obviously had an opportunity to review that
25   extraction, correct?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 44 of 108

1    A.    Yes, ma'am.

2    Q.    And you mentioned that there was -- you noticed on

3    that extraction some Facebook profile photographs of the

4    CS's children; is that true?

5    A.    Yes.

6    Q.    Did you notice anything else on the Cellebrite

7    extraction that pertained particularly to your

8    investigation or that was of interest to you?

9    A.    Yeah, in particular, which I think you're asking, he

10   had dozens and dozens and dozens -- I mean, he had 62,000

11   or 63,000 images on there.  And just by loosely counting

12   there's dozens upon dozens of sexual -- of child erotic

13   photographs.

14   Q.    Were those largely females?

15   A.    Yes.

16   Q.    Prepubescent or pubescent females?

17   A.    Both.

18   Q.    Did you notice anything with respect to phone calls

19   between the CS and defendant from the time period of

20   September -- or late September?

21   A.    Numerous.

22   Q.    As in over 300?

23   A.    Correct.

24   Q.    Ultimately, as part of your investigation, then, was

25   a hotel room rented in Illinois?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 45 of 108

A.   We made arrangements to make it look like one was
rented with a manager.  We didn't actually pay for one.
They just had one under the informant's name in case
somebody called or came.
Q.   Was the purpose of that hotel room to determine
whether the defendant would, in fact, meet the CS and her
children?
A.   Correct.
Q.   And that did not ultimately occur and the defendant
did not show up at the hotel room, correct?
A.   Correct.
          MS. DUPUICH:  Your Honor, I just have one last
question for this witness with respect to Defendant's
Exhibit M.  I was wondering if I could approach and show
it to him.
          THE COURT:  Certainly.
          MR. EISENBERG:  What page are you on?
          MS. DUPUICH:  Let me grab it.
          THE COURT:  Ms. Dupuich, I'm confused.  Is this
M as in "Mary" or N as in "Nancy"?
          MS. DUPUICH:  M as in "Mary," Your Honor.
          THE COURT:  All right.  Thank you.
          MS. DUPUICH:  I'm on page 20 of 23.  Docket 1'
I think it says '30-5, page 20 of 23.
          THE COURT:  All right.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 46 of 108

1       BY MS. DUPUICH:

2   Q.   I know this is difficult to read, but drawing your

3   attention there to Defendant's Exhibit M, as in "Mary,"

4   docket 130-5, page 20 of 23, do you recognize that

5   communication?

6   A.   Yes, it's a cell phone conversation between the

7   informant and Mr. Buttikofer.

8   Q.   And when was this conversation?

9   A.   It looks like on the 25th of September, 2019.

10  Q.   What was that date with respect to your

11  investigation?

12  A.   That was the day where the informant and the -- and

13  Mr. Buttikofer were talking about getting her children

14  together at a Galena hotel for a meet and greet and

15  possible sexual assault of one of her children.

16  Q.   Drawing your attention to page 22 of 23, I know it's

17  difficult to read, but in the middle of the page there

18  appears to be a message that indicates, "Hey, this is all

19  a fantasy for me and not real life."  Do you see that

20  message?

21  A.   Yes, ma'am.

22  Q.   Who wrote that message to your knowledge?

23  A.   That is Mr. Buttikofer to the informant.

24  Q.   And that would be the night of the hotel room,

25  correct?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 47 of 108

1  A.  Yes, ma'am.

2  Q.  I was wondering if you could put that into context

3  for the Court in terms of the timeline of your

4  investigation that evening.

5  A.  So after Mr. Buttikofer got off of work, he -- and

6  throughout his entire day of work, he was talking to the

7  informant, and they had talked about how her -- what he

8  wanted to do with the children and about maybe

9  facilitating some sort of meet-up that evening.  And the

10  informant had said she had a hotel room in Galena and the

11  children were there.

12      After he got off of work, he continued to talk to

13  her about how he was running a few errands and was

14  possibly thinking about coming to Galena.  That went on

15  for several hours.  And during the entire time, we had

16  surveillance, Illinois state troopers, police, special

17  agents, all following Mr. Buttikofer around the city of

18  Dubuque.  It became very obvious that he was not on his

19  way to Galena.  And after hours and hours of that

20  conversating, we weren't confident he was ultimately

21  going to come.  So I instructed the informant, let's, you

22  know, let's just be done with the conversation between

23  the two of you.  And the -- shortly after, like

24  instantaneous of her dropping communication with

25  Mr. Buttikofer, he began texting -- or calling and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 48 of 108

 1  texting, and this is one of -- one of those things.

 2  After I believe it's nearly an hour of the informant

 3  having very little to no conversation, he sends, "Hey,

 4  this is all fantasy to me and not real life," and it goes

 5  on.

 6  Q.   And that was after she had not communicated with him

 7  for a significant period of time?

 8  A.   Correct.

 9  Q.   Now, this was an individual that the defendant had

10  only known for, to your knowledge, approximately, what, a

11  week?

12  A.   Not long, yeah, a week is pretty solid.

13  Q.   Maybe less than?

14  A.   I think he met her -- I think he met her in person

15  on the weekend prior to this, like the 20th or 19th.  And

16  I think he saw her maybe a week or two before that and

17  approached a mutual friend of theirs for her phone

18  number.

19        MS. DUPUICH:  Thank you, Your Honor.  I don't

20  have any other questions for this witness.  I'd just like

21  to approach and grab the exhibit.

22        THE COURT:  You may.

23        MS. DUPUICH:  Thank you.

24        THE COURT:  Cross-examination.

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 49 of 108

```
1                    CROSS-EXAMINATION
2         BY MR. EISENBERG:
3    Q.   Agent, you just talked -- I'll stand up.  You just
4    got done talking about he said it was all a fantasy to
5    him, right?  Do you remember saying that?
6    A.   Repeat your question.
7    Q.   Sure.  You just got done saying Mr. Buttikofer said
8    to her, "This is all just a fantasy for me," correct?
9    A.   He did text that, correct.
10   Q.   You listened to all the phone conversations --
11   strike that.  You were with her when she was making these
12   phone calls, right?
13   A.   Two out of four.  The morning session, correct.  The
14   afternoon session, a different agent was with her.
15   Q.   And how many times did she try to entice him to come
16   to Illinois by saying, "I want you to live out your
17   fantasy.  I want you to act on your fantasy.  Let's do
18   this"?
19   A.   I think "entice" is a strong word.
20   Q.   Coerced, convince, request?
21   A.   I think -- I think request, sure.  I'm not sure how
22   many times that conversation, and I'm not sure how many
23   times he also did the same.
24   Q.   Okay.  And, actually, when he said, "This is all a
25   fantasy for me," she told him how disappointed she was
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 50 of 108

1  that he wouldn't come, right?

2  A.   I would have to look at exactly where that is.

3  Q.   Did you bring it?

4  A.   What's that?

5  Q.   Did you bring all the conversations?

6  A.   No.

7  Q.   You're telling me you don't remember her saying,

8  "I'm very disappointed in you and I need some time to

9  myself"?  Do you remember that?

10 A.   Verbatim, no.  The -- for me to answer that --

11 you're asking me to remember a specific quote out of I

12 believe it's 92 pages worth of transcripts --

13 Q.   Right.

14 A.   -- over several hours.  I do believe something was

15 said to that fact towards the end, and that was at the

16 end.

17 Q.   And that's when she cut him off, when she said "I

18 need some time," and that's why he was texting her,

19 right?

20 A.   I can't speak to why your client didn't --

21 Q.   Fair enough.  You said that there was a Cellebrite

22 download of his phone that was seized when he was

23 arrested, right?

24 A.   Correct.

25 Q.   And there was a ton of child erotica, right?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 51 of 108

```
 1  A.    Correct.
 2  Q.    And when you are saying that, you are talking about
 3  children clothed in modeling positions?
 4  A.    I would not say modeling, no.
 5  Q.    Okay.  But they had clothes on.  How many of those
 6  63,000 images that you took or found on the Cellebrite
 7  download from his cell phone contained child pornography?
 8  None, right?
 9  A.    Correct.
10  Q.    So we know then -- and he didn't know you were going
11  to take his phone, right?
12  A.    I have no idea what your client thought.
13  Q.    He had no reason to believe that you were going to
14  take his phone, did he?
15  A.    I have no idea what your client thought.  He was
16  being arrested for grooming, so I would have -- after
17  doing this for a number of years, I would have a belief
18  that if someone thinks they're getting arrested for
19  grooming a child, when they use their own phone to do it,
20  they would have a belief to take the phone, but otherwise
21  I can't testify to what he thought.
22  Q.    Well, let's back up for a second.  How did he know
23  he was going to get arrested for grooming?
24  A.    There was a warrant for his arrest, so when he got
25  arrested.
```

**Contact Patrice Murray at PAMurrayReporting@gmail.com**
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 52 of 108

```
1   Q.   Okay.  I am talking about before that.  Before he
2   got arrested, he didn't delete everything off his phone,
3   did he?
4   A.   He did delete items off of his phone.  He did
5   indicate that in the interview that we had of him, that
6   he deleted items, applications, conversations off of his
7   phone, so he did delete things off his phone.
8   Q.   He didn't delete 63,000 images, did he?
9   A.   Portions of those were deleted and recovered in the
10  physical analyzer Cellebrite extraction.
11  Q.   Let's talk about the informant for a minute.  Isn't
12  it true that Mr. Buttikofer wanted to have a relationship
13  with her?
14  A.   Repeat that question.
15  Q.   Isn't it true that Mr. Buttikofer wanted to have a
16  relationship with the informant?
17  A.   I -- from an aspect of him telling us in the
18  interview, he believed she was a prostitute.  That's --
19  that was the relationship he told me he wanted to have
20  with her.  In speaking with the informant, the
21  relationship -- I believe it was the same.  I guess I
22  don't know the definition of "relationship" that you are
23  trying to get at.
24  Q.   Fair enough.  Do you remember in one of the 92 pages
25  of phone conversations where he said to her, "I'd like to
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 53 of 108

1  have sex with you all night, and you are going to end up

2  being very sore the next day"?

3  A.   I do recall that.

4  Q.   What did she get arrested for?

5  A.   I have no --

6  Q.   Oh, come on.

7  A.   I have no knowledge.  I believe it was a drug

8  offense, but I have no knowledge.

9  Q.   You come here today to testify and you don't know

10  what the informant's background is?

11  A.   She wasn't my informant, sir.

12  Q.   You come in here to testify and you don't know what

13  the informant did to be in this position?

14  A.   I did ask and answer that.  You asked.  I said I

15  believe it was a narcotics offense.  It was not by the

16  Illinois State Police.  It was by a different agency.

17  The Illinois State Police just simply used her as an

18  informant.  I was not her handler.  Another agent, as I

19  testified to, Special Agent Mike Merritt, was her

20  handler.  I was not.

21  Q.   What did she get out of this?

22  A.   I do not know.  Again, the Illinois State Police did

23  not arrest her.  The City of Dubuque or the County of

24  Dubuque did.  I was not her handler.  Special Agent

25  Merritt was.  I do not know what she received out of

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 54 of 108

1  this. We had no conversation between the two of us.

2  Q.  Fair enough. When was it that Mr. Buttikofer

3  supposedly -- well, let's back up. Let's get the dates

4  right. The date of his arrest is what?

5  A.  I -- offhand, I don't remember. I would have to

6  look at my report.

7  Q.  What were the dates of the phone calls that you

8  recorded?

9  A.  The 25th of September, 2019.

10  Q.  Okay. And when did you first become aware she was

11  going to help you?

12  A.  The 23rd.

13  Q.  Okay. So we know from the 23rd to the 25th she's

14  working with you, right?

15  A.  Correct.

16  Q.  Okay. And you are saying that on the 24th is when

17  he went to her house, got her cell phone, and deleted her

18  Snapchats. How did that happen?

19  A.  I can't speak to that. All I can tell you is what I

20  was told by the informant.

21  Q.  Fair enough. So you don't have any personal

22  verification that he did that, do you?

23  A.  No, sir.

24  Q.  And again, you are -- strike that.

25          MR. EISENBERG: I don't have anything else,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 55 of 108

1   Judge.  Thank you.

2           THE COURT:  Any further redirect examination?

3           MS. DUPUICH:  No, thank you, Your Honor.

4           THE COURT:  Thank you, Sergeant.  You may step

5   down.  You are excused as a witness.

6       Ms. Dupuich, you don't have any other witnesses; is

7   that correct?

8           MS. DUPUICH:  That's correct, I don't.

9           THE COURT:  Mr. Eisenberg, do you wish to call

10  any witnesses?

11          MR. EISENBERG:  No, Your Honor, I don't.

12          THE COURT:  All right.  That completes the

13  evidence in this case, then.  All right.  At this stage,

14  the only thing left that I am aware of is the ruling on

15  the defendant's motion for a downward variance and the

16  ultimate disposition in this case.  It is the defense

17  motion, but it is my general practice to hear first from

18  the government regarding any downward variance motion

19  because that then gives the defense counsel an

20  opportunity to respond and then make the defense's own

21  argument.  So I'll hear first from Ms. Dupuich, then I'll

22  hear from Mr. Eisenberg, and then I'll hear from the

23  defendant, if he wishes to say anything to me, and then I

24  will impose sentence.  Before we go there, Ms. Dupuich,

25  is there anything else you believe we need to handle?

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 56 of 108

1    MS. DUPUICH:  No, Your Honor.

2    THE COURT:  Mr. Eisenberg?

3    MR. EISENBERG:  No, Your Honor, I -- my

4  argument was -- I don't want to be redundant.  I was just

5  going to respond to some things the government had put in

6  her sentencing memorandum.

7    THE COURT:  And that's fine, and I'll give you

8  an opportunity to do that.  We'll hear from her first,

9  and then you can respond to anything she says orally or

10  in her memorandum as well.

11    MR. EISENBERG:  Thank you.

12    THE COURT:  Very good.  So Ms. Dupuich.

13    MS. DUPUICH:  Thank you, Your Honor.

14  Similarly, I'm not going to repeat things that I had

15  already put in our brief.  I did want to point out just

16  some concerns, some general concerns, that the government

17  had with respect to Defendant's Exhibit P, as in "Paul,"

18  and Exhibit R, as in "Roger," which are the two

19  examinations from the -- psychological examinations.

20  There is some concern here related to the reliability of

21  those exhibits.  I think one concern that the government

22  has would be the limited records that were reviewed to

23  generate these evaluations.  Neither evaluator appears to

24  have had access to discovery materials.  Additionally,

25  they both appear to have reviewed and taken into

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 57 of 108

1   consideration the report by Ms. Christiansen at docket

2   61.  So to the extent that they are basing any of their

3   opinions off of her evaluation or information, the

4   government would proceed with caution.

5       Defense Exhibit R indicates that he -- the evaluator

6   did review the PSR; however, that's a relatively limited

7   universe of information.  It's a little unclear whether

8   the author of Defendant's Exhibit P reviewed the PSR.

9   It's possible that I missed it, but it says "review of

10  records" on page 1, so I'm not entirely sure what that

11  means.  I don't know what this evaluator considered,

12  other than Candice Christiansen's report and an interview

13  with the defendant and his mother.  I also don't know

14  what her credentials are or her background, training, or

15  experience.

16      To the extent the evaluator in Defendant's Exhibit R

17  reviewed the PSR and is providing an opinion concerning

18  whether this defendant is a risk to commit a hands-on

19  sexual offense, the government would ask why he didn't

20  ask the defendant any questions about paragraph 48 in the

21  PSR.  And just to clarify, the government is not asking

22  the Court to consider an unconvicted offense for

23  sentencing purposes.  The government is simply asking why

24  a professional who is evaluating whether or not an

25  individual is a risk to commit a hands-on sexual offense

Contact Patrice Murray at PAMurrayReporting@gmail.com
for a complete copy of the transcript.
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 58 of 108

1  wouldn't ask that individual about the facts and

2  circumstances concerning him being charged with a

3  hands-on sexual offense.

4      With respect to Defendant's Exhibit R, page 3 of 13,

5  the government would note defendant stated he had a core

6  group of friends under his educational history.  This may

7  be inconsistent with an earlier statement he made to

8  Ms. Christiansen that he "didn't have any friends" in

9  school, which is reflected on docket 61, page 8.  Also,

10 on Defendant's Exhibit R, page 8 of 13, the defendant

11 stated that he went 6 months with no porn and then

12 relapsed by looking at Kik and a video was sent and "that

13 was it."  The government would note that this is

14 inconsistent with paragraphs 20 and 22 of the PSR, which

15 reflect that child pornography was accessed over a period

16 of time from approximately February 7th through

17 March 30th.  Also defendant's statement in this report "a

18 video was sent and that was it," that's all inconsistent

19 with the facts of the distribution.  He sent two separate

20 videos of abuse, a total of three times; one video twice,

21 one video once.  Finally, defendant's statement, "This is

22 not something I was searching for ever," at the top of

23 page 8 of 13, in docket 130-10, that's entirely

24 contradicted by the evidence.

25      With respect to the bullet points on Defendant's

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 59 of 108

Exhibit R, on page 10 of 13, the government is unclear as to why this evaluator lists the only factor pertaining to defendant as "relationship issues."

THE COURT:  I'm not sure I understand what you mean by that.

MS. DUPUICH:  He says on page 9 of 13, if you look at the third paragraph, he says, "Of these 20 listed risk factors, Mr. Buttikofer is characterized by only one factor: relationship issues.  The remainder do not appear present."  Do you see that, Your Honor?

THE COURT:  I do, thank you.

MS. DUPUICH:  The government is not clear what the second bullet point "supervision failure" is or why defendant would not be considered in this category, as he was on pretrial release for grooming at the time he was arrested for the instant offense.  It also appears defendant would be characterized as the bullet point "victim of child abuse."  That's on page 10 of 13, about halfway down on the bullet points.  He himself alleges in paragraph 53 of the PSR that he was a victim.

Finally, under the "minimization or denial of sex offenses," which is the third from the last bullet point, that has remained a consistent theme throughout, as reflected in Government's Exhibits 1, 2, and elsewhere.

Under his conclusions, the author indicates on

```
 1   page 12 of 13, he has no prior criminal history.  That's
 2   inaccurate.  He states there's no evidence of substance
 3   abuse.  That's inconsistent with paragraph 64 of the PSR
 4   and the facts and circumstances of the instant offense
 5   where he was in possession of marijuana.  The government
 6   would take issue with the opinion offered on page 13 of
 7   13, document 130-10.  The author says, "There is no
 8   evidence he would ever commit a hands-on sexual offense"
 9   and believes -- the government's position is this opinion
10   is just not supported by the evidence.
11        The government would also express to the Court the
12   value of these reports is limited, as the government is
13   not in a position to effectively cross-examine these
14   witnesses.
15        With respect to the sentence and a downward
16   variance, the defendant in this case obviously
17   distributed two separate videos of the sexual abuse of a
18   toddler by her mom in an online chat group.  It appears
19   to be in order to secure his position within the group.
20   On the defendant's cellular telephone were images and
21   videos of child sexual abuse, which he accessed.  These
22   events occurred while the defendant was on pretrial
23   release for grooming in the state of Illinois.  For all
24   the reasons articulated in the government's brief, we do
25   not believe a downward variance is justified.  We believe
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 61 of 108

```
 1  a top of the range sentence is absolutely warranted.
 2  Thank you, Your Honor.
 3          THE COURT:  Thank you.
 4      Mr. Eisenberg.
 5          MR. EISENBERG:  First of all, I want to point
 6  out we are not blaming his behavior on autism spectrum
 7  disorder.  We are just saying this is the big picture,
 8  and I think it's important for the Court to understand
 9  what -- who the defendant is.  Now, again, the government
10  is saying it's all manufactured.  We heard from the
11  informant.  We heard from the prosecutor.  But nobody
12  said, "Well, jeez, Mr. Buttikofer got up and had -- asked
13  his mother to lie about his background."  There's no
14  evidence of that.  And a lot of that report from Megan
15  Farley and from Candice Christiansen -- and I'm the first
16  to admit Candice Christiansen's testimony left a lot to
17  be desired.  But Megan Farley's report did not, and
18  that's part of it.  The diagnosis has to do with getting
19  a history.  And they took the history from Cherie
20  Schilling and made her -- and she made her diagnosis.
21      As far as his criminal history goes, as I'm looking
22  on paragraphs 41 through 43 of the presentence report,
23  possession of alcohol -- I don't think that's even a
24  crime in Wisconsin; I don't know about here -- when he
25  was 19.  Another one, page -- at 19, possession of
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 62 of 108

alcohol.  A third one at age 25, public intoxication.

Now, I suppose we could make the argument that, oh, this Illinois case says that he was going to do something, and I have a real problem with this, Judge. If I have a discussion with you and I put that in the brief, about I'm going to rob a bank and I don't do anything, does that mean I committed a bank robbery? It's the same thing here.  And that informant wanted him to come to Illinois to work off some charge.  It's interesting that the agent couldn't even tell you what the charge was.  Some narcotics violation.  But she wanted to do something to help herself.

I want to talk a little bit about some of the arguments that were made in the government's brief. Specifically, under page 3, the history of the offense. She said that -- or the government said that we said that the agent asked, "begged" him for the videos.  Those were my words, but I still stand by them.  At 15:26, the undercover agent, "I would love to see that," after Mr. Buttikofer has talked about the videos.  At 15:37, "Man, can I see."  At 15:43, "I'd love" -- "I'd love to see that."  At 16:00, "Did you send it?"  So at least we have a 34-minute period where the agent -- or the undercover agent is trying to get Mr. Buttikofer to send that video.  And you know what?  He sent it.  We don't

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 63 of 108

```
 1    dispute that.  But it wasn't like, "Oh, here's the video
 2    and here it is, Agent."  And if he wanted to do that to
 3    stay with -- to stay in the group and be this -- get in
 4    the good graces of the administrator, why did he delete
 5    the Kik app?  Well, what the government says.  He didn't
 6    want to get caught.  I agree with that.  But he was
 7    also -- if his goal was to stay with the administrator,
 8    why did he delete that app?  Because not only was he
 9    trying to not get discovered, but he's -- he's sick of
10    himself.  He's got an addiction.  He knows it.  He's
11    disgusted.  And he doesn't want to do it.
12         Now, then we get into this argument about, oh,
13    there's all this talk about a VPN so that he can hide
14    himself.  Where's the evidence of the VPN?  There isn't
15    any.
16         Next issue, the government says that Mr. Buttikofer
17    lied to Agent Pfeiler when he was interviewed after his
18    arrest on April 1st.  Okay.  At first he did.  Well, why
19    did he do that?  Because he was scared.  He told them he
20    erased the Kik app.  He was scared and ashamed.  That's
21    at 59:15.  At 22:14 he did not save any Abby videos and
22    he deleted them.  That's true.  At 33:40 -- and this is
23    Government's Exhibit -- what did I do with that?  I just
24    had it.  Where is that?  I'm sorry, Judge.
25              THE COURT:  No, take your time.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 64 of 108

1          MR. EISENBERG:  It's the list of -- oh, here it
2    is.  Government's Exhibit 2, at 33:40, he's willing to
3    make a Kik account with the interviewing agents to try to
4    identify Abby and make that kind of abuse stop.  At
5    40:15, he says, "This is a sickness.  I've been going to
6    sex offenders anonymous."  At 1:08, "I'd like to
7    cooperate.  I'm not asking for an attorney."  At 1:08:50,
8    it is possible to -- that he sent the video to Johm,
9    J-O-H-M, the administrator, and Agent Pfeiler tells him
10   at 1:17:40, "Anything you can do will help you."  But, of
11   course, he's worried about going to jail that day.  Agent
12   Pfeiler is somewhat coy about it, because he knows he's
13   going to jail, but Mr. Buttikofer thinks, "Well, maybe I
14   can help myself and not go to jail," but that didn't
15   happen.  But the point of the matter is at first he did
16   say he didn't know anything about the video.  At first he
17   said "I didn't send it," but eventually he came around
18   and told him he probably did.
19          As far as the variance goes, I spent a lot of time
20   on statistics in this.  Exhibit K, 45 images came in on
21   March 30th, a day or two before he was arrested, between
22   12:15 and 12:20 a.m.  And as I am sure you know from
23   doing a lot of child pornography cases, because,
24   unfortunately, it's a pandemic across the country, most
25   child pornography defendants organize, place their stuff

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 65 of 108

1  in folders, make them by categories, and they have
2  thousands.  In fact, the statistic I showed in the memo
3  said that the average number of images per defendant is
4  4,572.  He had 45.  1 percent of the average.
5      Now, I also had an expert talk about the child
6  pornography that was found on his phone.  And Peyton
7  Engel says "There were no bookmarks on any of that child
8  pornography.  I didn't find any search terms for child
9  pornography, such as like PTH-C," preteen hard-core, "and
10  Little Lolita," and he said they were all on the cache,
11  not easily retrievable.  And the argument that Mr. Engel
12  made is that, look, unless he was a computer guru, he
13  wouldn't even know they were there, because they were in
14  the cache and he wouldn't have any way to retrieve them.
15  Now, again, I'm not trying to make an excuse.  He clearly
16  was on a website which did contain child pornography.
17  But -- and he had a screenshot that he took of one image
18  of child pornography.  But I think you have to put this
19  in perspective when you compare it to the rest of the
20  individuals that you see go in front of you.  They're not
21  in folders.  They're not easily retrievable.  They're
22  just there.  And, again, that doesn't excuse anything.
23  It doesn't excuse the fact that he sent that video to the
24  undercover agent.  I get that.
25      I spent a lot of time talking about the guidelines.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 66 of 108

And we agree that the guidelines are adequately -- the presentence writer calculated the guidelines adequately and correctly. But the government spent very little time talking about all the information I put in my brief about why those guidelines are skewed, and in this case, I think they're very skewed.

The Illinois case, to me, having a fantasy discussion with someone is not criminal. It's disgusting, but it's not criminal. When I say something like, I get angry with someone, "I'm so mad I could kill you," does that mean I should be charged with attempted murder? It's the same type of scenario. This is a fantasy discussion between I believe a prostitute who is trying to help herself, who is trying to entice him to come to Illinois, which he can't do because he doesn't want to do it. And I don't know why we spent so much time on the Illinois matter because that's not why we are here. And as I told you in my brief, that case is going to be dismissed as soon as he gets sentenced here. I think I already talked about that.

The letters for him -- and you pointed this out too in your initial observations -- he had steady employment for 20 years. He lost that job because of the Illinois charge. The letters all say the same thing. He is a good person. He is helpful. He made some very poor

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 67 of 108

choices and decisions. I want to say that it is an addiction. He should have sought help earlier to help his addiction. And I think he tried once he got charged in Illinois. He went to Daniel Finn, but he wasn't qualified to deal with this, and he should have gone to somebody else. He's amenable to treatment, however, is what I am trying to say.

And I don't think this charge defines him as a person. Certainly what he did is awful, but it doesn't really define him as who he is.

So the last thing I want to talk about was why you should give the downward departure. In the memo at page 20 there were factors to consider. Like I said, 1 percent. He has 1 percent of an amount of child pornography on his phone of the average defendant. How did he get it? Well, we know it all came in on March 30th. What was the volume? Significantly less than the average child pornographer. How long did he have it? Well, it appears he had it for like two days, but he also had, I think, some other images that started coming in on February 20th, a month and a half before he was arrested. But what's the big kicker here is, where is all the child porn on -- the 63,000 images that the Cellebrite download had from his phone in Illinois? There aren't any. And I didn't hear another word -- and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 68 of 108

```
1   I'm assuming there are some.  I heard a lot of child

2   erotica, but I didn't hear anything about adult

3   pornography in those 63,000 images either.  I'm assuming

4   there was some.  What was his attention to his

5   collection?  Nothing, no organization, no nothing.  He

6   deleted Abby as soon as he got it.  They were all in the

7   cache.  Did he transmit any of them?  It doesn't appear

8   that he did.  There was no VPN, as alleged, so he

9   couldn't hide it.  And he has no hands-on or production.

10        So, Judge, for those reasons, I think a downward

11  variance is appropriate.  I cannot ask you for less than

12  6 years, and I won't do that because that would violate

13  the plea agreement, but I do think a downward variance is

14  very warranted, and I'd ask you to do that.

15            THE COURT:  Thank you, Mr. Eisenberg.

16        Mr. Buttikofer, this is the time in the hearing when

17  you have an opportunity to speak to me directly to tell

18  me anything you'd like me to take into account in

19  determining your sentence.  You don't have to say

20  anything.  And if you choose not to say anything, I won't

21  hold that against you in any way.  But if there is

22  anything you would like to say, now is the time to do so.

23            THE DEFENDANT:  Yes, Your Honor, I would.

24            MR. EISENBERG:  Why don't you use the

25  microphone.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 69 of 108

```
 1              THE DEFENDANT:  Thank you.  Excuse me.  I had
 2   made some notes this morning.  I had a sleep study last
 3   night for sleep apnea, so I got done at about 6 -- 5:30
 4   this morning, so -- you know, from immediately after when
 5   I spoke with Mark last night, so I made some notes here
 6   to say today.  Sorry.
 7         Your Honor, first of all, I want to be totally clear
 8   that I a hundred percent admit the guilt of these
 9   charges.  I don't want to blame this on my autism
10   disorder, my porn addiction, the police, the FBI agent,
11   anybody.  It fully comes on me.
12         I read the victim impact statements that the
13   prosecutor provided me and my attorney.  They are a great
14   impact on me.  I understand how shameful and disgusting
15   my actions were and how they contributed to the cycle of
16   abuse of children.  You know, it makes me physically
17   sick, honestly, to know that I played any part in this
18   whatsoever.
19         I know that I hurt -- excuse me.  I know that I hurt
20   a lot of people with my selfish actions.  My mom; my dad;
21   my stepdad; my stepmom; my daughters, Madie and Katie; my
22   brother, Joel; my ex-girlfriend; my friends; and the rest
23   of my family.  They've all been drastically impacted by
24   my behavior.  The only way to attempt to redeem myself
25   with this is to live a good and honest life going
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 70 of 108

1  forward.

2       Your Honor, I know my journey from here on out is

3  not going to be easy.  But I'm fully dedicated to make

4  that happen and live an honest and good life from here on

5  out.

6       While I have been incarcerated, I have met with a

7  number of psychologists, and I read a lot of books about

8  this stuff -- like *Treating Out-of-Control Sexual*

9  *Behavior*; *Your Brain on Porn*; the book that they referred

10 to earlier, *Caught in the Web of the The Criminal Justice*

11 *System*; *Sex Addicts Anonymous,* "big book"; *Daily*

12 *Meditations For Men and Women Recovering From Sex and*

13 *Porn Addiction* -- and I've learned a lot about myself in

14 the last 17 months, Your Honor.

15      I've gained some healthy coping strategies to go

16 forward.  I look forward to continuing with the Sex

17 Offender Treatment Program in prison, and getting a

18 further understanding of myself and what led to my

19 actions so I never have anything like this happen again.

20      I want to apologize again to everybody here in the

21 courtroom today, everybody that's involved with this.  I

22 thank my family and my friends who have stuck by me and

23 supported me, and I hope you understand that these

24 terrible actions will not define me.  I will live a

25 better life going forward.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 71 of 108

1      Your Honor, since the day I got incarcerated here in
2  Cedar Rapids, I've experienced a lot.  This is the first
3  time I've been in jail for a period of time.  My bunkmate
4  about a month and a half ago hung himself, which, you
5  know, really showed me how valuable life and loved ones
6  really are.  I understand I have to go to prison for the
7  crime I committed, but I'd like to ask the Court to be
8  able to self-surrender to prison, or at least to give me
9  a few weeks to say good-bye to my family, especially my
10 great grandma who is 103 because there's a good chance
11 that I will never get to see her again.  I have never had
12 any write-ups in the jail, Your Honor, in the 17 months
13 I've been here.  And I give you my word that I will
14 follow all rules set by the Court if this is granted to
15 me.
16      I truly am not the same person I was going into all
17 this, and I am greatly ashamed.  It took this catastrophe
18 here for me to realize that I was living so wrong.  And
19 that's it, Your Honor.
20          THE COURT:  All right.  Thank you,
21 Mr. Buttikofer.
22      All right.  We've been going now for two-and-a-half
23 hours.  Our court reporter needs a break, and so we're
24 going to be on break for 15 minutes.  We will come back
25 at 10:50.  At that time, I will pronounce the sentence.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 72 of 108

1   We'll be in recess.

2        (Whereupon, a brief recess was taken.)

3           THE COURT:  We are back in the matter of United

4   States of America versus Douglas John Buttikofer, Jr.,

5   case number 20-CR-1012.  We have taken evidence in the

6   sentencing hearing, heard arguments from the parties,

7   heard allocution, and I understand there is no victim

8   that wishes to address the Court, so we are at that part

9   of the hearing where I am going to pronounce sentence.

10       I want to make some comments about the evidence

11  before the Court -- before I turn to the 3553(a) factors.

12  First of all, I found both witnesses before me today,

13  Charles Gregory and Joshua Heer, to be credible

14  witnesses.  With regard to Gregory in particular, I found

15  his testimony to be credible.  I found that he told what

16  he knew, and what he knew is what the defendant told him,

17  that he didn't have any knowledge beyond that.  I found

18  his recitation of the facts to be credible, and that is

19  that he was telling the truth about what he heard the

20  defendant tell him.

21       The question always is what -- to what extent the

22  defendant told him is the truth and to what extent what

23  the defendant told him was bluffing or other posturing by

24  him.  With regard in particular to his discussion about

25  the Philippines, that troubles me.  I found it to be

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 73 of 108

credible and I find it likely the defendant did make comments about wishing he would have just gone to the Philippines instead of spending his money on criminal defense here. That suggests to me a low degree of acceptance of what he has done here is wrong. I combine that incidentally with the fact that he committed this offense while he was on pretrial release on another sexual offense out of Illinois. And I'll talk more about that Illinois offense in a moment. Whether he is guilty or not guilty of some offense in Illinois, the fact is he was on pretrial release at the time for a sexual assault -- or grooming a child for sexual assault, and while under that condition, he continues to engage in the conduct he engaged in here in the offense conduct. And that's consistent in my view with what Mr. Gregory testified about, the defendant still not giving up and still interested in pursuing sex with children by going to the Philippines.

With regard to Mr. Gregory's comments about the defendant's statements of the autism defense, I found them to be credible. I think Mr. -- and Mr. Eisenberg makes a good point -- that a large portion of Ms. Christiansen's conclusion was based upon her conversation with the defendant's mother, which there's no evidence the defendant attempted to influence that.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 74 of 108

1  It's very clear to me though that the intended defense of

2  this trial was going to be to suggest that the defendant

3  was unusually susceptible to influences by an undercover

4  agent because he was on the autism spectrum, and I

5  believe that the defendant told Mr. Gregory that he was

6  going to do anything he could in his power to pursue that

7  defense and to make it clear, as best he could, that he

8  was on the autism spectrum to -- in order to try to get

9  off of these charges.

10      With regard to the testimony by Joshua Heer, I found

11  him to be a credible witness.  The Illinois event and

12  actions are a mixed bag in my mind.  I understand the

13  argument that there is fantasy and there's reality, and

14  some people engage in sexual fantasy and they find that

15  to be exciting and yet don't ever act and never intended

16  to act.  That could be what was going on here.  It could

17  also be that the defendant fully intended to act and was

18  intentionally trying to groom children through the use of

19  this CS.  I think it's probably someplace in between,

20  quite frankly, and here's my conclusion of the facts.

21  And that is, I think the defendant would have loved to

22  have been in a position to have engaged in sex acts with

23  children, and he lost his nerve when push came to shove.

24  And that suggests that maybe he wouldn't have actually

25  gone through with it.  He clearly didn't go through with

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 75 of 108

1   it.  He spent hours apparently talking but never acting

2   on it when the CS was making the opportunity available to

3   him.  And so while I think he has a strong interest in

4   having sex with children, at the end of the day, on this

5   occasion at least, he lost his nerve to go through with

6   it, either because he was fearful that she was connected

7   to law enforcement or simply because he didn't have the

8   nerve to go through with engaging in those acts with

9   children.

10       Again, it bothers me that he was on pretrial release

11  from that charge when he committed the charge before this

12  Court.  But I don't find the defendant -- That he did

13  not, in fact, go forward with the acts in Illinois I

14  think are to his credit largely.

15       I want to talk about the other evidence before the

16  Court in the form of the opinions by Ms. Christiansen,

17  Ms. Farley, and Mr. Rosell.  I give almost no weight to

18  Ms. Christiansen's opinions regarding the defendant being

19  on the autism spectrum.  I found her testimony -- and to

20  be clear for the record, I presided over a hearing,

21  evidentiary hearing, during which she testified in

22  relation to a motion in limine filed by the government.

23  I issued a ruling at document number 93 eliminating

24  substantially the testimony I was going to allow at trial

25  in this matter.  She was qualified to render an opinion

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 76 of 108

on autism spectrum, but in my mind, just barely. She
based her opinion almost exclusively upon reports of an
interview with the defendant's mother. It was not a
robust research of the defendant's history. She didn't
look into his school records, didn't go back and talk to
other childhood friends. It was almost completely a
hearsay-based conclusion based on a discussion with her
mother. And when she testified, I found her testimony to
be incredibly incredible. She was not a good witness.
She performed poorly. It was clear that she had an
agenda to push, and I found her testimony to be of very
little value, if at all.

    That plays in then into Ms. Farley's testimony --
not testimony, but opinion as reflected in Exhibit P, and
Mr. Rosell's opinion in Exhibit R, because they both
relied at least to some degree on Ms. Christiansen's
opinion and her report. I give little weight to
Ms. Farley's report. I don't know her credibility. She
did not testify. She was not subject to
cross-examination. I do not know her qualifications. I
do not know from the report the extent to which she
reached her conclusions based on what Ms. Christiansen
concluded. And I just found her report to be not very
helpful and not persuasive to me.

    I gave some weight to Mr. Rosell's testimony -- or

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 77 of 108

1  Dr. Rosell's testimony, as reflected -- or not

2  "testimony," opinion, as reflected in his report.  He did

3  conduct some examination and tests on the defendant, and

4  those I find to be reliable to some degree.  The problem

5  with his report is, again, it relies at least in part on

6  Ms. Christiansen's report, and I don't know how much.  I

7  don't know his credibility.  He was not subject to

8  cross-examination.  And there are inconsistencies in what

9  he stated were the facts as he understood them and the

10  facts as I understand them to be as reflected in the

11  presentence investigation report.  And I am -- I also

12  caught, as the government did, that he apparently never

13  questioned the defendant about the allegations of the

14  defendant being hands-on with a child of his girlfriend

15  at some point the past.  And without a confrontation

16  with the defendant about that, Dr. Rosell's opinion of

17  the defendant stands little chance -- or little risk of

18  hands-on in the future with a child carries much less

19  weight than it would if he had confronted him and dealt

20  with that issue.

21      So I'm going to turn now to the 3553(a) factors

22  here.  And turning first to the offense conduct in this

23  instance, the defendant was, as often is the case, online

24  with other people of like mind, looking for and

25  exchanging child porn.  He clearly sent videos to an

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 78 of 108

undercover officer of child porn, of actual sexual abuse

of a minor by a mother from the UK, knowing what was on

it. I do not buy, to the extent that that's being pushed

at all, that he didn't know what was on it or was

surprised by it or anything like that. He fully knew

what was on it.

His motivation I conclude was to curry favor with

the person he believed would be the administrator or with

the hope of obtaining some additional child porn himself.

The fact that he deleted his Kik messenger, I don't know

what to make of that. It could be, as Mr. Eisenberg is

arguing, that that means that he was done with it, had --

was ashamed of it, had no desire to do anything with

that, but I find that to be inconsistent with other

evidence before me about the defendant's continued

interest in child pornography. I think it just as likely

that the defendant deleted his Kik app because he has

clearly demonstrated that he was very careful about how

he dealt with child pornography. The fact that he went

to the woman's -- the CS's location and deleted her

messages off of her phone shows how vigilant he was in

trying to keep a very low profile and make sure there was

very little evidence of it out there. It's my

understanding, just common understanding, from the Kik

messenger that he could reload that app, go back in, and

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 79 of 108

1   reidentify himself as the same person he identified

2   himself as before, and have an ability to continue with

3   this -- the person he believed to be the administrator of

4   this site.  So I do find his conduct to be intentional to

5   solicit and obtain -- continue to obtain child

6   pornography.

7        Mr. Eisenberg makes a very good point though with a

8   differentiation between this defendant and the defendants

9   I often see.  He did not keep thousands of images of

10  child pornography like I normally see.  He did not

11  organize them.  He did not collect them.  Either he is

12  the most careful child pornographer that I've seen where

13  he would view and then delete so he could never get

14  caught with them, or he has less of an interest in it

15  than many of the people that I see that just can't ever

16  delete anything that they ever see that's child

17  pornography and they have to collect it and revisit it on

18  a regular basis.  The reality is the defendant had few

19  images.  As I noted before when I was going through the

20  guidelines, he had 344 total images.  That's just 44

21  images above the 300 images necessary for him to receive

22  a 4-level enhancement under the guidelines.

23       So while the defendant's offense conduct is clearly

24  troubling and disturbing, it does -- it is different from

25  many of the child porn cases I have before me.  This

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 80 of 108

 1  feeds a little bit into the guidelines.  It's been urged
 2  I should vary downward because the guidelines overstate
 3  the seriousness of child pornographers generally, but in
 4  particular with this offender.  I have on one or two
 5  occasions varied downward from the guidelines.  On
 6  guideline section 2G2.2(b)(6), that is the use of a
 7  computer.  I've done that when the only offense is
 8  somebody obtaining child pornography off of a computer
 9  because, in my view, that's the only way anybody gets
10  child pornography these days, and for there to be a
11  2-level enhancement for use of a computer to obtain child
12  pornography, to me, overstates the seriousness of the
13  offense if that's the only thing a person ever did.
14      Here, I don't find that a variance is justified
15  under that ground because the defendant not only used the
16  computer to obtain the child pornography, but then he
17  used the computer to further distribute the child
18  pornography.  The guidelines might overstate the people's
19  belief of how serious these offenses are, but if that's
20  the case, then the people through act of Congress has the
21  ability to change the guidelines, and they have on
22  occasion, and we've seen that in recent years with regard
23  to drug offenses and drug guidelines.  There is a
24  democratic process through which the people can have
25  their will felt and have the guidelines changed.  I don't

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 81 of 108

believe I, as an unelected official appointed for life, should be second-guessing Congress's decision about the seriousness of this offense and the weight that they believe different factors should have in arriving at the guidelines sentence.

It is an advisory guideline sentence, however, and it is only advisory to me. It suggests to me what the commission believes the defendant's sentence should be. But I'm not bound by it, but I'm also not going to vary from the guidelines just based on a disagreement with the guidelines. Even though I know I can have a policy disagreement with the guidelines, I do not.

Another ground for a downward variance here is the defendant's steady employment history, and that is a mitigating factor here. The defendant has been steadily employed as a hard worker. The letters of support show that. He has been a hard worker over the years and a reliable person. So that is -- has some mitigation in my mind.

It's also been urged as a downward variance that the defendant has little criminal history that is of -- of no import here, in the sense there's no crimes of violence, there's no other acts of a sexual nature, criminal acts of a sexual nature here, and I do find that to be mitigating as well. It's not uncommon, quite frankly, to

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 82 of 108

find somebody who is convicted of child pornography to
have little or no criminal history, but it also doesn't
mean it's not mitigating all the same.

It's been urged that I vary downward because the
defendant is suffering from an addiction to child
pornography, a sickness, if you will. I don't find that
to be a basis for a downward variance. Whether it's an
addiction or not, the fact that he desires child
pornography makes him a danger to the community. It
makes him likely to reoffend and harm other people. It's
akin in my mind to motions for a downward variance
because people have drug addictions. And the guidelines,
when we're dealing with departures -- not variances but
when we're dealing with departures -- note that courts
should not depart downward because of an addiction
because it is highly statistically connected with future
offenses if someone is addicted to drugs. I think the
same could be said here. Somebody highly addicted to
child pornography is likely to reoffend because they have
this desire to have child pornography. So I don't find
it to be a mitigating factor.

Finally, it's been urged that I vary downward in
this case because of the defendant's acceptance of
responsibility, and I find that to be a mixed bag here.
The defendant clearly has pled guilty to one of the three

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 83 of 108

offenses he was charged with.  He did not plead guilty in a manner that would allow him to earn a third level off for acceptance of responsibility.  He committed this offense while he was on pretrial release from another offense related to sexual abuse of children.

And, as I mentioned earlier, I credit Mr. Chapman's -- Gregory, I'm sorry, Mr. Gregory's testimony.  The defendant was still talking while in jail pending trial in this matter about the desire to go to the Philippines in order to be able to have sex with children.  It just suggests he's not come to terms with the wrongfulness of his conduct.  I heard his comments during his allocution, and perhaps he has reached that point in his life where he recognizes how severe and how wrong his conduct is, but his actions up until at least this point certainly has not suggested that he fully recognizes the seriousness of his conduct and the need to refrain from doing it.

In arriving at a sentence, I've taken into account a number of factors, including deterrence.  I need to impose a sufficiently severe sentence to deter the defendant from committing offenses like this in the future.  I find any sentence within this guideline range would be sufficient to accomplish that.  I have to impose a sentence sufficiently severe to deter others in the

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 84 of 108

```
 1   defendant's position from doing similar things.  And,
 2   again, I find a guideline sentence will accomplish that
 3   goal.  I need to impose a sentence sufficiently severe to
 4   protect the public and also to reflect the seriousness of
 5   the offense conduct here.  The offense conduct is
 6   serious, and I do find that the defendant still poses
 7   some risk.  Whether it's hands-on -- Dr. Rosell says
 8   no -- but whether it's a hands-on risk or whether it's a
 9   risk of him accessing child pornography and continuing to
10   victimize those children, I think there is a danger of
11   that remaining because of the defendant's persistent
12   pursuit of child pornography as reflected in his conduct
13   here.
14       So taking into account all the factors at Title 18
15   United States Code Section 3553(a), it is the judgment of
16   this Court, Mr. Buttikofer, that you are hereby committed
17   to the custody of the Bureau of Prisons to be imprisoned
18   for a term of 108 months.  That is roughly in the middle
19   of the advisory guideline range.  I find the middle to be
20   appropriate and not the top, because there are some
21   mitigating factors that Mr. Eisenberg has pointed out
22   here.  I find a downward variance below the advisory
23   guideline range is not appropriate here.  Having taken
24   into account not only the individual arguments but the
25   totality of the arguments made by the defense for a
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 85 of 108

1  downward variance, I find a guideline sentence is
2  necessary to achieve the goals of sentencing here.
3  Although I have imposed a sentence in the middle of the
4  guideline range, it's the middle of the guideline range
5  and not the bottom of the guideline range because, again,
6  I am concerned about the defendant's full acceptance of
7  responsibility here, and I find highly aggravating the
8  fact that he committed this offense while he was on
9  pretrial release for another offense connected to sexual
10 abuse of children.

11      It is ordered that this term of imprisonment be
12 served consecutive to any term of imprisonment that may
13 be imposed for the case set forth in paragraph 47 of the
14 presentence report.  This is under Title 18 United States
15 Code Section 3584.  It is recommended that you be
16 designated to a Bureau of Prisons facility in close
17 proximity to your family commensurate with your security
18 and custody classification needs.  It is recommended that
19 you participate in the Bureau of Prisons 500-hour
20 Comprehensive Residential Drug Abuse Treatment Program or
21 an alternate substance abuse treatment program.  It is
22 recommended that you participate in the Bureau of Prisons
23 Sex Offender Management Program.

24      Upon release from imprisonment, you will be placed
25 on supervised release for a term of 5 years.  While on

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 86 of 108

```
 1   supervised release, you must comply with the following
 2   mandatory conditions:  You must not commit another
 3   federal, state, or local crime; you must not unlawfully
 4   use or possess a controlled substance; and you must
 5   cooperate in the collection of a DNA sample as directed
 6   by your probation officer.
 7        You must comply with the requirements of the Sex
 8   Offender Registration and Notification Act as well, as
 9   directed by the United States probation office, the
10   Bureau of Prisons, and any state sex offender
11   registration agency in the location where you reside,
12   work, and/or are a student, and/or were convicted of a
13   qualifying offense.
14        In addition, you must comply with the standard
15   conditions of supervision set out in my judgment order
16   together with all the special conditions set out at
17   paragraphs 82 through 91 of the presentence report.
18        It is ordered that you must pay to the United States
19   a special assessment of $100, which is due immediately.
20   I find that you are indigent and do not impose the $5,000
21   special assessment under the JVTA found at Title 18
22   United States Code Section 3014.  Likewise, I find, given
23   your financial condition and the fact that there is
24   pending restitution, that you not pay a -- that you not
25   pay a special assessment under the AVAA found at 18 U.S.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 87 of 108

```
 1   Code -- I'm sorry, 2259(a).  I likewise find you do not
 2   have the ability to pay a fine, and no fine will be
 3   imposed.
 4        I am going to order restitution in this case, but as
 5   I noted earlier, that restitution order -- a
 6   determination of the amount of restitution will be
 7   determined at a later hearing on November 16, 2021, at
 8   the request of the parties.  I will announce the
 9   restitution obligation at that time, together with the
10   other language that would go with any kind of financial
11   penalty.
12        You are hereby remanded to the custody of the United
13   States Marshal.
14        Ms. Dupuich, there remains outstanding Counts 1 and
15   2.
16           MS. DUPUICH:  We're asking to dismiss those.
17   Thank you, Your Honor.
18           THE COURT:  The Court grants that motion, and
19   Counts 1 and 2 are dismissed.
20        Ms. Dupuich, before I advise Mr. Buttikofer of his
21   limited rights to appeal, is there anything else on
22   behalf of the United States?
23           MS. DUPUICH:  No, Your Honor.
24           THE COURT:  Officer Korth?
25           PROBATION OFFICER:  No, Your Honor.
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 88 of 108

```
 1              THE COURT:  Mr. Eisenberg?
 2              MR. EISENBERG:  I just had two things, Judge.
 3              THE COURT:  Certainly.
 4              MR. EISENBERG:  I know that you can't designate
 5    where he goes, but can you make a recommendation that he
 6    goes to Englewood, Colorado?  That is in our district,
 7    and they do have the RDAP program and they do have a sex
 8    offender program.  And I know it's just a recommendation
 9    but that might help.
10              THE COURT:  I'm not going to make that
11    recommendation, Mr. Eisenberg.  I appreciate you asking
12    for it, but my position generally is I don't make
13    recommendations to the Bureau of Prisons except under
14    very special circumstances, and here's why.  I've been to
15    a number of conferences where I talk with the Bureau of
16    Prisons officials, and what they tell me is, they -- when
17    they get a recommendation from a judge, they really try
18    to comply with that, but it often would be inconsistent
19    with what they believe would be in the best interest of
20    the offender, taking into account all the very many
21    things they have to take into account to try to figure
22    out what would be best housing for an offender, and that
23    they've had occasions where by complying with the judge's
24    request, it has not worked out best for the inmate.  And
25    so there's that factor, and then we add on top of it the
```

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 89 of 108

 1   COVID pandemic, and right now, the Bureau of Prisons has

 2   had tremendous success in limiting the outbreak of COVID

 3   within the prison system, but part of that is they are in

 4   total control of the movement of prisoners, and I don't

 5   want to do anything that's going to interfere with that

 6   or endanger Mr. Buttikofer or any other inmate by having

 7   where and how they place him be influenced by something I

 8   requested.  So given that, I'm not going to make a

 9   request for a specific facility.

10       I also meant to mention the defendant's request for

11   self-surrender or a furlough, and I'm not going to grant

12   that.  The defendant is -- this is a mandatory detention

13   given the nature of the offense here, and I'm not going

14   to allow the defendant the privilege of self-surrender or

15   to grant a furlough to him at this time.

16       Anything else though, Mr. Eisenberg?

17            MR. EISENBERG:  I think when you are done with

18   your discussion about the appellate rights, Ms. Dupuich

19   and I had a scheduling issue we'd like to talk to you

20   about.

21            THE COURT:  Very good.

22       All right.  So, Mr. Buttikofer, let me talk to you,

23   sir, about your right to appeal.  If you disagree with

24   the sentence I've just imposed, you have in this case a

25   limited right to appeal because you've signed a plea

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 90 of 108

agreement with the government in which you have given up

your right to appeal except under limited circumstances

set forth in that paragraph of that plea agreement. So

what I'm about to tell you about your right to appeal

applies only if you believe under the terms of the plea

agreement you can appeal. If you are going to appeal,

it's going to be to a higher court called the Eighth

Circuit Court of Appeals. To appeal to that court, you

would have to file a written notice of appeal with the

Clerk of Court for the Northern District of Iowa here in

Cedar Rapids within the next 14 days. If you fail to

file a written notice of appeal in the next 14 days, you

give up forever your right to appeal the sentence I've

just imposed. If you would like to appeal but you cannot

afford the services of an attorney to do so, I would

appoint an attorney to represent you on appeal at no

expense to you.

    Do you understand your right to appeal, sir?

        THE DEFENDANT: Yes, Your Honor.

        THE COURT: Do you have any questions about

anything we've done here today, sir?

        THE DEFENDANT: No, Your Honor.

        THE COURT: All right. Mr. Eisenberg, you

wanted to talk about scheduling.

        MR. EISENBERG: Sure. On the November 16th

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 91 of 108

1   restitution hearing, could we do it by Zoom or by phone?

2          THE COURT:  Certainly.  I'm amenable to that.

3   Ms. Dupuich?

4          MS. DUPUICH:  Yes, Your Honor.

5          THE COURT:  Yeah, that would be perfectly fine.

6   The defendant has a right to be present at that hearing

7   as well.  Do you want to have him present, Mr. Eisenberg?

8          MR. EISENBERG:  I suppose it depends where he

9   is.  If he's in the Linn County Jail still, sure.  If

10  he's not, I think -- I don't know if the accommodations

11  could be made to have him appear by phone.  I think that

12  would be satisfactory with him.

13         THE COURT:  All right.  We can certainly do it

14  by phone wherever he is at.  Sometimes -- working with

15  the Bureau of Prisons to get that accomplished sometimes

16  is a little difficult, but we'd get it accomplished one

17  way or the other, so we can certainly do that.  If he is

18  still in the Linn County Jail at the time, then we can

19  have him brought over.

20     Ms. Dupuich, I'm going to put you in charge of

21  monitoring where he's at at that time and advising the

22  Court, working with Mr. Eisenberg, of how he's going to

23  appear and whether we need to get a writ with the

24  marshals or an ASR or whatever we call them to have him

25  brought over if he's in the Linn County Jail.

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR   Document 169   Filed 10/27/21   Page 92 of 108

1          Ms. Dupuich, anything further from you?

2               MS. DUPUICH:  No, thank you.

3               THE COURT:  All right.  That concludes this

4     hearing.

5          (Proceedings concluded at 11:15 a.m.)

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 93 of 108

1              C E R T I F I C A T E

2          I, Patrice A. Murray, a Certified Shorthand
Reporter of the State of Iowa, do hereby certify that at
3  the time and place heretofore indicated, a hearing was
held before the Honorable C.J. Williams; that I reported
4  in shorthand and transcribed to the best of my ability
the proceedings of said hearing; and that the foregoing
5  transcript is a true record of all proceedings had on the
taking of said hearing at the above time and place.

6
           I further certify that I am not related to or
7  employed by any of the parties to this action, and
further, that I am not a relative or employee of any
8  attorney or counsel employed by the parties hereto or
financially interested in the action.

9
       IN WITNESS WHEREOF, I have set my hand this 27th day
10  of October, 2021.

11
                /s/ Patrice A. Murray
12              Patrice A. Murray, CSR, RMR, FCRR
                Court Reporter
13              PO Box 10541
                Cedar Rapids, Iowa 52410

14

15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 94 of 108

## $

**$1,000** [1] - 13:18
**$100** [2] - 4:2, 87:19
**$17,000** [2] - 4:7, 12:7
**$250,000** [1] - 4:1
**$45,000** [1] - 13:19
**$5,000** [3] - 4:3, 12:3, 87:20
**$80,000** [1] - 13:12

## '

**'What** [2] - 22:5

## /

**/s** [1] - 94:11

## 1

**1** [16] - 1:10, 2:8, 3:25, 10:11, 10:19, 10:21, 41:4, 46:23, 58:10, 60:24, 66:4, 68:14, 88:14, 88:19
**1-level** [1] - 9:4
**10** [5] - 2:8, 2:8, 7:17, 60:1, 60:18
**10,000** [1] - 37:4
**10-year-old** [1] - 38:25
**10/27/21** [1] - 1:21
**103** [1] - 72:10
**10541** [2] - 1:24, 94:13
**1069** [1] - 1:12
**108** [1] - 85:18
**10:50** [1] - 72:25
**11** [1] - 37:7
**111** [2] - 1:10, 1:17
**11:15** [1] - 93:5
**12** [9] - 7:24, 41:4, 41:9, 41:25, 61:1
**120** [1] - 9:19
**128** [1] - 3:11
**12:15** [1] - 65:22
**12:20** [1] - 65:22
**13** [15] - 2:8, 5:25, 10:11, 10:19, 10:21, 31:10, 59:4, 59:10, 59:23, 60:1, 60:6, 60:18, 61:1, 61:6, 61:7
**130** [1] - 9:24
**130-10** [2] - 59:23, 61:7
**130-5** [1] - 47:4
**14** [5] - 5:25, 91:11, 91:12
**140** [1] - 10:9
**140-6** [1] - 41:5
**15** [2] - 5:25, 72:24
**15:26** [1] - 63:18
**15:37** [1] - 63:20
**15:43** [1] - 63:21

## 2

**16** [3] - 2:3, 11:12, 88:7
**16-year-old** [1] - 38:25
**16:00** [1] - 63:22
**16th** [1] - 91:25
**17** [2] - 71:14, 72:12
**18** [6] - 3:15, 7:20, 85:14, 86:14, 87:21, 87:25
**19** [2] - 62:25
**19th** [1] - 49:15
**1:08** [1] - 65:6
**1:08:50** [1] - 65:7
**1:17:40** [1] - 65:10
**1st** [1] - 64:18

## 2

**2** [9] - 3:12, 36:15, 37:10, 41:9, 41:25, 60:24, 65:2, 88:15, 88:19
**2-level** [5] - 7:22, 8:2, 8:11, 8:23, 81:11
**20** [8] - 3:19, 46:23, 46:24, 47:4, 59:14, 60:7, 67:23, 68:13
**20-CR-1012** [3] - 1:5, 3:4, 73:5
**2002** [2] - 36:18, 36:25
**2013** [2] - 37:8
**2018** [2] - 37:8, 37:9
**2019** [10] - 37:13, 37:15, 37:18, 39:25, 42:2, 42:9, 42:18, 44:18, 47:9, 55:9
**2020** [2] - 17:1, 17:23
**2021** [7] - 1:17, 3:12, 11:12, 17:2, 17:24, 88:7, 94:10
**20th** [3] - 1:17, 49:15, 68:21
**21** [1] - 5:25
**22** [3] - 37:2, 47:16, 59:14
**2252A(a)(5)(B** [1] - 3:16
**2252A(b)(2)** [1] - 3:17
**2259(a)** [1] - 88:1
**22:14** [1] - 64:21
**23** [4] - 46:23, 46:24, 47:4, 47:16
**23rd** [2] - 37:18, 55:12, 55:13
**24** [3] - 6:1, 39:25, 42:2
**24th** [5] - 40:12, 43:1, 43:16, 43:23, 55:16
**25** [1] - 63:1
**25th** [5] - 42:8, 42:18, 47:9, 55:9, 55:13
**26** [1] - 2:4
**27** [1] - 7:18
**27th** [1] - 94:9
**28** [1] - 7:21
**29** [1] - 8:1
**2G2.2(a)(1)** [1] - 7:20
**2G2.2(b)(2)** [1] - 7:25
**2G2.2(b)(3)(F** [1] - 8:3
**2G2.2(b)(4** [1] - 8:7

## 3

**2G2.2(b)(6** [2] - 8:12, 81:6
**2G2.2(b)(7)(C** [1] - 8:17
**2nd** [1] - 6:23

## 3

**3** [4] - 3:14, 37:5, 59:4, 63:15
**30** [3] - 8:5, 9:11, 9:18
**30-5** [1] - 46:24
**300** [4] - 8:20, 45:22, 80:21
**3014** [1] - 87:22
**308** [1] - 1:12
**30th** [3] - 59:17, 65:21, 68:17
**31** [3] - 8:10, 24:21, 26:15
**32** [2] - 8:15, 8:21
**33:40** [2] - 64:22, 65:2
**34-minute** [1] - 63:23
**344** [2] - 8:19, 80:20
**3553(a** [4] - 12:7, 73:11, 78:21, 85:15
**3584** [1] - 86:15
**36** [1] - 2:5
**3E1.1(a)** [1] - 8:25
**3E1.1(b** [1] - 9:5

## 4

**4,572** [1] - 66:4
**4-level** [3] - 8:6, 8:16, 80:22
**40** [1] - 9:14
**40:15** [1] - 65:5
**41** [1] - 62:22
**43** [1] - 62:22
**44** [1] - 80:20
**45** [3] - 9:14, 65:20, 66:4
**47** [2] - 6:2, 86:13
**48** [2] - 6:3, 58:20

## 5

**5** [4] - 3:22, 3:25, 13:13, 86:25
**5-year** [5] - 18:12, 18:13, 18:15, 18:20, 23:22
**5-year-old** [2] - 38:6, 38:24
**50** [1] - 2:5
**500-hour** [1] - 86:19
**52401** [1] - 1:10
**52410** [2] - 1:24, 94:13
**53** [1] - 60:20
**53701-1069** [1] - 1:13
**59** [1] - 4:13
**59:15** [1] - 64:21
**5:30** [1] - 70:3

## 6

**6** [9] - 5:25, 40:16, 40:19,

## A (column)

**41:4, 41:8, 41:25, 59:11, 69:12, 70:3**
**60** [1] - 4:14
**600** [1] - 8:20
**61** [2] - 58:2, 59:9
**62,000** [1] - 45:10
**63,000** [5] - 45:11, 52:6, 53:8, 68:23, 69:3
**64** [1] - 61:3

## 7

**7** [1] - 42:14
**70** [1] - 13:8
**73** [2] - 4:15, 13:9
**7th** [1] - 59:16

## 8

**8** [3] - 59:9, 59:10, 59:23
**8-year-old** [1] - 38:25
**82** [1] - 87:17
**8:58** [1] - 1:18

## 9

**9** [3] - 5:25, 37:6, 60:6
**9/24/21** [1] - 1:21
**91** [1] - 87:17
**92** [2] - 51:12, 53:24
**93** [2] - 6:4, 76:23
**97** [1] - 9:19

## A

**a.m** [3] - 1:18, 65:22, 93:5
**Abby** [3] - 64:21, 65:4, 69:6
**ability** [13] - 4:15, 4:20, 4:22, 6:5, 13:2, 13:3, 13:21, 14:7, 14:17, 80:2, 81:21, 88:2, 94:4
**able** [10] - 7:8, 14:2, 18:5, 22:4, 39:12, 39:14, 43:11, 43:14, 72:8, 84:10
**absolutely** [1] - 62:1
**Abuse** [1] - 86:20
**abuse** [12] - 8:8, 59:20, 60:18, 61:3, 61:17, 61:21, 65:4, 70:16, 79:1, 84:5, 86:10, 86:21
**accept** [1] - 24:19
**acceptance** [6] - 8:24, 9:4, 74:5, 83:23, 84:3, 86:6
**accepted** [1] - 31:4
**accepting** [5] - 30:5, 30:19, 30:22, 31:1, 32:3
**access** [1] - 57:24
**accessed** [2] - 59:15, 61:21
**accessing** [2] - 3:14, 85:9

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 95 of 108

**accommodations** [1] - 92:10
**accomplish** [2] - 84:24, 85:2
**accomplished** [2] - 92:15, 92:16
**account** [15] - 12:25, 13:6, 14:16, 32:15, 32:17, 40:25, 44:5, 44:6, 65:3, 69:18, 84:19, 85:14, 85:24, 89:20, 89:21
**accurate** [6] - 21:16, 41:10, 42:5, 42:16, 42:17, 44:18
**achieve** [1] - 86:2
**acquaintance/friend** [1] - 38:4
**act** [5] - 50:17, 75:15, 75:16, 75:17, 81:20
**Act** [2] - 4:6, 87:8
**acting** [1] - 76:1
**action** [2] - 94:7, 94:8
**actions** [6] - 70:15, 70:20, 71:19, 71:24, 75:12, 84:15
**acts** [5] - 75:22, 76:8, 76:13, 82:23
**actual** [2] - 42:3, 79:1
**add** [2] - 12:13, 89:25
**addendum** [1] - 6:23
**addicted** [2] - 83:17, 83:18
**addiction** [7] - 64:10, 68:2, 68:3, 70:10, 83:5, 83:8, 83:15
**Addiction** [1] - 71:13
**addictions** [1] - 83:12
**Addicts** [1] - 71:11
**addition** [1] - 87:14
**additional** [4] - 9:3, 9:9, 9:22, 79:9
**additionally** [1] - 57:24
**address** [3] - 5:1, 39:13, 73:8
**adequately** [2] - 67:1, 67:2
**adjusted** [1] - 8:21
**administrator** [10] - 22:3, 32:8, 32:16, 32:19, 32:22, 64:4, 64:7, 65:9, 79:8, 80:3
**admit** [2] - 62:16, 70:8
**adult** [2] - 38:7, 69:2
**advance** [1] - 10:13
**advise** [2] - 42:22, 88:20
**advising** [1] - 92:21
**advisory** [6] - 7:16, 9:18, 82:6, 82:7, 85:19, 85:22
**affirmed** [2] - 16:5, 35:24
**afford** [1] - 91:15
**afternoon** [2] - 37:19, 50:14
**age** [2] - 7:24, 63:1
**agency** [4] - 39:9, 44:17, 54:16, 87:11
**agenda** [1] - 77:11
**Agent** [8] - 37:19, 40:8, 54:19, 54:24, 64:2, 64:17, 65:9, 65:11
**agent** [14] - 32:14, 40:8, 41:13, 50:3, 50:14, 54:18, 63:10, 63:17, 63:19, 63:23,

63:24, 66:24, 70:10, 75:4
**agents** [3] - 28:17, 48:17, 65:3
**ages** [1] - 38:22
**aggravating** [1] - 86:7
**ago** [3] - 24:21, 26:15, 72:4
**agree** [3] - 40:6, 64:6, 67:1
**agreement** [4] - 69:13, 91:1, 91:3, 91:6
**air** [1] - 14:11
**akin** [1] - 83:11
**alcohol** [2] - 62:23, 63:1
**alert** [1] - 41:18
**alerting** [1] - 41:21
**allegations** [1] - 78:13
**alleged** [1] - 69:8
**alleges** [1] - 60:19
**allocution** [2] - 73:7, 84:13
**allow** [5] - 76:24, 84:2, 90:14
**almost** [3] - 76:17, 77:2, 77:6
**alternate** [1] - 86:21
**amenable** [2] - 68:6, 92:2
**America** [2] - 3:3, 73:4
**AMERICA** [1] - 1:3
**amount** [3] - 33:14, 68:14, 88:6
**Amy** [1] - 4:5
**analyzer** [1] - 53:10
**Andy** [1] - 4:5
**angry** [1] - 67:10
**announce** [1] - 88:8
**Anonymous** [1] - 71:11
**anonymous** [1] - 65:6
**answer** [6] - 7:9, 24:18, 29:17, 30:25, 51:10, 54:14
**anxiety** [1] - 19:11
**apnea** [1] - 70:3
**apologize** [1] - 71:20
**app** [6] - 32:18, 64:5, 64:8, 64:20, 79:17, 79:25
**appeal** [14] - 88:21, 90:23, 90:25, 91:2, 91:4, 91:6, 91:8, 91:9, 91:12, 91:13, 91:14, 91:16, 91:18
**Appeals** [1] - 91:8
**appear** [6] - 41:9, 57:25, 60:9, 69:7, 92:11, 92:23
**APPEARANCES** [1] - 1:9
**appeared** [2] - 1:11, 1:13
**appellate** [1] - 90:18
**applications** [1] - 53:6
**applies** [1] - 91:5
**apply** [3] - 19:17, 23:16, 24:17
**appoint** [1] - 91:16
**appointed** [1] - 82:1
**appreciate** [3] - 11:4, 12:15, 89:11
**approach** [2] - 46:14, 49:21
**approached** [1] - 49:17
**appropriate** [4] - 15:9, 69:11,

85:20, 85:23
**approximate** [1] - 38:5
**April** [1] - 64:18
**area** [2] - 17:17, 31:12
**arguing** [1] - 79:12
**argument** [7] - 32:21, 56:21, 57:4, 63:2, 64:12, 66:11, 75:13
**arguments** [4] - 63:14, 73:6, 85:24, 85:25
**armed** [2] - 26:19, 26:20
**arrangements** [1] - 46:1
**arrest** [7] - 13:11, 32:5, 43:25, 52:24, 54:23, 55:4, 64:18
**arrested** [12] - 24:2, 44:20, 51:23, 52:16, 52:18, 52:23, 52:25, 53:2, 54:4, 60:16, 65:21, 68:22
**arrests** [1] - 6:4
**arriving** [2] - 82:4, 84:19
**articulated** [1] - 61:24
**ashamed** [4] - 24:25, 64:20, 72:17, 79:13
**aspect** [1] - 53:17
**ASR** [1] - 92:24
**assault** [3] - 47:15, 74:12
**assessed** [6] - 7:18, 7:21, 8:1, 8:5, 8:10, 8:15
**assesses** [1] - 13:2
**assessing** [1] - 12:23
**assessment** [12] - 4:2, 4:3, 4:7, 6:6, 11:21, 11:22, 12:24, 13:7, 14:16, 87:19, 87:21, 87:25
**assessments** [4] - 11:7, 11:8, 11:17, 14:22
**assets** [4] - 12:25, 13:16, 13:19
**assigned** [1] - 37:14
**assignment** [1] - 36:13
**Assistance** [1] - 4:6
**Assistant** [1] - 3:6
**assuming** [2] - 69:1, 69:3
**attached** [2] - 9:24, 10:10
**attained** [1] - 7:24
**attempt** [1] - 70:24
**attempted** [2] - 67:11, 74:25
**attempting** [1] - 33:2
**attention** [6] - 34:7, 37:17, 37:20, 47:3, 47:16, 69:4
**ATTORNEY** [2] - 1:10, 1:12
**attorney** [11] - 19:4, 34:12, 34:13, 34:14, 34:16, 39:18, 65:7, 70:13, 91:15, 91:16, 94:8
**Attorney** [3] - 3:6, 3:8, 37:11
**Attorney's** [1] - 1:10
**August** [1] - 1:17
**author** [4] - 3:10, 58:8, 60:25, 61:7

**authorities** [1] - 34:3
**authorize** [1] - 39:19
**autism** [23] - 19:6, 19:7, 19:10, 19:18, 22:13, 22:15, 23:10, 23:12, 23:14, 23:19, 23:20, 29:3, 33:2, 34:17, 35:6, 62:6, 70:9, 74:20, 75:4, 75:8, 76:19, 77:1
**AVAA** [6] - 4:4, 11:21, 12:5, 13:6, 14:13, 87:25
**available** [1] - 76:2
**Avenue** [3] - 1:10, 1:12, 1:17
**average** [5] - 13:13, 66:3, 66:4, 68:15, 68:18
**awarded** [1] - 8:23
**aware** [3] - 12:2, 55:10, 56:14
**awful** [1] - 68:9

**B**

**background** [5] - 36:16, 36:23, 54:10, 58:14, 62:13
**bag** [2] - 75:12, 83:24
**bail** [3] - 27:21, 27:22, 28:6
**bank** [2] - 63:6, 63:7
**barely** [1] - 77:1
**base** [1] - 7:19
**based** [8] - 12:7, 13:2, 74:23, 77:2, 77:7, 77:22, 82:10
**basing** [1] - 58:2
**basis** [2] - 80:18, 83:7
**became** [1] - 48:18
**become** [1] - 55:10
**bed** [1] - 31:17
**BEFORE** [1] - 1:16
**began** [4] - 36:18, 37:9, 41:15, 48:25
**begged** [1] - 63:17
**begin** [1] - 7:14
**beginning** [1] - 9:13
**begins** [1] - 7:17
**behalf** [4] - 1:11, 1:13, 4:8, 88:22
**Behavior** [1] - 71:9
**behavior** [3] - 30:6, 62:6, 70:24
**belief** [3] - 52:17, 52:20, 81:19
**believes** [2] - 61:9, 82:8
**below** [2] - 31:15, 85:22
**benefit** [1] - 29:7
**Berlin** [2] - 36:18, 37:1
**best** [6] - 16:3, 75:7, 89:19, 89:22, 89:24, 94:4
**better** [4] - 24:11, 25:5, 33:16, 71:25
**between** [9] - 42:10, 45:19, 47:6, 48:22, 55:1, 65:21, 67:13, 75:19, 80:8

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 96 of 108

**beyond** [1] - 73:17
**big** [3] - 62:7, 68:22, 71:11
**biggest** [1] - 24:24
**bill** [1] - 33:15
**bit** [3] - 44:21, 63:13, 81:1
**blame** [1] - 70:9
**blaming** [1] - 62:6
**bluffing** [1] - 73:23
**bond** [1] - 28:10
**book** [4] - 23:14, 23:15, 71:9, 71:11
**bookmarks** [1] - 66:7
**books** [1] - 71:7
**bothers** [1] - 76:10
**bottom** [2] - 17:19, 86:5
**bound** [1] - 82:9
**Box** [4] - 1:10, 1:12, 1:24, 94:13
**Brain** [1] - 71:9
**break** [2] - 72:23, 72:24
**breasts** [1] - 21:24
**brief** [10] - 6:18, 12:2, 12:6, 57:15, 61:24, 63:6, 63:14, 67:4, 67:18, 73:2
**briefly** [3] - 5:15, 6:24, 36:16
**bring** [2] - 51:3, 51:5
**brother** [1] - 70:22
**brought** [4] - 34:7, 37:19, 92:19, 92:25
**bullet** [5] - 59:25, 60:13, 60:17, 60:19, 60:22
**bunk** [4] - 17:14, 17:19, 17:20, 31:15
**bunkbeds** [1] - 17:19
**bunkmate** [1] - 72:3
**Bureau** [9] - 85:17, 86:16, 86:19, 86:22, 87:10, 89:13, 89:15, 90:1, 92:15
**burglary** [1] - 26:22
**Buttikofer** [38] - 3:3, 7:3, 17:6, 28:18, 28:23, 31:9, 31:12, 31:24, 35:3, 39:8, 39:13, 40:25, 41:16, 43:8, 47:7, 47:13, 47:23, 48:5, 48:17, 48:25, 50:7, 53:12, 53:15, 55:2, 60:8, 62:12, 63:20, 63:24, 64:16, 65:13, 69:16, 72:21, 73:4, 85:16, 88:20, 90:6, 90:22
**BUTTIKOFER** [1] - 1:6
**Buttikofer's** [1] - 11:1
**buy** [1] - 79:3
**BY** [11] - 2:3, 2:4, 2:5, 2:5, 16:19, 21:13, 26:12, 28:13, 36:12, 47:1, 50:2
**bye** [1] - 72:9

**C**

**C.J** [2] - 1:16, 94:3

**cache** [3] - 66:10, 66:14, 69:7
**calculated** [1] - 67:2
**calculation** [2] - 4:17, 7:15, 7:17
**call** [7] - 10:24, 11:1, 15:12, 35:4, 35:17, 56:9, 92:24
**called** [6] - 16:5, 35:24, 39:21, 44:2, 46:4, 91:7
**calling** [2] - 35:7, 48:25
**calls** [5] - 15:14, 35:19, 45:18, 50:12, 55:7
**Candice** [3] - 58:12, 62:15, 62:16
**cannot** [3] - 9:8, 69:11, 91:14
**capacity** [7] - 13:1, 13:5, 14:8, 14:9, 14:11, 14:19, 14:20
**capture** [1] - 41:21
**captured** [2] - 41:1, 41:19
**career** [1] - 36:18
**careful** [2] - 79:18, 80:12
**carries** [1] - 78:18
**carrying** [2] - 9:14, 13:9
**Case** [1] - 3:4
**case** [31] - 4:25, 8:18, 12:20, 12:22, 13:17, 14:14, 14:21, 14:23, 15:20, 19:2, 19:15, 25:20, 28:8, 30:23, 37:15, 37:17, 46:3, 56:13, 56:16, 61:16, 63:3, 67:5, 67:7, 67:18, 73:5, 78:23, 81:20, 83:23, 86:13, 88:4, 90:24
**cases** [2] - 65:23, 80:25
**catastrophe** [1] - 72:17
**categories** [1] - 66:1
**category** [3] - 9:17, 9:18, 60:14
**catfish** [1] - 21:3
**catfish-type** [1] - 21:3
**Caught** [1] - 71:10
**caught** [3] - 64:6, 78:12, 80:14
**caused** [2] - 23:17, 33:8
**caution** [1] - 58:4
**caveat** [1] - 43:22
**Cedar** [6] - 1:10, 1:18, 1:24, 72:2, 91:11, 94:13
**cell** [7] - 17:17, 33:21, 41:23, 43:9, 44:1, 47:6, 52:7, 55:17
**cellblock** [2] - 28:22, 31:23, 33:10, 33:12
**Cellebrite** [10] - 44:2, 44:7, 44:10, 44:14, 44:23, 45:6, 51:21, 52:6, 53:10, 68:24
**cellular** [4] - 40:2, 42:1, 44:13, 61:20
**center** [1] - 5:12
**Center** [2] - 16:24, 17:5
**certainly** [9] - 13:1, 26:10, 46:16, 68:9, 84:16, 86:18, 92:2, 92:13, 92:17
**Certified** [2] - 1:19, 94:2
**certify** [2] - 94:2, 94:6
**chair** [5] - 16:2, 16:8, 31:14, 36:2, 36:3
**chance** [2] - 72:10, 78:17
**change** [1] - 81:21
**changed** [1] - 81:25
**Chapman's** [1] - 84:7
**characterized** [2] - 60:8, 60:17
**charade** [1] - 35:5
**charge** [31] - 18:7, 18:8, 18:10, 18:11, 18:12, 18:15, 18:19, 18:23, 20:1, 27:2, 27:15, 27:23, 27:25, 28:2, 28:14, 30:7, 33:15, 63:9, 63:11, 67:24, 68:8, 76:11, 92:20
**charged** [7] - 3:14, 24:4, 24:22, 59:2, 67:11, 68:3, 84:1
**charges** [6] - 6:3, 18:3, 18:6, 30:2, 70:9, 75:9
**CHARLES** [2] - 2:3, 16:4, 16:14
**Charles** [4] - 5:12, 15:14, 16:13, 73:13
**chat** [20] - 20:2, 20:7, 20:8, 20:17, 20:18, 20:19, 20:23, 20:25, 21:4, 21:5, 21:11, 21:19, 23:4, 23:6, 32:9, 32:13, 32:23, 61:18
**cheaper** [1] - 24:12
**check** [1] - 30:7
**Cherie** [1] - 62:19
**Child** [1] - 4:5
**child** [54] - 3:15, 18:9, 18:11, 18:15, 18:19, 24:14, 32:1, 38:6, 38:7, 38:8, 45:12, 51:25, 52:7, 52:19, 59:15, 60:18, 61:21, 65:23, 65:25, 66:5, 66:7, 66:8, 66:16, 66:18, 68:14, 68:18, 68:23, 69:1, 74:12, 78:14, 78:18, 78:25, 79:1, 79:9, 79:16, 79:19, 80:5, 80:10, 80:12, 80:16, 80:25, 81:3, 81:8, 81:10, 81:11, 81:16, 81:17, 83:1, 83:5, 83:8, 83:19, 83:20, 85:9, 85:12
**childhood** [1] - 77:6
**children** [39] - 38:20, 44:11, 45:4, 46:7, 47:13, 47:15, 48:8, 48:11, 52:3, 70:16, 74:17, 75:18, 75:23, 76:4, 76:9, 84:5, 84:11, 85:10, 86:10
**Children's** [1] - 37:12
**children's** [2] - 43:24, 44:9
**choices** [1] - 68:1
**choose** [1] - 69:20
**Christiansen** [5] - 58:1, 59:8, 62:15, 76:16, 77:22
**Christiansen's** [6] - 58:12, 62:16, 74:23, 76:18, 77:16, 78:6
**Circuit** [2] - 12:22, 91:8
**circumstances** [5] - 25:1, 59:2, 61:4, 89:14, 91:2
**City** [7] - 36:18, 37:1, 37:3, 37:4, 40:10, 44:19, 54:23
**city** [3] - 36:19, 37:2, 48:17
**clarification** [1] - 6:12
**clarify** [1] - 58:21
**classification** [1] - 86:18
**clear** [6] - 60:12, 70:7, 75:1, 75:7, 76:20, 77:10
**clearly** [6] - 66:15, 75:25, 78:25, 79:18, 80:23, 83:25
**Clerk** [1] - 91:10
**client** [6] - 5:20, 6:20, 29:14, 51:20, 52:12, 52:15
**close** [1] - 86:16
**clothed** [1] - 52:3
**clothes** [1] - 52:5
**co** [1] - 23:13
**co-counsel** [1] - 23:13
**Code** [5] - 3:16, 85:15, 86:15, 87:22, 88:1
**coerced** [1] - 50:20
**collect** [2] - 80:11, 80:17
**collection** [2] - 69:5, 87:5
**Colorado** [1] - 89:6
**combine** [1] - 74:5
**comfortable** [3] - 16:10, 36:2, 36:4
**coming** [4] - 17:13, 33:7, 48:14, 68:21
**commencing** [1] - 1:18
**commensurate** [1] - 86:17
**comment** [2] - 24:15, 25:23
**comments** [5] - 23:11, 73:10, 74:2, 74:19, 84:12
**commission** [1] - 82:8
**commit** [5] - 25:6, 58:18, 58:25, 61:8, 87:2
**committed** [8] - 31:4, 63:7, 72:7, 74:6, 76:11, 84:3, 85:16, 86:8
**committing** [1] - 84:22
**common** [1] - 79:24
**communicated** [1] - 49:6
**communication** [2] - 47:5, 48:24
**community** [1] - 83:9
**compare** [1] - 66:19
**Completed** [1] - 1:21
**completely** [1] - 77:6
**completes** [1] - 56:12
**comply** [4] - 87:1, 87:7, 87:14, 89:18
**complying** [1] - 89:23
**Comprehensive** [1] - 86:20
**computer** [8] - 8:13, 66:12,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 97 of 108

81:7, 81:8, 81:11, 81:16, 81:17
concern [2] - 57:20, 57:21
concerned [1] - 86:6
concerning [2] - 58:17, 59:2
concerns [1] - 57:16
concession [2] - 29:21, 29:23
conclude [1] - 79:7
concluded [2] - 77:23, 93:5
concludes [1] - 93:3
conclusion [3] - 74:23, 75:20, 77:7
conclusions [2] - 60:25, 77:22
condition [3] - 13:11, 74:13, 87:23
conditions [3] - 87:2, 87:15, 87:16
conduct [14] - 6:2, 8:8, 74:14, 78:3, 78:22, 80:4, 80:23, 84:12, 84:15, 84:17, 85:5, 85:12
conferences [1] - 89:15
confident [1] - 48:20
confidential [5] - 37:21, 38:13, 39:3, 40:1
confines [1] - 44:2
confirm [2] - 39:14, 43:18
confrontation [1] - 78:15
confronted [1] - 78:19
confused [3] - 27:9, 30:3, 46:19
Congress [1] - 81:20
Congress's [1] - 82:2
connected [3] - 76:6, 83:16, 86:9
consecutive [1] - 86:12
consider [2] - 58:22, 68:13
consideration [1] - 58:1
considered [2] - 58:11, 60:14
consistent [2] - 60:23, 74:15
contact [4] - 17:5, 17:9, 42:21, 43:4
contain [1] - 66:16
contained [1] - 52:7
content [1] - 21:7
contest [1] - 4:23
contested [2] - 11:5, 11:6
contesting [1] - 4:21
context [1] - 48:2
continue [2] - 80:2, 80:5
continued [2] - 48:12, 79:15
continues [1] - 74:13
continuing [2] - 71:16, 85:9
contradicted [1] - 59:24
contributed [1] - 70:15
control [1] - 90:4
Control [1] - 71:8
controlled [2] - 13:25, 87:4

conversating [1] - 48:20
conversation [10] - 37:23, 39:17, 43:22, 47:6, 47:8, 48:22, 49:3, 50:22, 55:1, 74:24
conversations [6] - 19:24, 43:10, 50:10, 51:5, 53:6, 53:25
convicted [3] - 31:25, 83:1, 87:12
conviction [2] - 13:23, 31:3
convictions [3] - 9:15, 26:13, 30:20
convince [2] - 25:15, 50:20
convincing [1] - 25:14
cooperate [2] - 65:7, 87:5
copies [1] - 42:5
coping [1] - 71:15
copout [3] - 25:18, 29:15, 30:8
copy [1] - 42:16
core [2] - 59:5, 66:9
correct [27] - 5:17, 25:5, 32:1, 38:17, 40:12, 41:6, 41:7, 41:11, 42:3, 42:6, 44:14, 44:25, 45:23, 46:8, 46:10, 46:11, 47:25, 49:8, 50:8, 50:9, 50:13, 51:24, 52:1, 52:9, 55:15, 56:7, 56:8
Correctional [2] - 16:24, 17:5
correctional [2] - 5:11, 16:20
correctly [1] - 67:3
counsel [3] - 23:13, 56:19, 94:8
count [2] - 3:13
Count [1] - 3:14
counting [1] - 45:11
country [2] - 22:19, 65:24
Counts [2] - 88:14, 88:19
County [10] - 16:22, 16:24, 17:5, 39:19, 41:14, 42:4, 54:23, 92:9, 92:18, 92:25
course [3] - 9:21, 42:20, 65:11
COURT [78] - 1:1, 3:2, 4:12, 4:20, 4:25, 5:4, 5:7, 5:16, 5:18, 5:23, 6:12, 6:14, 6:18, 7:2, 7:7, 7:11, 7:14, 9:8, 10:5, 10:7, 10:9, 10:17, 10:19, 10:22, 11:3, 12:10, 12:19, 15:4, 15:6, 15:15, 15:17, 15:22, 15:24, 16:7, 16:16, 24:17, 26:2, 26:6, 26:10, 28:3, 35:13, 35:15, 35:20, 36:1, 36:8, 36:22, 46:16, 46:19, 46:22, 46:25, 49:22, 49:24, 56:2, 56:4, 56:9, 56:12, 57:2, 57:7, 57:12, 60:4, 60:11, 62:3, 64:25, 69:15, 72:20, 73:3, 88:18, 88:24, 89:1, 89:3,

89:10, 90:21, 91:20, 91:23, 92:2, 92:5, 92:13, 93:3
Court [33] - 1:23, 3:2, 3:21, 3:24, 3:25, 4:1, 5:1, 9:8, 10:13, 11:10, 11:20, 13:2, 13:5, 22:9, 24:19, 30:14, 48:3, 58:22, 61:11, 62:8, 72:7, 72:14, 73:8, 73:11, 76:12, 76:16, 85:16, 88:18, 91:8, 91:10, 92:22, 94:12
Court's [1] - 12:8
court's [1] - 3:11
Courthouse [1] - 41:15
courthouse [1] - 42:4
courtroom [4] - 15:19, 17:7, 26:7, 71:21
courts [2] - 22:12, 83:14
covert [1] - 40:25
COVID [2] - 90:1, 90:2
coy [1] - 65:12
cracked [1] - 19:9
credentials [1] - 58:14
credibility [2] - 77:18, 78:7
credible [6] - 73:13, 73:15, 73:18, 74:1, 74:21, 75:11
credit [2] - 76:14, 84:6
crime [7] - 3:18, 25:6, 27:4, 31:4, 62:24, 72:7, 87:3
crimes [1] - 82:22
Crimes [2] - 36:15, 37:12
Criminal [2] - 3:4, 71:10
criminal [18] - 9:12, 9:16, 9:17, 9:18, 13:17, 18:3, 18:6, 30:2, 30:7, 37:1, 61:1, 62:21, 67:8, 67:9, 74:3, 82:21, 82:23, 83:2
cross [5] - 19:8, 49:24, 61:13, 77:20, 78:8
Cross [1] - 26:2
CROSS [4] - 2:4, 2:5, 26:11, 50:1
Cross-examination [1] - 26:2
CROSS-EXAMINATION [4] - 2:4, 2:5, 26:11, 50:1
cross-examination [3] - 49:24, 77:20, 78:8
cross-examine [1] - 61:13
cross-examined [1] - 19:8
CS [7] - 42:10, 44:4, 45:19, 46:6, 75:19, 76:2
CS's [3] - 42:1, 45:4, 79:20
CSR [2] - 1:23, 94:12
current [2] - 12:25, 13:3, 36:13
curry [1] - 79:7
custody [5] - 13:14, 15:15,

85:17, 86:18, 88:12
cut [1] - 51:17
cycle [1] - 70:15

**D**

D.J [5] - 39:7, 39:12, 40:24, 41:15, 44:6
D.JButtikofer [1] - 44:6
dad [1] - 70:20
Daily [1] - 71:11
danger [2] - 83:9, 85:10
Daniel [1] - 68:4
databases [1] - 39:10
date [3] - 11:11, 47:10, 55:4
dates [2] - 55:3, 55:7
daughter [2] - 22:22, 22:23
daughters [2] - 39:1, 70:21
Daviess [3] - 39:18, 41:14, 42:4
days [4] - 68:19, 81:10, 91:11, 91:12
deal [1] - 68:5
dealing [2] - 83:13, 83:14
dealt [2] - 78:19, 79:19
decide [1] - 39:3
decision [1] - 82:2
decisions [1] - 68:1
dedicated [1] - 71:3
defendant [30] - 3:7, 3:12, 3:20, 4:4, 5:13, 5:24, 6:6, 7:19, 7:22, 8:2, 8:3, 8:11, 8:16, 8:22, 9:3, 9:12, 9:23, 10:12, 12:3, 12:23, 13:11, 13:20, 13:21, 14:3, 14:5, 14:13, 14:14, 14:19, 15:8, 17:23, 18:1, 19:20, 19:25, 21:14, 21:18, 23:3, 23:9, 24:6, 28:9, 37:15, 38:10, 41:6, 42:10, 42:22, 45:19, 46:6, 46:9, 49:9, 56:23, 58:13, 58:18, 58:20, 59:5, 59:10, 60:3, 60:14, 60:17, 61:16, 61:22, 62:9, 66:3, 68:15, 73:16, 73:20, 73:22, 73:23, 74:1, 74:16, 74:25, 75:2, 75:5, 75:17, 75:21, 76:12, 76:18, 78:3, 78:13, 78:14, 78:16, 78:17, 78:23, 79:17, 80:8, 80:18, 81:15, 82:15, 82:21, 83:5, 83:25, 84:8, 84:22, 85:6, 90:12, 90:14, 92:6
DEFENDANT [7] - 7:6, 7:10, 7:13, 69:23, 70:1, 91:19, 91:22
Defendant [2] - 1:7, 1:13
Defendant's [8] - 46:13, 47:3, 57:17, 58:8, 58:16, 59:4, 59:10, 59:25
defendant's [28] - 4:14, 4:21, 6:10, 6:5, 9:1, 9:15, 11:19,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 98 of 108

13:2, 13:10, 14:16, 44:12, 56:15, 59:17, 59:21, 61:20, 74:20, 74:24, 77:3, 77:4, 79:15, 80:23, 82:8, 82:14, 83:23, 85:1, 85:11, 86:6, 90:10

**defendants** [2] - 65:25, 80:8
**Defense** [1] - 58:5
**defense** [14] - 13:17, 15:20, 19:7, 19:18, 23:12, 23:19, 25:12, 56:16, 56:19, 74:4, 74:20, 75:1, 75:7, 85:25
**defense's** [1] - 56:20
**define** [2] - 68:10, 71:24
**defines** [1] - 68:8
**definition** [1] - 53:22
**degree** [4] - 36:25, 74:4, 77:16, 78:4
**delayed** [1] - 14:9
**delete** [10] - 42:23, 43:11, 53:2, 53:4, 53:7, 53:8, 64:4, 64:8, 80:13, 80:16
**deleted** [13] - 32:18, 43:10, 43:12, 43:18, 43:20, 53:6, 53:9, 55:17, 64:22, 69:6, 79:10, 79:17, 79:20
**democratic** [1] - 81:24
**demonstrated** [1] - 79:18
**denial** [1] - 60:21
**depart** [1] - 83:15
**department** [1] - 41:22
**department-issued** [1] - 41:22
**departure** [1] - 68:12
**departures** [2] - 83:13, 83:14
**depending** [1] - 10:25
**depends** [1] - 92:8
**describe** [1] - 17:11
**designate** [1] - 89:4
**designated** [1] - 86:16
**desire** [4] - 43:23, 79:13, 83:20, 84:9
**desired** [1] - 62:17
**desires** [1] - 83:8
**detail** [1] - 9:21
**details** [1] - 6:1
**detained** [3] - 27:20, 28:8, 28:9
**detention** [1] - 90:12
**deter** [2] - 84:21, 84:25
**determination** [1] - 88:6
**determine** [2] - 38:19, 46:5
**determined** [6] - 7:16, 8:19, 12:15, 13:18, 38:10, 88:7
**determining** [2] - 28:4, 69:19
**deterrence** [1] - 84:20
**devoted** [1] - 14:20
**diagnoses** [1] - 34:21
**diagnosis** [4] - 34:24, 35:1, 62:18, 62:20
**different** [6] - 19:23, 44:22,

50:14, 54:16, 80:24, 82:4
**differentiation** [1] - 80:8
**difficult** [4] - 26:4, 47:2, 47:17, 92:16
**DIRECT** [4] - 2:3, 2:5, 16:18, 36:11
**directed** [2] - 87:5, 87:9
**directly** [1] - 69:17
**disability** [1] - 19:10
**disagree** [1] - 90:23
**disagreement** [2] - 82:10, 82:12
**disappointed** [2] - 50:25, 51:8
**discovered** [1] - 64:9
**discovery** [1] - 57:24
**discretion** [1] - 12:9
**discuss** [1] - 19:25
**discussed** [2] - 6:22, 7:1
**discussion** [6] - 63:5, 67:8, 67:13, 73:24, 77:7, 90:18
**discussions** [2] - 28:17, 31:11
**disgusted** [1] - 64:11
**disgusting** [2] - 67:9, 70:14
**dismiss** [1] - 88:16
**dismissed** [2] - 67:19, 88:19
**disorder** [6] - 29:4, 33:3, 34:18, 35:6, 62:7, 70:10
**disposition** [1] - 56:16
**dispute** [1] - 64:1
**dissipated** [1] - 13:16
**distribute** [1] - 81:17
**distributed** [1] - 61:17
**distributing** [1] - 18:10
**distribution** [3] - 8:4, 20:1, 59:19
**DISTRICT** [2] - 1:1, 1:1
**district** [2] - 28:4, 89:6
**District** [1] - 91:10
**districts** [1] - 28:6
**disturbing** [1] - 80:24
**DNA** [1] - 87:5
**docket** [5] - 46:23, 47:4, 58:1, 59:9, 59:23
**document** [6] - 3:11, 9:24, 10:9, 41:5, 61:7, 76:23
**done** [10] - 34:17, 48:22, 50:4, 50:7, 70:3, 74:5, 79:12, 81:7, 90:17, 91:21
**dorm** [3] - 17:13, 17:14, 31:8
**dormitory** [2] - 17:18, 17:20
**doubtful** [1] - 11:2
**Doug** [1] - 17:6
**DOUGLAS** [1] - 1:6
**Douglas** [3] - 3:3, 39:13, 73:4
**down** [2] - 56:5, 60:19
**download** [6] - 44:2, 44:7, 44:10, 51:22, 52:7, 68:24
**downloaded** [1] - 44:1

**downward** [19] - 15:7, 56:15, 56:18, 61:15, 61:25, 68:12, 69:10, 69:13, 81:2, 81:5, 82:13, 82:20, 83:4, 83:7, 83:11, 83:15, 83:22, 85:22, 86:1
**dozens** [5] - 45:10, 45:12
**Dr** [3] - 78:1, 78:16, 85:7
**drastically** [1] - 70:23
**drawing** [2] - 47:2, 47:16
**driver** [1] - 13:23
**driving** [1] - 14:3
**dropped** [1] - 43:4
**dropping** [1] - 48:24
**Drug** [1] - 86:20
**drug** [4] - 54:7, 81:23, 83:12
**drugged** [1] - 38:5
**drugs** [1] - 83:17
**Dubuque** [6] - 37:22, 44:19, 44:20, 48:18, 54:23, 54:24
**due** [1] - 87:19
**duly** [2] - 16:5, 35:24
**Dupuich** [20] - 3:7, 4:8, 9:1, 10:14, 11:16, 14:24, 15:11, 16:17, 36:9, 46:19, 56:6, 56:21, 56:24, 57:12, 68:14, 88:20, 90:18, 92:3, 92:20, 93:1
**DUPUICH** [42] - 1:10, 2:3, 2:5, 4:11, 4:19, 4:24, 5:3, 5:6, 5:9, 5:17, 9:6, 10:6, 10:15, 11:23, 15:3, 15:13, 15:16, 15:18, 16:19, 21:13, 25:25, 35:14, 35:18, 36:10, 36:12, 46:12, 46:18, 46:21, 46:23, 47:1, 49:19, 49:23, 56:3, 56:8, 57:1, 57:13, 60:6, 60:12, 88:16, 88:23, 92:4, 93:2
**during** [7] - 5:5, 19:3, 37:23, 43:22, 48:15, 76:21, 84:13

## E

**early** [1] - 43:5
**earn** [4] - 13:4, 13:21, 14:3, 84:2
**earning** [8] - 13:1, 13:5, 13:12, 14:8, 14:11, 14:19, 14:20
**easily** [2] - 66:11, 66:21
**easy** [1] - 71:3
**eavesdrop** [4] - 39:21, 39:23, 40:4, 43:2
**educational** [1] - 59:6
**effect** [1] - 43:11
**effectively** [1] - 61:13
**Eighth** [2] - 12:22, 91:7
**EISENBERG** [39] - 1:12, 2:4, 2:5, 5:22, 6:8, 6:13, 6:17, 6:21, 10:3, 10:18, 10:25,

12:13, 15:5, 15:23, 21:8, 21:12, 24:16, 26:3, 26:9, 26:12, 28:12, 28:13, 30:13, 35:11, 36:20, 46:17, 50:2, 55:25, 56:11, 57:3, 57:11, 62:5, 65:1, 69:24, 89:2, 89:4, 90:17, 91:25, 92:8
**Eisenberg** [27] - 1:12, 3:8, 5:19, 6:19, 7:5, 7:8, 10:1, 10:22, 12:11, 15:4, 15:22, 28:3, 56:9, 56:22, 57:2, 62:4, 69:15, 74:21, 79:11, 80:7, 85:21, 89:1, 89:11, 90:16, 91:23, 92:7, 92:22
**either** [7] - 11:21, 14:13, 14:14, 28:7, 69:3, 76:6, 80:11
**ejaculate** [1] - 38:8
**electronic** [1] - 39:20
**eliminating** [1] - 76:23
**Elizabeth** [1] - 3:6
**ELIZABETH** [1] - 1:10
**elsewhere** [1] - 60:24
**employed** [4] - 13:15, 82:16, 94:7, 94:8
**employee** [1] - 94:7
**employment** [4] - 13:14, 13:22, 67:22, 82:14
**encountered** [2] - 20:4, 21:2
**end** [4] - 51:15, 51:16, 54:1, 76:4
**endanger** [1] - 90:6
**ended** [1] - 20:15
**enforcement** [4] - 36:17, 37:7, 39:10, 76:7
**engage** [2] - 74:13, 75:14
**engaged** [3] - 8:4, 74:14, 75:22
**engaging** [1] - 75:8
**Engel** [2] - 66:7, 66:11
**Englewood** [1] - 89:6
**enhancement** [7] - 7:22, 8:2, 8:6, 8:11, 8:16, 80:22, 81:11
**entice** [3] - 50:15, 50:19, 67:14
**entire** [3] - 17:22, 48:6, 48:15
**entirely** [2] - 58:10, 59:23
**erased** [1] - 64:20
**erotic** [1] - 45:12
**erotica** [2] - 51:25, 69:2
**errands** [1] - 48:13
**escorted** [1] - 43:3
**especially** [1] - 72:9
**evaluating** [1] - 58:24
**evaluation** [1] - 58:3
**evaluations** [1] - 57:23
**evaluator** [5] - 57:23, 58:5, 58:11, 58:16, 60:2
**evening** [5] - 43:4, 43:5, 48:4, 48:9
**event** [1] - 75:11
**events** [1] - 61:22

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 99 of 108

eventually [1] - 65:17
**Evidence** [1] - 24:17
evidence [17] - 10:2, 10:14, 11:18, 14:25, 56:13, 59:24, 61:2, 61:8, 61:10, 62:14, 64:14, 73:5, 73:10, 74:25, 76:15, 79:15, 79:23
evidentiary [1] - 76:21
ex [1] - 70:22
ex-girlfriend [1] - 70:22
exact [1] - 22:11
exactly [3] - 21:17, 33:5, 51:2
**EXAMINATION** [8] - 2:3, 2:4, 2:5, 2:5, 16:18, 26:11, 36:11, 50:1
examination [7] - 26:2, 35:13, 49:24, 56:2, 77:20, 78:3, 78:8
examinations [2] - 57:19
examine [2] - 40:2, 61:13
examined [3] - 16:6, 19:8, 35:25
example [1] - 13:25
exceeding [1] - 13:19
except [3] - 11:13, 89:13, 91:2
exchanging [1] - 78:25
exciting [1] - 75:15
exclusively [1] - 77:2
excuse [6] - 25:1, 66:15, 66:22, 66:23, 70:1, 70:19
excused [2] - 35:16, 56:5
exhibit [2] - 40:20, 49:21
**Exhibit** [22] - 2:8, 10:8, 40:19, 41:4, 41:8, 41:25, 42:14, 46:14, 47:3, 57:17, 57:18, 58:5, 58:8, 58:16, 59:4, 59:10, 60:1, 64:23, 65:2, 65:20, 77:14, 77:15
exhibits [2] - 10:1, 57:21
**Exhibits** [7] - 2:8, 9:24, 10:11, 10:19, 10:21, 40:16, 60:24
expecting [1] - 22:7
expense [1] - 91:17
experience [2] - 36:17, 58:15
experienced [1] - 72:2
expert [6] - 19:1, 19:5, 19:21, 29:3, 34:18, 66:5
explanation [1] - 6:10
exploitation [1] - 8:9
express [2] - 21:18, 61:11
expressed [5] - 23:3, 23:9, 24:6, 25:17, 43:23
extent [7] - 14:19, 58:2, 58:16, 73:21, 73:22, 77:21, 79:3
extraction [6] - 44:16, 44:23, 44:25, 45:3, 45:7, 53:10

## F

**Facebook** [8] - 39:6, 40:20, 40:24, 40:25, 41:5, 44:6, 44:8, 45:3
facilitating [1] - 48:9
facility [4] - 16:20, 17:13, 86:16, 90:9
facing [3] - 18:3, 18:6, 18:19
fact [16] - 12:16, 19:13, 34:16, 34:23, 46:6, 51:15, 66:2, 66:23, 74:6, 74:10, 76:13, 79:10, 79:19, 83:8, 86:8, 87:23
factor [5] - 60:2, 60:9, 82:15, 83:21, 89:25
factors [9] - 12:8, 60:8, 68:13, 73:11, 78:21, 82:4, 84:20, 85:14, 85:21
facts [8] - 14:12, 59:1, 59:19, 61:4, 73:18, 75:20, 78:9, 78:10
fail [1] - 91:11
failed [1] - 30:20
failure [5] - 26:24, 27:1, 27:13, 27:25, 60:13
fair [6] - 4:9, 5:20, 51:21, 53:24, 55:2, 55:21
fake [1] - 33:2
fall [2] - 20:20, 37:15
falls [1] - 8:19
familiar [1] - 5:8
family [4] - 70:23, 71:22, 72:9, 86:17
fantasy [11] - 47:19, 49:4, 50:4, 50:8, 50:17, 50:25, 67:7, 67:13, 75:13, 75:14
far [9] - 14:6, 19:5, 19:14, 24:14, 30:11, 32:25, 34:19, 62:21, 65:19
Farley [2] - 62:15, 76:17
Farley's [3] - 62:17, 77:13, 77:18
favor [3] - 20:20, 23:5, 79:7
FBI [4] - 32:5, 32:7, 32:13, 70:10
FCRR [2] - 1:23, 94:12
fearful [1] - 76:6
February [3] - 3:12, 59:16, 68:21
federal [8] - 27:2, 27:3, 27:4, 27:23, 27:24, 27:25, 28:2, 87:3
feeds [1] - 81:1
feel [4] - 7:3, 29:25, 30:1, 32:3
fees [1] - 24:10
fellow [1] - 31:24
felt [11] - 23:19, 24:23, 24:25, 25:2, 25:10, 25:15,

29:12, 29:13, 30:4, 30:5, 81:25
**female** [10] - 19:4, 38:4, 38:5, 38:7, 38:14, 38:17, 38:25, 40:8, 42:10, 42:21
females [3] - 21:16, 45:14, 45:16
few [3] - 48:13, 72:9, 80:18
figure [1] - 89:21
file [3] - 3:11, 91:9, 91:12
filed [4] - 3:11, 9:23, 10:10, 76:22
finally [3] - 59:21, 60:21, 83:22
financial [5] - 13:3, 13:10, 14:23, 87:23, 88:10
financially [1] - 94:8
find [30] - 4:4, 14:5, 14:6, 14:7, 14:12, 34:1, 39:7, 66:8, 74:1, 75:14, 76:12, 78:4, 79:14, 80:4, 81:14, 82:24, 83:1, 83:6, 83:20, 83:24, 84:23, 85:2, 85:6, 85:19, 85:22, 86:1, 86:7, 87:20, 87:22, 88:1
finds [1] - 24:20
fine [16] - 3:25, 4:15, 4:21, 4:22, 11:7, 11:8, 12:7, 13:1, 13:2, 13:4, 14:13, 14:21, 57:7, 88:2, 92:5
Finn [1] - 68:4
first [26] - 5:19, 6:21, 7:3, 11:17, 11:24, 14:6, 15:12, 16:5, 35:24, 37:17, 37:23, 39:5, 40:19, 55:10, 56:17, 56:21, 57:8, 62:5, 62:15, 64:18, 65:15, 65:16, 70:7, 72:2, 73:12, 78:22
flux [1] - 12:21
folders [2] - 66:1, 66:21
follow [1] - 72:14
following [4] - 3:1, 42:8, 48:17, 87:1
follows [2] - 16:6, 35:25
FOR [1] - 1:1
Force [2] - 37:12
foregoing [1] - 94:4
foremost [1] - 11:25
forever [1] - 91:13
form [1] - 76:16
forth [4] - 22:2, 30:17, 86:13, 91:3
forward [6] - 25:22, 33:7, 34:6, 71:1, 71:16, 71:25, 76:13
forwarded [1] - 22:12
four [3] - 36:25, 38:24, 50:13
four-year [1] - 36:25
frankly [2] - 75:20, 82:25
freely [1] - 39:16
friend [2] - 44:5, 49:17

friend's [1] - 43:7
friends [5] - 59:6, 59:8, 70:22, 71:22, 77:6
front [2] - 16:9, 66:20
full [3] - 4:9, 5:20, 86:6
fully [5] - 70:11, 71:3, 75:17, 79:5, 84:16
furlough [2] - 90:11, 90:15
future [11] - 12:25, 13:4, 13:22, 14:4, 14:8, 14:12, 14:17, 14:19, 78:18, 83:16, 84:23

## G

gained [1] - 71:15
Galena [5] - 40:10, 47:14, 48:10, 48:14, 48:19
general [2] - 56:17, 57:16
General's [1] - 37:11
generally [2] - 81:3, 89:12
generate [1] - 57:23
get [28] - 18:17, 19:21, 20:20, 25:3, 25:6, 29:6, 33:17, 39:13, 52:23, 53:23, 54:4, 54:21, 55:3, 63:24, 64:3, 64:6, 64:9, 64:12, 66:24, 67:10, 68:16, 72:11, 75:8, 80:13, 89:17, 92:15, 92:16, 92:23
gets [4] - 44:21, 44:22, 67:19, 81:9
getting [5] - 34:24, 47:13, 52:18, 62:18, 71:17
girlfriend [3] - 38:4, 70:22, 78:14
give [10] - 19:15, 20:22, 29:21, 57:7, 68:12, 72:8, 72:13, 76:17, 77:17, 91:13
given [5] - 14:12, 87:22, 90:8, 90:13, 91:1
gives [2] - 8:21, 56:19
giving [1] - 74:16
goal [2] - 64:7, 85:3
goals [1] - 86:2
good-bye [1] - 72:9
government [36] - 4:12, 4:16, 9:10, 10:10, 11:25, 14:18, 15:14, 28:17, 29:21, 30:4, 34:10, 35:17, 35:19, 56:18, 57:5, 57:16, 57:21, 58:4, 58:19, 58:21, 58:23, 59:5, 59:13, 60:1, 60:12, 61:5, 61:11, 61:12, 62:9, 63:16, 64:5, 64:16, 67:3, 76:22, 78:12, 91:1
Government [1] - 10:19
Government's [9] - 40:16, 40:18, 41:4, 41:8, 41:24, 42:13, 60:24, 64:23, 65:2
government's [7] - 9:2, 9:9, 11:19, 14:25, 61:9, 61:24,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR     Document 169     Filed 10/27/21     Page 100 of 108

63:14
**grab** [2] - 46:18, 49:21
**graces** [1] - 64:4
**graduating** [1] - 36:25
**grandma** [1] - 72:10
**grant** [3] - 9:8, 90:11, 90:15
**granted** [2] - 39:22, 72:14
**grants** [1] - 88:18
**great** [2] - 70:13, 72:10
**greatly** [1] - 72:17
**greet** [1] - 47:14
**GREGORY** [3] - 2:3, 16:4, 16:15
**Gregory** [10] - 5:12, 15:14, 16:13, 16:14, 26:13, 73:13, 73:14, 74:15, 75:5, 84:7
**Gregory's** [2] - 74:19, 84:7
**groom** [1] - 75:18
**grooming** [6] - 52:16, 52:19, 52:23, 60:15, 61:23, 74:12
**ground** [2] - 81:15, 82:13
**group** [21] - 20:2, 20:7, 20:8, 20:17, 20:18, 20:19, 20:21, 20:23, 20:25, 21:5, 21:11, 21:19, 23:4, 23:6, 32:13, 59:6, 61:18, 61:19, 64:3
**groups** [2] - 20:25, 21:15
**guaranteed** [2] - 29:9, 29:24
**guess** [1] - 53:21
**guessing** [1] - 82:2
**guideline** [20] - 7:20, 7:25, 8:2, 8:6, 8:11, 8:16, 8:25, 9:4, 9:19, 11:5, 81:6, 82:6, 84:23, 85:2, 85:19, 85:23, 86:1, 86:4, 86:5
**guidelines** [20] - 4:18, 7:16, 66:25, 67:1, 67:2, 67:5, 80:20, 80:22, 81:1, 81:2, 81:5, 81:18, 81:21, 81:23, 81:25, 82:5, 82:10, 82:11, 82:12, 83:12
**guilt** [1] - 70:8
**guilty** [11] - 3:12, 3:14, 8:22, 24:23, 31:5, 34:6, 34:8, 74:9, 74:10, 83:25, 84:1
**gun** [1] - 26:21
**guru** [1] - 66:12
**guy** [1] - 25:10

**H**

**H-E-E-R** [1] - 36:7
**half** [2] - 68:21, 72:4, 72:22
**halfway** [1] - 60:19
**hand** [3] - 16:2, 35:21, 94:9
**handle** [2] - 11:14, 56:25
**handled** [1] - 44:22
**handler** [3] - 54:18, 54:20, 54:24
**hands** [9] - 58:18, 58:25, 59:3, 61:8, 69:9, 78:14, 78:18,

85:7, 85:8
**hands-on** [9] - 58:18, 58:25, 59:3, 61:8, 69:9, 78:14, 78:18, 85:7, 85:8
**happen** [4] - 55:18, 65:15, 71:4, 71:19
**happened** [2] - 20:14, 30:23
**happy** [1] - 15:11
**hard** [3] - 66:9, 82:16, 82:17
**hard-core** [1] - 66:9
**harm** [1] - 83:10
**health** [3] - 4:14, 5:11, 5:14
**healthy** [1] - 71:15
**hear** [14] - 14:24, 15:11, 21:9, 31:13, 31:21, 31:22, 36:22, 56:17, 56:21, 56:22, 57:8, 68:25, 69:2
**heard** [9] - 12:11, 25:20, 62:10, 62:11, 69:1, 73:6, 73:7, 73:19, 84:12
**HEARING** [1] - 1:15
**hearing** [22] - 3:5, 5:2, 5:5, 7:15, 9:20, 11:11, 11:15, 19:3, 24:18, 28:4, 69:16, 73:6, 73:9, 76:20, 76:21, 88:7, 92:1, 92:6, 93:4, 94:3, 94:4, 94:5
**hearsay** [1] - 77:7
**hearsay-based** [1] - 77:7
**Heer** [5] - 35:19, 36:6, 36:7, 73:13, 75:10
**HEER** [2] - 2:4, 35:23
**HELD** [1] - 1:16
**held** [3] - 3:1, 27:8, 94:3
**help** [12] - 16:7, 23:21, 28:3, 34:25, 55:11, 63:12, 65:10, 65:14, 67:14, 68:2, 89:9
**helpful** [2] - 67:25, 77:24
**hereby** [3] - 85:16, 88:12, 94:2
**hereto** [1] - 94:8
**heretofore** [1] - 94:3
**herself** [5] - 19:11, 40:6, 41:21, 63:12, 67:14
**hide** [2] - 64:13, 69:9
**higher** [1] - 91:7
**highly** [4] - 23:17, 83:16, 83:18, 86:7
**himself** [8] - 25:5, 60:19, 64:10, 64:14, 72:4, 79:9, 80:1, 80:2
**hired** [1] - 19:1
**history** [15] - 9:12, 9:16, 9:17, 9:18, 34:24, 59:6, 61:1, 62:19, 62:21, 63:15, 77:4, 82:14, 82:21, 83:2
**hold** [1] - 69:21
**home** [1] - 43:23
**homosexuals** [1] - 21:2
**HON** [1] - 1:16
**honest** [2] - 70:25, 71:4
**honestly** [1] - 70:17

**Honor** [45] - 4:11, 4:19, 4:24, 5:3, 5:9, 6:8, 6:17, 7:6, 7:10, 7:13, 9:7, 10:3, 10:6, 10:15, 10:18, 11:23, 12:9, 15:3, 15:5, 15:13, 35:18, 36:10, 46:12, 46:21, 49:19, 56:3, 56:11, 57:1, 57:3, 57:13, 60:10, 62:2, 69:23, 70:7, 71:2, 71:14, 72:1, 72:12, 72:19, 88:17, 88:23, 88:25, 91:19, 91:22, 92:4
**Honorable** [1] - 94:3
**hope** [2] - 71:23, 79:9
**hopeful** [1] - 29:8
**hoping** [5] - 18:14, 29:6, 29:8, 29:21, 29:23
**hotel** [6] - 45:25, 46:5, 46:10, 47:14, 47:24, 48:10
**hour** [2] - 33:15, 49:2
**hours** [10] - 33:14, 39:16, 39:17, 48:15, 48:19, 51:14, 72:23, 76:1
**house** [2] - 43:7, 55:17
**housed** [4] - 16:23, 17:4, 17:12, 18:1
**housekeeping** [1] - 15:1
**housing** [1] - 89:22
**hundred** [1] - 70:8
**hung** [1] - 72:4
**hurt** [2] - 70:19

**I**

**ICAC** [1] - 37:11
**idea** [5] - 34:22, 35:2, 36:23, 52:12, 52:15
**identified** [1] - 80:1
**identify** [3] - 39:11, 39:12, 65:4
**identifying** [1] - 41:2
**III** [2] - 16:14, 16:15
**Illinois** [30] - 5:15, 5:16, 15:19, 36:15, 37:8, 37:11, 37:14, 39:19, 39:22, 44:20, 45:25, 48:16, 50:16, 54:16, 54:17, 54:22, 61:23, 63:3, 63:9, 67:7, 67:15, 67:17, 67:23, 68:4, 68:24, 74:8, 74:9, 74:10, 75:11, 76:13
**image** [1] - 66:17
**images** [19] - 8:17, 8:18, 8:20, 41:21, 44:3, 45:11, 52:6, 53:8, 61:20, 65:20, 66:3, 68:20, 68:23, 69:3, 80:9, 80:19, 80:20, 80:21
**imagine** [1] - 25:14
**immediately** [2] - 70:4, 87:19
**impact** [2] - 70:12, 70:14
**impacted** [1] - 70:23
**import** [1] - 82:22
**importance** [1] - 11:25

**important** [1] - 62:8
**impose** [13] - 3:24, 3:25, 4:1, 4:3, 4:6, 11:20, 12:16, 14:14, 56:24, 84:21, 84:24, 85:3, 87:20
**imposed** [5] - 86:3, 86:13, 88:3, 90:24, 91:14
**impressionable** [1] - 23:18
**imprisoned** [1] - 85:17
**imprisonment** [4] - 9:19, 86:11, 86:12, 86:24
**IN** [2] - 1:1, 94:9
**inaccurate** [1] - 61:2
**incarcerated** [3] - 14:10, 71:6, 72:1
**incest** [1] - 22:25
**incidentally** [1] - 74:6
**including** [2] - 4:17, 84:20
**income** [2] - 13:12, 14:4
**inconsistencies** [1] - 78:8
**inconsistent** [6] - 59:7, 59:14, 59:18, 61:3, 79:14, 89:18
**incredible** [1] - 77:9
**incredibly** [1] - 77:9
**INDEX** [1] - 2:1
**indicate** [2] - 22:17, 53:5
**indicated** [7] - 19:20, 21:14, 23:9, 37:22, 37:24, 44:5, 94:3
**indicates** [3] - 47:18, 58:5, 60:25
**indicating** [2] - 18:18, 39:16
**indictment** [1] - 3:13
**indigent** [8] - 4:4, 11:20, 12:4, 12:15, 12:17, 13:20, 14:5, 87:20
**individual** [13] - 37:22, 37:24, 38:1, 38:2, 38:5, 38:9, 39:8, 40:5, 44:17, 49:9, 58:25, 59:1, 85:24
**individuals** [2] - 21:15, 66:20
**infant** [1] - 8:9
**influence** [1] - 74:25
**influenced** [1] - 90:7
**influences** [1] - 75:3
**informant** [25] - 11:1, 37:25, 38:1, 38:2, 40:5, 40:23, 41:2, 41:14, 41:20, 47:7, 47:12, 47:23, 48:7, 48:10, 48:21, 49:2, 53:11, 53:16, 53:20, 54:11, 54:13, 54:18, 55:20, 62:11, 63:8
**informant's** [2] - 46:3, 54:10
**information** [17] - 12:2, 12:6, 18:5, 18:25, 20:22, 21:21, 22:17, 23:11, 23:16, 23:25, 34:2, 39:2, 39:9, 43:15, 58:3, 58:7, 67:4
**initial** [2] - 36:7, 67:22
**inmate** [4] - 5:12, 17:6, 89:24, 90:6

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 101 of 108

instance [1] - 78:23
instant [2] - 60:16, 61:4
instantaneous [1] - 48:24
instead [1] - 74:3
instructed [1] - 48:21
intelligence [1] - 39:9
intend [2] - 4:22, 5:4
intended [3] - 75:1, 75:15, 75:17
intending [1] - 10:24
intent [2] - 11:12, 11:17
intentional [1] - 80:4
intentionally [1] - 75:18
interest [6] - 21:18, 45:8, 76:3, 79:16, 80:14, 89:19
interested [2] - 74:17, 94:8
interesting [1] - 63:10
interfere [1] - 90:5
Internet [1] - 37:12
interrupt [1] - 33:17
interview [5] - 10:11, 53:5, 53:18, 58:12, 77:3
interviewed [2] - 32:4, 64:17
interviewing [1] - 65:3
intoxication [1] - 63:1
investigation [10] - 3:10, 9:21, 39:4, 42:21, 44:14, 45:8, 45:24, 47:11, 48:4, 78:11
investigations [2] - 36:14, 39:5
investigator [2] - 37:9, 37:14
involved [4] - 7:23, 8:7, 8:12, 71:21
involving [2] - 7:23, 37:15
IOWA [1] - 1:1
Iowa [11] - 1:10, 1:18, 1:24, 16:22, 19:13, 37:22, 44:22, 44:23, 91:10, 94:2, 94:13
issue [4] - 61:6, 64:16, 78:20, 90:19
issued [2] - 41:22, 76:23
issues [7] - 5:7, 11:5, 11:6, 11:9, 14:23, 60:3, 60:9
items [2] - 53:4, 53:6
itself [1] - 40:7

**J**

jail [10] - 26:23, 27:10, 27:12, 28:14, 65:11, 65:13, 65:14, 72:3, 72:12, 84:8
Jail [4] - 16:22, 92:9, 92:18, 92:25
jailhouse [1] - 10:25
January [3] - 17:2, 17:24, 28:24
jeez [1] - 62:12
Jo [3] - 39:18, 41:14, 42:4
job [1] - 67:23
Joel [1] - 70:22

Johm [1] - 65:8
JOHM [1] - 65:9
John [2] - 3:3, 73:4
joined [1] - 20:7
Joshua [4] - 35:19, 36:6, 73:13, 75:10
JOSHUA [3] - 2:4, 35:23, 36:6
journey [1] - 71:2
Jr [2] - 3:4, 73:4
JR [1] - 1:6
Judge [8] - 12:14, 21:8, 35:11, 56:1, 63:4, 64:24, 69:10, 89:2
judge [4] - 26:3, 28:9, 39:22, 89:17
judge's [1] - 89:23
judgment [2] - 85:15, 87:15
June [1] - 6:23
jury [3] - 25:14, 33:3, 33:6
Justice [1] - 71:10
justice [1] - 37:1
justified [2] - 61:25, 81:14
JVTA [1] - 4:2, 6:5, 6:15, 11:21, 12:1, 12:20, 12:24, 14:6, 87:21

**K**

Katie [1] - 70:21
keep [3] - 13:24, 79:22, 80:9
kept [1] - 43:4
kicked [2] - 20:20, 23:6
kicker [1] - 68:22
Kik [7] - 59:12, 64:5, 64:20, 65:3, 79:10, 79:17, 79:24
kill [1] - 67:10
kind [3] - 32:21, 65:4, 88:10
knowing [1] - 79:2
knowingly [1] - 8:3
knowledge [7] - 23:10, 24:4, 47:22, 49:10, 54:7, 54:8, 73:17
known [1] - 49:10
knows [2] - 64:10, 65:12
Korth [2] - 3:9, 88:24

**L**

lady [1] - 20:4
language [1] - 88:10
large [1] - 74:22
largely [3] - 13:16, 45:14, 76:14
last [6] - 6:24, 13:13, 24:5, 28:24, 46:12, 60:22, 68:11, 70:2, 70:5, 71:14
late [3] - 9:2, 43:5, 45:20
Law [1] - 1:12

law [6] - 12:20, 30:10, 36:17, 37:7, 39:10, 76:7
lawyer [3] - 23:14, 25:17, 28:10
leader [8] - 20:8, 20:17, 20:18, 20:19, 21:4, 21:5, 23:5, 32:12
leader's [1] - 23:7
leading [1] - 25:1
learned [1] - 71:13
least [3] - 3:22, 12:21, 13:13, 63:22, 72:8, 76:5, 77:16, 78:5, 84:15
leave [1] - 12:8
leaves [1] - 9:11
lectern [1] - 26:8
led [1] - 71:18
left [3] - 33:11, 56:14, 62:16
legal [1] - 24:10
less [6] - 8:20, 49:13, 68:17, 69:11, 78:18, 80:14
letters [3] - 67:21, 67:24, 82:16
level [6] - 7:19, 8:21, 9:9, 9:11, 9:18, 84:2
liabilities [1] - 13:19
licensed [1] - 19:13
lie [2] - 35:4, 62:13
lied [1] - 64:17
life [12] - 3:22, 24:24, 24:25, 38:3, 47:19, 49:4, 70:25, 71:4, 71:25, 72:5, 82:1, 84:14
likely [4] - 74:1, 79:16, 83:10, 83:19
likewise [2] - 87:22, 88:1
limine [1] - 76:22
limit [2] - 37:25, 38:3
limited [6] - 57:22, 58:6, 61:12, 88:21, 90:25, 91:2
limiting [1] - 90:2
lines [1] - 44:21
Linn [5] - 16:24, 17:4, 92:9, 92:18, 92:25
list [1] - 65:1
listed [1] - 60:7
listened [1] - 50:10
lists [1] - 60:2
live [4] - 50:16, 70:25, 71:4, 71:24
lived [1] - 17:12
living [3] - 13:21, 16:21, 72:18
local [2] - 39:18, 87:3
locate [1] - 39:15
located [1] - 43:8
location [4] - 40:9, 43:3, 79:20, 87:11
Lolita [1] - 66:10
London [1] - 22:20
look [8] - 39:6, 46:1, 51:2, 55:6, 60:7, 66:12, 71:16, 77:5

looking [3] - 59:12, 62:21, 78:24
looks [1] - 47:9
loosely [1] - 45:11
lost [3] - 67:23, 75:23, 76:5
love [3] - 63:19, 63:21
loved [2] - 72:5, 75:21
low [2] - 74:4, 79:22
lying [2] - 35:8, 35:9

**M**

ma'am [6] - 37:16, 42:19, 44:15, 45:1, 47:21, 48:1
machine [1] - 1:20
mad [1] - 67:10
Madam [1] - 30:14
made [14] - 5:13, 9:10, 15:8, 46:1, 59:7, 62:20, 63:14, 66:12, 67:25, 70:2, 70:5, 85:25, 92:11
Madie [1] - 70:21
Madison [1] - 1:12
magistrate [1] - 28:9
maintain [1] - 23:5
Major [1] - 36:15
make [21] - 6:18, 22:12, 34:25, 43:12, 46:1, 56:20, 63:2, 65:3, 65:4, 66:1, 66:15, 71:3, 73:10, 74:1, 75:7, 79:11, 79:22, 89:5, 89:10, 89:12, 90:8
makes [5] - 70:16, 74:22, 80:7, 83:9, 83:10
making [4] - 9:6, 41:3, 50:11, 76:2
male [1] - 38:25
Man [1] - 63:21
Management [1] - 86:23
manager [1] - 46:2
mandatory [11] - 4:1, 4:3, 11:9, 12:3, 18:12, 18:13, 18:16, 18:20, 23:22, 87:2, 90:12
manner [2] - 31:7, 84:2
manufactured [1] - 62:10
March [3] - 59:17, 65:21, 68:17
marijuana [3] - 23:25, 24:3, 61:5
Mark [2] - 3:8, 70:5
MARK [1] - 1:12
marked [4] - 40:15, 40:18, 41:24, 42:13
Marshal [1] - 88:13
marshal [3] - 16:7, 28:19, 28:20
marshals [1] - 92:24
Mary [3] - 46:20, 46:21, 47:3
masochistic [1] - 8:8

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR     Document 169     Filed 10/27/21     Page 102 of 108

**material** [5] - 7:23, 8:7, 8:14, 19:15, 22:14
**materials** [2] - 9:22, 57:24
**matter** [11] - 3:2, 3:4, 9:2, 13:12, 28:10, 34:16, 65:15, 67:17, 73:3, 76:25, 84:9
**matters** [2] - 10:23, 12:12
**mean** [10] - 26:19, 27:9, 29:15, 30:3, 31:19, 45:10, 60:5, 63:7, 67:11, 83:3
**means** [3] - 41:2, 58:11, 79:12
**meant** [4] - 22:6, 38:1, 38:3, 90:10
**medical** [1] - 14:1
**Meditations** [1] - 71:12
**meet** [5] - 38:16, 40:1, 46:6, 47:14, 48:9
**meet-up** [1] - 48:9
**meeting** [1] - 37:23
**meetings** [1] - 28:16
**Megan** [2] - 62:14, 62:17
**memo** [2] - 66:2, 68:12
**memorandum** [5] - 9:23, 10:10, 15:9, 57:6, 57:10
**Men** [1] - 71:12
**mental** [3] - 4:14, 5:11, 5:14
**mention** [1] - 90:10
**mentioned** [7] - 20:9, 20:12, 20:14, 20:24, 21:4, 45:2, 84:6
**Merritt** [3] - 37:19, 54:19, 54:25
**message** [4] - 41:18, 47:18, 47:20, 47:22
**messages** [5] - 40:2, 41:15, 42:23, 43:9, 79:21
**messenger** [2] - 79:10, 79:25
**met** [5] - 28:19, 37:22, 49:14, 71:6
**microphone** [2] - 16:10, 69:25
**mid** [1] - 28:15
**middle** [6] - 36:6, 47:17, 85:18, 85:19, 86:3, 86:4
**might** [5] - 6:9, 6:10, 25:15, 81:18, 89:9
**Mike** [1] - 54:19
**mind** [5] - 75:12, 77:1, 78:24, 82:19, 83:11
**minimization** [1] - 60:21
**minimum** [5] - 18:12, 18:13, 18:16, 18:21, 23:22
**minor** [4] - 7:23, 7:24, 20:10, 79:2
**minute** [1] - 53:11
**minutes** [1] - 72:24
**missed** [1] - 58:9
**mistakes** [1] - 30:11
**mitigating** [5] - 82:15, 82:25, 83:3, 83:21, 85:21

**mitigation** [1] - 82:18
**mixed** [2] - 75:12, 83:24
**modeling** [2] - 52:3, 52:4
**mom** [2] - 61:18, 70:20
**moment** [1] - 74:9
**money** [3] - 13:4, 24:9, 74:3
**monitoring** [1] - 92:21
**Monroe** [2] - 37:3, 37:6
**Montes** [1] - 40:8
**month** [2] - 68:21, 72:4
**months** [7] - 9:19, 29:1, 37:2, 59:11, 71:14, 72:12, 85:18
**morning** [6] - 16:1, 35:20, 43:19, 50:13, 70:2, 70:4
**most** [3] - 24:24, 65:24, 80:12
**mother** [11] - 11:1, 25:18, 35:4, 35:8, 35:9, 58:13, 62:13, 74:24, 77:3, 77:8, 79:2
**motion** [11] - 9:6, 9:9, 9:10, 11:10, 15:7, 19:3, 56:15, 56:17, 56:18, 76:22, 88:18
**motions** [1] - 83:11
**motivation** [1] - 79:7
**move** [5] - 11:17, 14:24, 16:8, 26:8
**movement** [1] - 90:4
**moving** [2] - 10:1, 10:14
**MR** [38] - 2:4, 2:5, 5:22, 6:8, 6:13, 6:17, 6:21, 10:3, 10:18, 10:25, 12:13, 15:5, 15:23, 21:8, 21:12, 24:16, 26:3, 26:9, 26:12, 28:12, 28:13, 30:13, 35:11, 36:20, 46:17, 50:2, 55:25, 56:11, 57:3, 57:11, 62:5, 65:1, 69:24, 89:2, 89:4, 90:17, 91:25, 92:8
**MS** [41] - 2:3, 2:5, 4:11, 4:19, 4:24, 5:3, 5:6, 5:9, 5:17, 9:6, 10:6, 10:15, 11:23, 15:3, 15:13, 15:16, 15:18, 16:19, 21:13, 25:25, 35:14, 35:18, 36:10, 36:12, 46:12, 46:18, 46:21, 46:23, 47:1, 49:19, 49:23, 56:3, 56:8, 57:1, 57:13, 60:6, 60:12, 88:16, 88:23, 92:4, 93:2
**murder** [1] - 67:12
**Murray** [5] - 1:19, 1:23, 94:2, 94:11, 94:12
**must** [8] - 4:1, 87:1, 87:2, 87:3, 87:4, 87:7, 87:14, 87:18
**mutual** [1] - 49:17

**N**

**name** [7] - 16:11, 20:6, 25:20, 36:4, 46:3
**named** [5] - 5:12, 17:6
**Nancy** [1] - 46:20

**narcotics** [4] - 37:5, 37:19, 54:15, 63:11
**nature** [6] - 13:22, 21:1, 31:19, 82:23, 82:24, 90:13
**nearly** [1] - 49:2
**necessarily** [1] - 6:9
**necessary** [2] - 80:21, 86:2
**need** [6] - 6:15, 39:20, 39:21, 40:7, 51:8, 51:18, 56:25, 84:17, 84:20, 85:3, 92:23
**needed** [1] - 25:16
**needs** [3] - 40:5, 72:23, 86:18
**neglected** [1] - 10:22
**nerve** [3] - 75:23, 76:5, 76:8
**never** [10] - 14:2, 35:3, 35:7, 71:19, 72:11, 75:15, 76:1, 78:12, 80:13
**nevertheless** [1] - 14:5
**new** [2] - 19:17, 20:9
**New** [1] - 23:14
**news** [1] - 22:7
**next** [9] - 35:17, 39:4, 39:24, 43:16, 43:19, 54:2, 64:16, 91:11, 91:12
**night** [6] - 6:24, 44:4, 44:7, 47:24, 54:1, 70:3, 70:5
**no-limit** [1] - 37:25, 38:3
**nobody** [3] - 31:13, 31:21, 62:11
**none** [1] - 52:8
**normally** [1] - 80:10
**Northern** [1] - 91:10
**NORTHERN** [1] - 1:1
**note** [4] - 15:18, 59:5, 59:13, 83:14
**noted** [5] - 4:12, 14:18, 15:6, 80:19, 88:5
**notes** [2] - 70:2, 70:5
**nothing** [1] - 29:24, 69:5
**notice** [4] - 45:6, 45:18, 91:9, 91:12
**noticed** [1] - 45:2
**Notification** [1] - 87:8
**November** [6] - 11:12, 11:14, 17:1, 17:23, 28:15, 28:24, 88:7, 91:25
**number** [11] - 3:11, 8:17, 8:18, 49:18, 52:17, 66:3, 71:7, 73:5, 76:23, 84:20, 89:15
**Number** [1] - 3:4
**numerous** [1] - 45:21

**O**

**oath** [2] - 16:3, 35:22
**objection** [4] - 6:2, 10:5, 10:17, 15:20
**objections** [8] - 4:13, 4:16,

5:24, 5:25, 6:6, 6:9, 6:16
**obligation** [1] - 88:9
**observations** [1] - 67:22
**obtain** [5] - 39:23, 80:5, 81:11, 81:16
**obtaining** [2] - 79:9, 81:8
**obvious** [1] - 48:18
**obviously** [5] - 11:24, 38:16, 44:13, 44:24, 61:16
**occasion** [2] - 76:5, 81:22
**occasionally** [1] - 17:11
**occasions** [2] - 81:5, 89:23
**occupation** [1] - 36:13
**occur** [1] - 46:9
**occurred** [1] - 61:22
**October** [2] - 44:18, 94:10
**OF** [1] - 1:1, 1:3
**Offender** [3] - 71:17, 86:23, 87:8
**offender** [26] - 26:24, 27:1, 27:13, 28:1, 30:20, 30:21, 31:2, 31:3, 31:6, 81:4, 87:10, 89:8, 89:20, 89:22
**offenders** [1] - 65:6
**offense** [41] - 6:1, 7:19, 7:23, 8:12, 8:21, 8:22, 9:11, 9:17, 14:1, 24:22, 26:16, 26:20, 54:8, 54:15, 58:19, 58:22, 58:25, 59:3, 60:16, 61:4, 61:8, 63:15, 74:7, 74:8, 74:9, 74:10, 74:14, 78:22, 80:23, 81:7, 81:13, 82:3, 84:4, 84:5, 85:5, 86:8, 86:9, 87:13, 90:13
**offenses** [6] - 60:22, 81:19, 81:23, 83:17, 84:1, 84:22
**offered** [1] - 61:6
**offhand** [1] - 55:5
**Office** [2] - 1:10, 37:11
**office** [13] - 7:17, 7:18, 7:21, 8:1, 8:5, 8:10, 8:15, 8:18, 8:23, 9:13, 13:10, 13:18, 87:9
**OFFICER** [1] - 88:25
**officer** [2] - 79:1, 87:6
**Officer** [2] - 3:9, 88:24
**Offices** [1] - 1:12
**official** [1] - 82:1
**officials** [1] - 89:16
**often** [3] - 78:23, 80:9, 89:18
**once** [4] - 28:19, 34:2, 59:21, 68:3
**one** [33] - 3:13, 6:21, 12:22, 14:14, 18:9, 18:24, 26:15, 26:20, 30:8, 31:22, 34:23, 40:5, 43:18, 43:22, 46:1, 46:2, 46:3, 46:12, 47:15, 49:1, 53:24, 57:21, 59:20, 59:21, 60:8, 62:25, 63:1, 66:17, 81:4, 83:25, 92:16
**ones** [1] - 72:5
**online** [2] - 61:18, 78:23
**open** [2] - 3:1, 17:20

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 103 of 108

**opinion** [10] - 58:17, 61:6, 61:9, 76:25, 77:2, 77:14, 77:15, 77:17, 78:2, 78:16
**opinions** [3] - 58:3, 76:16, 76:18
**opportunity** [14] - 4:9, 5:20, 12:16, 18:2, 19:25, 38:16, 40:1, 40:15, 42:13, 44:24, 56:20, 57:8, 69:17, 76:2
**opposed** [1] - 14:21
**option** [1] - 3:23
**oral** [2] - 38:6, 38:7
**orally** [1] - 57:9
**order** [12] - 39:21, 39:23, 40:4, 40:7, 43:3, 61:19, 75:8, 84:10, 87:15, 88:4, 88:5
**Ordered** [1] - 1:21
**ordered** [3] - 28:9, 86:11, 87:18
**organization** [1] - 69:5
**organize** [2] - 65:25, 80:11
**otherwise** [1] - 52:20
**Out-of-Control** [1] - 71:8
**outbreak** [1] - 90:2
**outstanding** [1] - 88:14
**overstate** [2] - 81:2, 81:18
**overstates** [1] - 81:12
**own** [5] - 40:25, 41:17, 41:22, 52:19, 56:20
**owned** [1] - 30:10

**P**

**page** [22] - 7:17, 40:19, 41:4, 46:17, 46:23, 46:24, 47:4, 47:16, 47:17, 58:10, 59:4, 59:9, 59:10, 59:23, 60:1, 60:6, 60:18, 61:1, 61:6, 62:25, 63:15, 68:12
**PAGE** [1] - 2:2
**pages** [5] - 41:8, 41:9, 41:25, 51:12, 53:24
**PAMurrayReporting@ gmail.com** [1] - 1:25
**pandemic** [2] - 65:24, 90:1
**paragraph** [22] - 4:15, 5:10, 6:2, 6:3, 6:4, 7:18, 7:21, 8:1, 8:5, 8:10, 8:15, 9:14, 13:8, 13:9, 58:20, 60:7, 60:20, 61:3, 86:13, 91:3
**paragraphs** [5] - 4:13, 5:25, 59:14, 62:22, 87:17
**parent** [1] - 34:25
**parole** [1] - 3:19
**part** [11] - 5:2, 15:8, 24:23, 25:22, 44:13, 45:24, 62:18, 70:17, 73:8, 78:5, 90:3
**partial** [1] - 19:16
**participate** [3] - 42:9, 86:19, 86:22

**participated** [1] - 42:17
**participating** [1] - 3:8
**particular** [2] - 28:8, 45:9, 73:14, 73:24, 81:4
**particularly** [1] - 45:7
**parties** [5] - 9:23, 73:6, 88:8, 94:7, 94:8
**party** [1] - 39:20
**past** [1] - 78:15
**Pat** [1] - 3:9
**Patrice** [5] - 1:19, 1:23, 94:2, 94:11, 94:12
**patrol** [2] - 37:4, 37:9
**Paul** [1] - 57:17
**pay** [15] - 4:15, 4:20, 4:22, 6:5, 12:24, 13:2, 13:4, 14:7, 14:13, 14:17, 46:2, 87:18, 87:24, 87:25, 88:2
**paying** [3] - 14:17, 14:20, 24:9
**peculiar** [1] - 41:16
**penalty** [1] - 88:11
**pending** [5] - 6:3, 28:8, 28:9, 84:9, 87:24
**people** [11] - 25:19, 28:6, 31:8, 70:20, 75:14, 78:24, 80:15, 81:20, 81:24, 83:10, 83:12
**people's** [1] - 81:18
**per** [3] - 33:15, 43:25, 66:3
**perceived** [1] - 20:17
**percent** [4] - 66:4, 68:14, 70:8
**perfectly** [1] - 92:5
**performed** [3] - 44:16, 44:19, 77:10
**perhaps** [1] - 84:13
**period** [9] - 14:9, 16:23, 17:10, 17:22, 45:19, 49:7, 59:15, 63:23, 72:3
**persistent** [1] - 85:11
**person** [22] - 20:11, 20:13, 20:16, 20:25, 22:6, 37:24, 38:17, 39:11, 40:2, 40:23, 41:3, 41:19, 41:20, 49:14, 67:25, 68:9, 72:16, 79:8, 80:1, 80:3, 81:13, 82:18
**personal** [2] - 28:7, 55:21
**personally** [4] - 3:7, 39:15, 41:6, 42:1
**perspective** [1] - 66:19
**persuasive** [1] - 77:24
**pertained** [1] - 45:7
**pertaining** [1] - 60:2
**Peyton** [1] - 66:6
**Pfeiler** [3] - 64:17, 65:9, 65:12
**Philippines** [8] - 24:7, 24:11, 25:23, 31:25, 73:25, 74:3, 74:18, 84:10
**phone** [7] - 33:13, 39:17,

41:1, 41:18, 41:23, 42:1, 43:9, 43:13, 43:16, 44:1, 44:3, 44:11, 45:18, 47:6, 49:17, 50:10, 50:12, 51:22, 52:7, 52:11, 52:14, 52:19, 52:20, 53:2, 53:4, 53:7, 53:25, 55:7, 55:17, 66:6, 68:15, 68:24, 79:21, 92:1, 92:11, 92:14
**photo** [2] - 41:1, 41:18
**photographs** [2] - 45:3, 45:13
**photos** [3] - 41:22, 44:9, 44:10
**physical** [1] - 53:10
**physically** [1] - 70:16
**picked** [2] - 40:9, 41:13
**pics** [1] - 20:9
**picture** [3] - 39:7, 40:20, 62:7
**pictures** [2] - 21:24, 43:24
**pistol** [1] - 26:21
**place** [7] - 3:21, 16:3, 35:22, 65:25, 90:7, 94:3, 94:5
**placed** [1] - 86:24
**Plaintiff** [1] - 1:4
**plan** [1] - 22:23
**play** [2] - 23:20, 33:3
**played** [1] - 70:17
**plays** [1] - 77:13
**plea** [6] - 9:1, 33:8, 69:13, 90:25, 91:3, 91:5
**plead** [3] - 18:23, 25:21, 84:1
**pled** [13] - 3:12, 3:14, 8:22, 24:22, 31:5, 33:9, 33:11, 33:21, 33:23, 34:1, 34:6, 34:8, 83:25
**PO** [3] - 1:12, 1:24, 94:13
**point** [21] - 4:21, 4:23, 6:9, 6:16, 13:20, 17:4, 18:25, 19:24, 38:19, 42:20, 57:15, 60:13, 60:17, 60:22, 62:5, 65:15, 74:22, 78:15, 80:7, 84:14, 84:16
**pointed** [3] - 19:12, 67:21, 85:21
**points** [3] - 9:16, 59:25, 60:19
**Police** [6] - 5:15, 36:15, 37:8, 54:16, 54:17, 54:22
**police** [2] - 48:16, 70:10
**policy** [1] - 82:11
**poor** [1] - 67:25
**poorly** [1] - 77:10
**porn** [8] - 20:10, 59:11, 68:23, 70:10, 78:25, 79:1, 79:9, 80:25
**Porn** [2] - 71:9, 71:13
**pornographer** [2] - 68:18, 80:12
**pornographers** [1] - 81:3
**pornography** [32] - 3:15,

18:9, 18:11, 18:20, 52:7, 59:15, 65:23, 65:25, 66:6, 66:8, 66:9, 66:16, 66:18, 68:15, 69:3, 79:16, 79:19, 80:6, 80:10, 80:17, 81:8, 81:10, 81:12, 81:16, 81:18, 83:1, 83:6, 83:9, 83:19, 83:20, 85:9, 85:12
**Pornography** [1] - 4:6
**portion** [2] - 30:15, 74:22
**portions** [2] - 34:24, 53:9
**portrayed** [1] - 8:8
**poses** [1] - 85:6
**position** [9] - 9:2, 11:19, 54:13, 61:9, 61:13, 61:19, 75:22, 85:1, 89:12
**positions** [1] - 52:3
**possess** [1] - 87:4
**possessing** [2] - 18:11, 18:19
**possession** [5] - 8:13, 23:21, 61:5, 62:23, 62:25
**possibility** [2] - 3:19, 28:11
**possible** [4] - 24:7, 47:15, 58:9, 65:8
**possibly** [2] - 20:20, 48:14
**post** [2] - 27:21, 28:6
**posting** [1] - 28:10
**posturing** [1] - 73:23
**potential** [1] - 23:12
**power** [1] - 75:6
**practice** [2] - 19:13, 56:17
**predetermined** [2] - 40:9, 43:3
**preliminary** [1] - 10:23
**preparation** [1] - 9:20
**prepubescent** [2] - 7:23, 45:16
**present** [6] - 3:7, 5:4, 15:19, 60:10, 92:6, 92:7
**presentence** [13] - 3:10, 4:10, 4:17, 6:7, 6:11, 9:21, 12:14, 13:9, 62:22, 67:2, 78:11, 86:14, 87:17
**presided** [1] - 76:20
**pressure** [1] - 19:9
**preteen** [1] - 66:9
**pretrial** [7] - 60:15, 61:22, 74:7, 74:11, 76:10, 84:4, 86:9
**pretty** [2] - 25:14, 49:12
**previous** [1] - 13:11
**previously** [4] - 11:10, 13:22, 21:15, 40:15
**priority** [1] - 14:18
**prison** [6] - 3:19, 3:20, 71:17, 72:6, 72:8, 90:3
**prisoners** [1] - 90:4
**Prisons** [9] - 85:17, 86:16, 86:19, 86:22, 87:10, 89:13, 89:16, 90:1, 92:15
**private** [1] - 31:12

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR     Document 169     Filed 10/27/21     Page 104 of 108

**privilege** [1] - 90:14
**Probation** [1] - 3:9
**PROBATION** [1] - 88:25
**probation** [17] - 3:23, 3:24, 7:16, 7:18, 7:21, 8:1, 8:5, 8:10, 8:15, 8:18, 8:23, 9:13, 13:10, 13:17, 27:17, 87:6, 87:9
**problem** [4] - 15:23, 25:5, 63:4, 78:4
**proceed** [7] - 16:17, 19:12, 19:14, 19:22, 36:9, 39:3, 58:4
**Proceedings** [1] - 93:5
**proceedings** [3] - 3:1, 94:4, 94:5
**process** [1] - 81:24
**production** [1] - 69:9
**profession** [1] - 13:24
**professional** [1] - 58:24
**profile** [3] - 44:8, 45:3, 79:22
**Program** [3] - 71:17, 86:20, 86:23
**program** [3] - 86:21, 89:7, 89:8
**promised** [1] - 29:9
**pronounce** [2] - 72:25, 73:9
**prosecutor** [5] - 19:7, 19:12, 28:20, 62:11, 70:13
**prostitute** [2] - 53:18, 67:13
**protect** [1] - 85:4
**provided** [4] - 10:13, 12:2, 39:2, 70:13
**provider** [1] - 14:1
**providing** [1] - 58:17
**proximity** [1] - 86:17
**PSR** [7] - 58:6, 58:8, 58:17, 58:21, 59:14, 60:20, 61:3
**psychological** [1] - 57:19
**psychologist** [2] - 19:18, 19:23
**psychologists** [1] - 71:7
**PTH** [1] - 66:9
**PTH-C** [1] - 66:9
**pubescent** [1] - 45:16
**public** [2] - 63:1, 85:4
**pull** [1] - 36:3
**punishable** [1] - 3:18
**purpose** [2] - 23:3, 46:5
**purposes** [1] - 58:23
**pursue** [1] - 75:6
**pursuing** [1] - 74:17
**pursuit** [1] - 85:12
**push** [2] - 75:23, 77:11
**pushed** [1] - 79:3
**put** [8] - 26:4, 48:2, 57:5, 57:15, 63:5, 66:18, 67:4, 92:20
**putting** [1] - 27:12

**Q**

**qualifications** [2] - 36:21, 77:20
**qualified** [3] - 44:17, 68:5, 76:25
**qualifying** [1] - 87:13
**questioned** [1] - 78:13
**questions** [6] - 7:9, 7:11, 25:25, 49:20, 58:20, 91:20
**quite** [3] - 13:14, 75:20, 82:25
**quote** [2] - 19:9, 51:11

**R**

**raise** [2] - 16:2, 35:21
**ran** [1] - 39:9
**random** [1] - 31:20
**range** [9] - 8:19, 9:19, 62:1, 84:23, 85:19, 85:23, 86:4, 86:5
**Rapids** [6] - 1:10, 1:18, 1:24, 72:2, 91:11, 94:13
**rather** [1] - 41:20
**RDAP** [1] - 89:7
**reached** [4] - 39:18, 43:6, 77:22, 84:13
**read** [10] - 6:24, 6:25, 22:14, 30:13, 30:16, 47:2, 47:17, 70:12, 71:7
**reading** [1] - 23:15
**real** [7] - 21:3, 21:6, 21:10, 21:16, 47:19, 49:4, 63:4
**reality** [2] - 75:13, 80:18
**realize** [1] - 72:18
**really** [5] - 22:5, 68:10, 72:5, 72:6, 89:17
**reason** [4] - 23:6, 23:7, 25:22, 52:13
**reasons** [2] - 61:24, 69:10
**rebut** [1] - 32:21
**rebuttal** [1] - 11:2
**receipt** [1] - 8:14
**receive** [4] - 9:3, 18:15, 23:21, 80:21
**received** [12] - 9:22, 10:7, 10:8, 10:20, 10:21, 20:9, 21:22, 21:23, 21:25, 22:18, 23:15, 54:25
**receives** [1] - 22:6
**receiving** [3] - 18:9, 41:15
**recent** [1] - 81:22
**recently** [1] - 37:20
**recess** [2] - 73:1, 73:2
**recitation** [1] - 73:18
**recognizance** [1] - 28:7
**recognize** [2] - 40:19, 47:4
**recognizes** [2] - 84:14, 84:17

**recollection** [1] - 12:22
**recommendation** [4] - 89:5, 89:8, 89:11, 89:17
**recommendations** [1] - 89:13
**recommended** [3] - 86:15, 86:18, 86:22
**record** [5] - 6:19, 30:15, 39:10, 76:20, 94:5
**recorded** [2] - 40:6, 55:8
**recording** [1] - 39:21
**recordings** [3] - 42:10, 42:14, 42:17
**records** [2] - 57:22, 58:10, 77:5
**recovered** [2] - 44:13, 53:9
**Recovering** [1] - 71:12
**redeem** [1] - 70:24
**redirect** [2] - 35:13, 56:2
**reduction** [2] - 8:24, 9:4
**redundant** [1] - 57:4
**referred** [7] - 18:7, 18:10, 19:8, 20:5, 38:3, 39:7, 71:9
**referring** [2] - 38:9, 38:13
**reflect** [3] - 41:10, 59:15, 85:4
**reflected** [7] - 59:9, 60:24, 77:14, 78:1, 78:2, 78:10, 85:12
**reflecting** [4] - 5:10, 21:15, 42:5, 42:16
**refrain** [1] - 84:18
**refund** [3] - 19:16, 19:21
**regard** [6] - 11:6, 12:20, 13:1, 73:14, 73:24, 74:19, 75:10, 81:22
**regarding** [6] - 6:4, 11:19, 14:23, 18:2, 56:18, 76:18
**register** [5] - 26:24, 27:1, 27:13, 28:1, 31:6
**registering** [1] - 31:2
**Registration** [1] - 87:8
**registration** [1] - 87:11
**regretful** [1] - 24:24
**regular** [1] - 80:18
**reidentify** [1] - 80:1
**relapsed** [1] - 59:12
**related** [4] - 5:13, 57:20, 84:5, 94:6
**relating** [1] - 20:1
**relation** [1] - 76:22
**relationship** [7] - 53:12, 53:16, 53:19, 53:21, 53:22, 60:3, 60:9
**relative** [1] - 94:7
**relatively** [1] - 58:6
**release** [12] - 3:21, 3:23, 60:15, 61:23, 74:7, 74:11, 76:10, 84:4, 86:9, 86:24, 86:25, 87:1
**released** [2] - 28:5, 28:7

**relevance** [2] - 24:16
**reliability** [1] - 57:20
**reliable** [2] - 78:4, 82:18
**relied** [1] - 77:16
**relies** [1] - 78:5
**reload** [1] - 79:25
**remain** [3] - 15:25, 23:4, 26:7
**remainder** [1] - 60:9
**remained** [1] - 60:23
**remaining** [3] - 15:21, 21:19, 85:11
**remains** [2] - 9:16, 88:14
**remanded** [1] - 88:12
**remember** [6] - 50:5, 51:7, 51:9, 51:11, 53:24, 55:5
**remorseful** [1] - 25:2
**render** [1] - 76:25
**rented** [2] - 45:25, 46:2
**reoffend** [2] - 83:10, 83:19
**repeat** [3] - 50:6, 53:14, 57:14
**report** [29] - 3:10, 4:10, 4:17, 5:21, 6:7, 6:20, 7:4, 7:8, 7:12, 9:22, 13:9, 30:20, 55:6, 58:1, 58:12, 59:17, 62:14, 62:17, 62:22, 77:17, 77:18, 77:21, 77:23, 78:2, 78:5, 78:6, 78:11, 86:14, 87:17
**reported** [2] - 1:19, 94:3
**reporter** [5] - 16:12, 30:16, 35:21, 36:5, 72:23
**Reporter** [5] - 1:20, 1:23, 30:14, 94:2, 94:12
**reports** [2] - 61:12, 77:2
**represent** [1] - 91:16
**represented** [2] - 3:6, 3:8
**request** [6] - 50:20, 50:21, 88:8, 89:24, 90:9, 90:10
**requested** [3] - 30:15, 44:5, 90:8
**requirements** [1] - 87:7
**research** [1] - 77:4
**reside** [1] - 87:11
**Residential** [1] - 86:20
**respect** [17] - 5:10, 5:12, 12:1, 12:5, 18:6, 19:1, 24:1, 24:7, 29:10, 30:12, 45:18, 46:13, 47:10, 57:17, 59:4, 59:25, 61:15
**respond** [3] - 56:20, 57:5, 57:9
**responsibilities** [1] - 30:10
**responsibility** [10] - 8:24, 30:5, 30:19, 30:22, 31:1, 31:5, 32:4, 83:24, 84:3, 86:7
**responsible** [1] - 14:15
**rest** [3] - 12:1, 66:19, 70:22
**resting** [1] - 12:6
**restitution** [15] - 11:9, 11:10, 11:11, 11:13, 11:14, 11:24, 14:15, 14:17, 14:21, 87:24,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 105 of 108

88:4, 88:5, 88:6, 88:9, 92:1
**result** [3] - 34:8, 39:2, 41:20
**resulted** [1] - 9:15
**retrievable** [2] - 66:11, 66:21
**retrieve** [1] - 66:14
**review** [7] - 4:9, 5:20, 40:15, 42:13, 44:24, 58:6, 58:9
**reviewed** [6] - 9:20, 10:12, 57:22, 57:25, 58:8, 58:17
**reviewing** [1] - 44:9
**revisit** [1] - 80:17
**rights** [2] - 88:21, 90:18
**risk** [7] - 58:18, 58:25, 60:8, 78:17, 85:7, 85:8, 85:9
**river** [1] - 43:13
**RMR** [2] - 1:23, 94:12
**rob** [1] - 63:6
**robbery** [3] - 26:19, 26:20, 63:7
**Robert** [2] - 16:13, 16:14
**ROBERT** [1] - 16:14
**robust** [1] - 77:4
**Rockford** [2] - 36:15, 37:10
**Roger** [1] - 57:18
**role** [1] - 23:20
**room** [7] - 32:9, 32:23, 45:25, 46:5, 46:10, 47:24, 48:10
**Rosell** [2] - 76:17, 85:7
**Rosell's** [4] - 77:15, 77:25, 78:1, 78:16
**roughly** [2] - 37:8, 85:18
**rule** [2] - 6:16, 11:13
**ruled** [1] - 11:10
**rules** [1] - 72:14
**Rules** [1] - 24:17
**ruling** [3] - 14:23, 56:14, 76:23
**run** [1] - 39:9
**running** [1] - 48:13

## S

**S.E** [2] - 1:10, 1:18
**sadistic** [1] - 8:8
**samaritan** [2] - 29:11, 29:20
**sample** [1] - 87:5
**sanctions** [1] - 12:17
**satisfactory** [1] - 92:12
**save** [1] - 64:21
**saved** [1] - 44:10
**saw** [4] - 4:13, 5:24, 5:25, 49:16
**scared** [2] - 64:19, 64:20
**scenario** [1] - 67:12
**scenarios** [1] - 21:3
**schedule** [1] - 11:11
**scheduled** [1] - 11:12
**scheduling** [2] - 90:19, 91:24

**Schilling** [1] - 62:20
**school** [2] - 59:9, 77:5
**scoot** [1] - 16:9
**scored** [1] - 9:13
**screen** [4] - 41:1, 41:19, 41:21
**screenshot** [3] - 41:5, 41:17, 66:17
**screenshots** [2] - 41:10, 42:6
**seal** [2] - 10:15, 10:20
**search** [2] - 43:25, 66:8
**searching** [2] - 40:24, 59:22
**seat** [2] - 16:8, 36:1
**seated** [2] - 17:7, 38:10
**second** [4] - 22:16, 52:22, 60:13, 82:2
**second-guessing** [1] - 82:2
**secondly** [1] - 11:25
**section** [9] - 7:20, 7:25, 8:3, 8:7, 8:12, 8:17, 8:25, 9:4, 81:6
**Section** [3] - 85:15, 86:15, 87:22
**Sections** [1] - 3:16
**secure** [1] - 61:19
**security** [2] - 26:6, 86:17
**see** [19] - 11:3, 17:20, 20:11, 30:8, 39:6, 39:19, 44:3, 44:6, 47:19, 60:10, 63:19, 63:21, 63:22, 66:20, 72:11, 80:9, 80:10, 80:15, 80:16
**seeing** [1] - 26:4
**seem** [2] - 22:12, 23:20
**seized** [1] - 51:22
**seizing** [1] - 44:23
**seldom** [1] - 28:6
**self** [3] - 72:8, 90:11, 90:14
**self-surrender** [3] - 72:8, 90:11, 90:14
**selfish** [1] - 70:20
**send** [6] - 6:21, 20:12, 43:25, 63:22, 63:24, 65:17
**sending** [2] - 20:15, 23:4
**sends** [1] - 49:3
**sense** [1] - 82:22
**sent** [16] - 6:23, 20:4, 22:3, 32:8, 32:12, 32:16, 32:19, 32:21, 44:3, 59:12, 59:18, 59:19, 63:25, 65:8, 66:23, 78:25
**sentence** [23] - 3:20, 27:6, 27:7, 27:14, 56:24, 61:15, 62:1, 69:19, 72:25, 73:9, 82:5, 82:6, 82:8, 84:19, 84:21, 84:23, 84:25, 85:2, 85:3, 86:1, 86:3, 90:24, 91:13
**sentenced** [2] - 27:16, 67:19
**SENTENCING** [1] - 1:15
**sentencing** [9] - 3:5, 9:23, 10:10, 15:8, 24:18, 57:6, 58:23, 73:6, 86:2

**separate** [2] - 59:19, 61:17
**September** [11] - 37:18, 39:25, 40:12, 42:2, 42:8, 42:18, 43:2, 45:20, 47:9, 55:9
**Sergeant** [1] - 56:4
**sergeant** [1] - 36:14
**serious** [2] - 81:19, 85:6
**seriousness** [5] - 81:3, 81:12, 82:3, 84:17, 85:4
**served** [2] - 3:20, 86:12
**service** [1] - 8:13
**services** [1] - 91:15
**session** [2] - 50:13, 50:14
**set** [7] - 34:4, 72:14, 86:13, 87:15, 87:16, 91:3, 94:9
**Seventh** [2] - 1:10, 1:17
**several** [3] - 25:18, 48:15, 51:14
**severe** [4] - 84:14, 84:21, 84:25, 85:3
**Sex** [5] - 71:11, 71:12, 71:16, 86:23, 87:7
**sex** [27] - 23:2, 26:16, 26:20, 26:24, 27:1, 27:4, 27:13, 28:1, 30:19, 30:20, 31:2, 31:3, 31:6, 32:1, 37:25, 38:3, 38:6, 38:7, 54:1, 60:21, 65:6, 74:17, 75:22, 76:4, 84:10, 87:10, 89:7
**sexual** [20] - 8:8, 24:14, 24:22, 45:12, 47:15, 58:19, 58:25, 59:3, 61:8, 61:17, 61:21, 74:8, 74:11, 74:12, 75:14, 79:1, 82:23, 82:24, 84:5, 86:9
**Sexual** [1] - 71:8
**shame** [1] - 24:24
**shameful** [1] - 70:14
**share** [4] - 18:5, 18:25, 21:21, 23:11
**shared** [1] - 23:24
**Shorthand** [2] - 1:19, 94:2
**shorthand** [2] - 1:20, 94:4
**shortly** [2] - 33:12, 48:23
**shove** [1] - 75:23
**show** [4] - 41:2, 46:10, 46:14, 82:16
**showed** [2] - 66:2, 72:5
**showing** [1] - 40:18
**shows** [1] - 79:21
**shrugged** [1] - 23:1
**sick** [2] - 64:9, 70:17
**sickness** [2] - 65:5, 83:6
**side** [2] - 23:8, 31:18
**sign** [1] - 40:7
**signed** [3] - 40:5, 43:2, 90:25
**significant** [1] - 49:7
**significantly** [1] - 68:17
**similar** [1] - 85:1
**similarly** [1] - 57:14
**simply** [5] - 12:1, 40:24,

54:17, 58:23, 76:7
**single** [1] - 39:20
**single-party** [1] - 39:20
**sit** [4] - 31:14, 31:15, 31:17
**site** [2] - 20:6, 80:4
**sitting** [1] - 25:13
**situation** [4] - 17:10, 22:13, 23:17, 25:4
**skewed** [2] - 67:5, 67:6
**slap** [1] - 18:17
**sleep** [2] - 70:2, 70:3
**sleeping** [1] - 17:17
**small** [2] - 36:19, 37:2
**Snapchat** [5] - 39:17, 41:10, 41:16, 41:18, 43:9
**Snapchats** [1] - 55:18
**solicit** [1] - 80:5
**solid** [1] - 49:12
**someone** [4] - 52:18, 67:8, 67:10, 83:17
**someplace** [1] - 75:19
**sometime** [1] - 37:18
**sometimes** [7] - 31:14, 31:15, 31:16, 31:17, 31:20, 92:14, 92:15
**somewhat** [3] - 12:20, 14:10, 65:12
**soon** [4] - 25:20, 36:22, 67:19, 69:6
**sore** [1] - 54:2
**sorry** [6] - 21:8, 26:25, 64:24, 70:6, 84:7, 88:1
**sort** [2] - 17:16, 48:9
**sought** [1] - 68:2
**sound** [1] - 25:14
**source** [5] - 37:21, 38:13, 39:3, 40:1
**speaking** [4] - 17:10, 41:3, 42:22, 53:20
**special** [19] - 4:1, 4:3, 4:7, 6:5, 11:7, 11:8, 11:16, 11:21, 12:24, 13:6, 14:22, 40:8, 48:16, 87:16, 87:19, 87:21, 87:25, 89:14
**Special** [4] - 37:19, 40:8, 54:19, 54:24
**specializes** [1] - 34:20
**specific** [2] - 51:11, 90:9
**specifically** [1] - 63:15
**spectrum** [9] - 29:3, 33:3, 34:17, 35:6, 62:6, 75:4, 75:8, 76:19, 77:1
**speed** [1] - 36:21
**spell** [2] - 16:11, 36:4
**spending** [1] - 74:3
**spent** [5] - 65:19, 66:25, 67:3, 67:16, 76:1
**spin** [1] - 22:9
**spoken** [1] - 37:20
**stage** [3] - 4:22, 15:2, 56:13
**stand** [2] - 50:3, 63:18

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR     Document 169     Filed 10/27/21     Page 106 of 108

standard [1] - 87:14
standpoint [1] - 15:1
stands [1] - 78:17
started [2] - 37:1, 68:20
starting [1] - 13:8
State [7] - 5:15, 36:15, 37:8, 54:16, 54:17, 54:22, 94:2
state [14] - 12:21, 16:11, 27:2, 27:23, 27:25, 36:4, 36:16, 39:9, 39:20, 44:21, 48:16, 61:23, 87:3, 87:10
state's [1] - 39:18
state-ran [1] - 39:9
statement [3] - 59:7, 59:17, 59:21
statements [5] - 5:13, 70:12, 74:20
states [1] - 61:2
STATES [2] - 1:1, 1:3
States [15] - 1:11, 3:3, 3:5, 3:6, 3:9, 3:16, 4:8, 73:4, 85:15, 86:14, 87:9, 87:18, 87:22, 88:13, 88:22
statistic [1] - 66:2
statistically [1] - 83:16
statistics [1] - 65:20
status [2] - 11:20, 13:3
statute [2] - 3:18, 3:23
stay [6] - 20:23, 23:7, 32:22, 64:3, 64:7
steadily [1] - 82:15
steady [2] - 67:22, 82:14
step [2] - 35:20, 56:4
stepdad [1] - 70:21
stepmom [1] - 70:21
STIC [2] - 39:9, 39:10
still [7] - 63:18, 74:16, 74:17, 84:8, 85:6, 92:9, 92:18
stipulate [1] - 36:20
stop [1] - 65:4
stopped [1] - 43:8
strategies [1] - 71:15
strike [3] - 24:15, 50:11, 55:24
strong [2] - 50:19, 76:3
struck [1] - 24:21
stuck [1] - 71:22
student [1] - 87:12
studied [1] - 22:14
study [1] - 70:2
stuff [4] - 22:15, 25:21, 65:25, 71:8
subject [2] - 77:19, 78:7
subsequent [1] - 41:8
substance [4] - 13:25, 61:2, 86:21, 87:4
substantially [1] - 76:24
success [1] - 90:2
suffering [2] - 19:10, 83:5
sufficient [2] - 7:4, 84:24
sufficiently [3] - 84:21,

84:25, 85:3
suggest [1] - 75:2
suggested [1] - 84:16
suggests [2] - 74:4, 75:24, 82:7, 84:11
summarized [2] - 9:13, 13:10
superseding [1] - 3:13
supervised [4] - 3:21, 3:22, 86:25, 87:1
supervision [2] - 60:13, 87:15
support [1] - 82:16
supported [2] - 61:10, 71:23
suppose [2] - 63:2, 92:8
supposedly [1] - 55:3
surprised [1] - 79:5
surrender [3] - 72:8, 90:11, 90:14
surveillance [2] - 39:14, 48:16
susceptible [1] - 75:3
sworn [2] - 16:5, 35:24
system [1] - 90:3
System [1] - 71:11

## T

table [3] - 31:15, 31:16, 31:18
taboo [1] - 20:5
talk [22] - 11:16, 25:17, 29:14, 30:23, 31:13, 31:16, 31:17, 31:18, 31:20, 48:12, 53:11, 63:13, 64:13, 66:5, 68:11, 74:8, 76:15, 77:5, 89:15, 90:19, 90:22, 91:24
talked [6] - 6:24, 17:15, 31:19, 37:25, 48:7, 50:3, 63:20, 67:20
talking [11] - 20:16, 33:13, 47:13, 48:6, 50:4, 52:2, 53:1, 66:25, 67:4, 76:1, 84:8
tape [2] - 20:10
Task [2] - 37:11, 37:12
telephone [5] - 3:9, 6:22, 40:3, 44:13, 61:20
tell [11] - 4:20, 6:25, 32:11, 32:18, 35:4, 55:19, 63:10, 69:17, 73:20, 89:16, 91:4
telling [8] - 25:11, 25:12, 29:15, 35:8, 51:7, 53:17, 73:19
tells [1] - 65:9
term [6] - 3:21, 3:25, 85:18, 86:11, 86:12, 86:25
terms [4] - 48:3, 66:8, 84:11, 91:5
terrible [1] - 71:24
testified [6] - 16:6, 35:25,

54:19, 74:16, 76:21, 77:8
testify [6] - 5:15, 34:5, 52:21, 54:9, 54:12, 77:19
testifying [1] - 19:5, 29:10, 29:12, 29:19, 29:20
testimony [14] - 29:7, 62:16, 73:15, 75:10, 76:19, 76:24, 77:8, 77:11, 77:13, 77:14, 77:25, 78:1, 78:2, 84:8
tests [1] - 78:3
text [4] - 22:2, 39:17, 43:9, 50:9
texting [4] - 22:1, 48:25, 49:1, 51:18
THE [90] - 1:1, 1:1, 1:16, 3:2, 4:12, 4:20, 4:25, 5:4, 5:7, 5:16, 5:18, 5:23, 6:12, 6:14, 6:18, 7:2, 7:6, 7:7, 7:10, 7:11, 7:13, 7:14, 9:8, 10:5, 10:7, 10:9, 10:17, 10:19, 10:22, 11:3, 12:10, 12:19, 15:4, 15:6, 15:15, 15:17, 15:22, 15:24, 16:7, 16:13, 16:16, 21:10, 24:17, 26:2, 26:6, 26:10, 28:3, 35:13, 35:15, 35:20, 36:1, 36:3, 36:8, 36:22, 46:16, 46:19, 46:22, 46:25, 49:22, 49:24, 56:2, 56:4, 56:9, 56:12, 57:2, 57:7, 57:12, 60:4, 60:11, 62:3, 64:25, 69:15, 69:23, 70:1, 72:20, 73:3, 88:18, 88:24, 89:1, 89:3, 89:10, 90:21, 91:19, 91:20, 91:22, 91:23, 92:2, 92:5, 92:13, 93:3
theirs [1] - 49:17
theme [1] - 60:23
therapist [1] - 34:20
therapists [1] - 35:5
they've [2] - 70:23, 89:23
thinking [1] - 48:14
thinks [2] - 52:18, 65:13
third [5] - 26:21, 60:7, 60:22, 63:1, 84:2
this' [1] - 22:5
thousand [1] - 33:16
thousands [2] - 66:2, 80:9
three [5] - 3:13, 22:24, 26:14, 59:20, 83:25
three-count [1] - 3:13
three-some [1] - 22:24
throughout [6] - 17:22, 19:24, 42:20, 43:4, 48:6, 60:23
throw [1] - 43:12
timeline [1] - 48:3
timely [1] - 31:7
Title [4] - 3:15, 85:14, 86:14, 87:21
today [11] - 7:11, 10:24, 11:13, 29:7, 40:14, 42:12, 54:9, 70:6, 71:21, 73:12,

91:21
today's [1] - 9:20
toddler [2] - 8:9, 61:18
together [3] - 47:14, 87:16, 88:9
ton [1] - 51:25
took [8] - 30:8, 41:6, 41:22, 42:6, 52:6, 62:19, 66:17, 72:17
top [5] - 17:20, 59:22, 62:1, 85:20, 89:25
total [10] - 9:11, 9:17, 26:14, 28:20, 28:22, 31:10, 37:6, 59:20, 80:20, 90:4
totality [1] - 85:25
totally [1] - 70:7
toward [1] - 14:20
towards [2] - 19:17, 51:15
training [2] - 36:17, 58:14
transcribed [1] - 94:4
transcript [3] - 42:14, 42:17, 94:5
Transcript [2] - 1:21, 1:21
transcripts [1] - 51:12
transmission [1] - 8:14
transmit [1] - 69:7
transported [2] - 40:9, 41:14
Treating [1] - 71:8
Treatment [2] - 71:17, 86:20
treatment [2] - 68:6, 86:21
tremendous [1] - 90:2
trial [9] - 18:15, 28:8, 28:10, 34:4, 34:5, 34:7, 75:2, 76:24, 84:9
tried [2] - 29:14, 68:3
trip [1] - 24:7
troopers [1] - 48:16
trouble [1] - 24:13
troubles [1] - 73:25
troubling [1] - 80:24
true [8] - 27:22, 42:5, 42:16, 45:4, 53:12, 53:15, 64:22, 94:5
truly [1] - 72:16
truth [2] - 73:19, 73:22
try [10] - 22:9, 22:12, 23:16, 39:5, 39:11, 50:15, 65:3, 75:8, 89:17, 89:21
trying [13] - 18:14, 25:3, 25:4, 25:17, 53:23, 63:24, 64:9, 66:15, 67:14, 68:7, 75:18, 79:22
turn [2] - 73:11, 78:21
turned [1] - 32:13
turning [3] - 7:15, 34:5, 78:22
twice [2] - 20:12, 59:20
twins [1] - 23:2
two [19] - 22:24, 23:2, 28:20, 28:21, 28:22, 29:1, 35:4, 48:23, 49:16, 50:13, 55:1,

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*
Case 2:20-cr-01012-CJW-MAR    Document 169    Filed 10/27/21    Page 107 of 108

57:18, 59:19, 61:17, 65:21, 68:19, 72:22, 81:4, 89:2

**two-and-a-half** [1] - 72:22

**type** [9] - 17:9, 17:13, 19:6, 19:7, 19:10, 19:11, 20:7, 21:3, 67:12

## U

**U.S** [2] - 1:10, 87:25
**UK** [1] - 79:2
**ultimate** [1] - 56:16
**ultimately** [7] - 38:10, 39:23, 40:11, 42:9, 45:24, 46:9, 48:20
**unable** [1] - 14:13
**unbeknownst** [1] - 43:7
**unclear** [2] - 58:7, 60:1
**uncommon** [1] - 82:25
**unconvicted** [1] - 58:22
**under** [30] - 3:23, 4:2, 4:4, 7:20, 7:25, 8:2, 8:6, 8:11, 8:16, 8:25, 9:4, 10:15, 10:20, 16:3, 19:9, 35:22, 46:3, 59:6, 60:21, 60:25, 63:15, 74:13, 80:22, 81:15, 86:14, 87:21, 87:25, 89:13, 91:2, 91:5
**undercover** [6] - 37:5, 63:19, 63:24, 66:24, 75:3, 79:1
**understood** [3] - 5:18, 6:14, 78:9
**underwear** [2] - 43:24, 44:3
**unelected** [1] - 82:1
**unfortunately** [1] - 65:24
**UNITED** [2] - 1:1, 1:3
**United** [15] - 1:11, 3:3, 3:5, 3:6, 3:9, 3:16, 4:8, 73:3, 85:15, 86:14, 87:9, 87:18, 87:22, 88:12, 88:22
**universe** [1] - 58:7
**unlawfully** [1] - 87:3
**unless** [3] - 4:3, 12:3, 66:12
**unlike** [2] - 13:24, 28:5
**unplanned** [1] - 43:7
**unquote** [1] - 19:9
**unremorseful** [1] - 24:21
**unusually** [1] - 75:3
**up** [30] - 3:18, 3:22, 3:25, 4:7, 12:7, 14:11, 15:1, 15:9, 16:9, 20:15, 28:24, 30:10, 33:15, 35:20, 36:3, 36:21, 40:9, 41:13, 43:1, 46:10, 48:9, 50:3, 52:22, 54:1, 55:3, 62:12, 74:16, 84:15, 91:1, 91:13
**UPS** [1] - 13:23
**ups** [1] - 72:12
**urged** [4] - 81:1, 82:20, 83:4, 83:22
**use** [7] - 8:12, 52:19, 69:24, 75:18, 81:6, 81:11, 87:4

**used** [3] - 54:17, 81:15, 81:17
**using** [2] - 1:20, 41:17
**UUW** [1] - 26:21

## V

**validate** [1] - 39:6
**valuable** [1] - 72:5
**value** [3] - 24:19, 61:12, 77:12
**variance** [15] - 15:7, 56:15, 56:18, 61:16, 61:25, 65:19, 69:11, 69:13, 81:14, 82:13, 82:20, 83:7, 83:11, 85:22, 86:1
**variances** [1] - 83:13
**varied** [1] - 81:5
**vary** [4] - 81:2, 82:9, 83:4, 83:22
**verbatim** [1] - 51:10
**verification** [1] - 55:22
**verify** [2] - 39:5, 43:14
**versus** [2] - 3:3, 73:4
**Vicky** [1] - 4:5
**victim** [5] - 4:25, 60:18, 60:20, 70:12, 73:7
**victimize** [1] - 85:10
**victims** [2] - 5:1, 14:21
**video** [19] - 10:11, 20:1, 20:15, 21:22, 21:25, 22:18, 23:4, 32:8, 32:16, 32:22, 59:12, 59:18, 59:20, 59:21, 63:25, 64:1, 65:8, 65:16, 66:23
**videos** [8] - 20:4, 59:20, 61:17, 61:21, 63:17, 63:20, 64:21, 78:25
**view** [3] - 74:15, 80:13, 81:9
**viewed** [1] - 44:8
**vigilant** [1] - 79:21
**violate** [1] - 69:12
**violation** [2] - 3:15, 63:11
**violence** [1] - 82:22
**volume** [1] - 68:17
**VPN** [3] - 64:13, 64:14, 69:8
**VS** [1] - 1:5

## W

**walk** [1] - 16:1
**want** [28] - 12:11, 14:20, 18:13, 19:11, 19:14, 19:22, 20:19, 20:20, 30:23, 43:5, 50:16, 50:17, 57:4, 57:15, 62:5, 63:13, 64:6, 64:11, 67:16, 68:1, 68:11, 70:7, 70:9, 71:20, 73:10, 76:15, 90:5, 92:7
**wanted** [16] - 18:23, 18:24,

19:15, 19:21, 20:11, 20:23, 23:7, 24:13, 48:8, 53:12, 53:15, 53:19, 63:8, 63:12, 64:2, 91:24
**warrant** [3] - 44:1, 44:20, 52:24
**warranted** [3] - 12:18, 62:1, 69:14
**Washington** [1] - 1:12
**Web** [1] - 71:10
**website** [1] - 66:16
**week** [3] - 49:11, 49:12, 49:16
**weekend** [1] - 49:15
**weeks** [1] - 72:9
**weight** [5] - 76:17, 77:17, 77:25, 78:19, 82:3
**whatsoever** [1] - 70:18
**WHEREOF** [1] - 94:9
**whole** [4] - 22:4, 23:19, 24:14, 24:25
**wife** [1] - 34:25
**WILLIAMS** [1] - 1:16
**Williams** [1] - 94:3
**willing** [1] - 65:2
**wiped** [1] - 43:16
**Wisconsin** [5] - 1:13, 36:19, 37:2, 37:4, 62:24
**wish** [5] - 5:1, 25:7, 25:8, 26:8, 56:9
**wishes** [2] - 56:23, 73:8
**wishing** [1] - 74:2
**witness** [20] - 5:11, 5:14, 15:12, 15:19, 15:21, 16:5, 19:1, 19:5, 19:15, 25:19, 26:1, 35:16, 35:17, 35:24, 36:2, 46:13, 49:20, 56:5, 75:11, 77:9
**WITNESS** [5] - 2:2, 16:13, 21:10, 36:6, 94:9
**witnesses** [8] - 5:5, 10:24, 15:12, 56:6, 56:10, 61:14, 73:12, 73:14
**woman** [4] - 21:22, 22:18, 22:21, 22:22
**woman's** [1] - 79:20
**Women** [1] - 71:12
**women** [4] - 21:3, 21:6, 21:9, 21:10
**wondering** [2] - 46:14, 48:2
**word** [3] - 50:19, 68:25, 72:13
**words** [2] - 22:11, 63:18
**work** [9] - 14:2, 37:3, 37:7, 41:1, 48:5, 48:6, 48:12, 63:9, 87:12
**worked** [4] - 36:19, 37:2, 37:9, 89:24
**worker** [2] - 82:16, 82:17
**working** [5] - 13:24, 14:1, 55:14, 92:14, 92:22

**worried** [1] - 65:11
**worth** [1] - 51:12
**Wow** [1] - 25:13
**wrist** [1] - 18:17
**writ** [1] - 92:23
**write** [1] - 72:12
**write-ups** [1] - 72:12
**writer** [2] - 12:14, 67:2
**written** [2] - 91:9, 91:12
**wrongfulness** [1] - 84:12
**wrote** [2] - 23:14, 47:22

## Y

**year** [4] - 13:13, 28:24, 28:25, 36:25
**years** [15] - 3:19, 3:22, 3:25, 7:24, 13:13, 24:21, 26:15, 37:5, 37:7, 52:17, 67:23, 69:12, 81:22, 82:17, 86:25
**York** [1] - 23:14

## Z

**Zone** [2] - 36:15, 37:10
**Zoom** [1] - 92:1

*Contact Patrice Murray at PAMurrayReporting@gmail.com*
*for a complete copy of the transcript.*